UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARVIN KEY, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:03CV144(RNC) |
| v. | : | |
| WAL-MART, INC. AND DR. ANTHONY GORDON, | : | |
| Defendants. | : | OCTOBER 30, 2003 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Marvin Key, by and through his undersigned counsel, submits this memorandum of law in support of his motion for summary judgment.

### Preliminary Statement

Plaintiff filed a six count complaint against Defendant Wal-Mart, Inc. ("Wal-Mart") and Defendant Anthony Gordon ("Dr. Gordon") challenging his discharge by Wal-Mart on April 30, 2001, alleging: (1) wrongful discharge in violation of public policy; (2) breach of implied contract; (3) negligent misrepresentation; (4) violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et. seq.*, on the basis of race and retaliation; (5) violation of Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-60 *et seq.*, and (6) violation of CFEPA by Dr. Gordon for aiding and abetting Wal-Mart's violation of that statute. Plaintiff has moved for summary judgment on Counts One and Three of his Complaint.

## Facts

Plaintiff is an Optician licensed by the State of Connecticut. (Parties' Rule 26(f) Report, Undisputed Facts, ¶ 4).[1] Defendant, Wal-Mart, Inc., is a retail company, incorporated in Delaware, doing business in Connecticut. Wal-Mart operates several vision centers within Connecticut including at its North Windham store. (26(f) Undisputed Facts, ¶ ¶ 1 and 2). Plaintiff was employed by Wal-Mart as an Optician in the North Windham vision center from February 7, 2000 to April 30, 2001.

Defendant, Anthony Gordon is an independent licensed Optometrist who provided optometry services in Wal-Mart's North Windham store while Plaintiff was employed there. (26(f) Undisputed Facts, ¶ 3). Pursuant to an agreement between Wal-Mart and Dr. Gordon, Wal-Mart provided its own employees to perform vision screenings for customers and vision pre-testing for Dr. Gordon's patients. (License Agreement between Wal-Mart and Dr. Anthony Gordon, attached as Exhibit 1 to Plaintiff's Rule 56(a) 1 Statement,[2] p. 3 [D00483]; Deposition transcript of Dr. Anthony Gordon, p. 31[3]). Wal-Mart received 10 percent of Dr. Gordon's gross sales receipts in exchange for, inter alia, its provision of "Para-Optometric Services," i.e., provision of Wal-Mart employees for vision testing of Dr. Gordon's patients. (License

---

[1] Hereinafter referred to as "26(f) Undisputed Facts, ¶ __".
[2] Hereinafter referred to as "License Agreement".
[3] Hereinafter referred to as "Gordon Dep., p. ___" (cited pages attached as Exhibit 2 to Plaintiff's Rule 56(a) 1 Statement).

2

Agreement, p. 3 [D00483]; Gordon Dep., p. 109). Dr. Gordon did not employ anyone in his optometry practice at Wal-Mart (Gordon Dep., pp. 33-34). Wal-Mart views private Optometrists as competitors of their vision centers. (Wal-Mart Academy of Vision training manual, p. 18, attached as part of Exhibit 4 toPlaintiff's Rule 56(a) 1 Statement).

Wal-Mart requires its vision center employees (including Plaintiff) to perform two types of vision examinations. (Wal-Mart's Supplemental Response to Plaintiff's First Set of Interrogatories, attached as Exhibit 3 to Plaintiff's Rule 56(a) 1 Statement, #10). Vision screenings are done utilizing: (1) an autorefractor; (2) an eye chart; or (3) a vision screening machine. (*Id.*) According to Wal-Mart's Academy of Vision training manual, vision screenings are performed to "educate the customer about their eye health." (Wal-Mart Vision Academy Training Manual, p. 160, cited pages are attached as Exhibit 4 to Plaintiff's Rule 56(a) 1 Statement.

Vision center employees (including Plaintiff) are also required to perform vision pre-testing. These are performed to gather information to assist the Optometrist in his exam and evaluation of a patient. (Wal-Mart's Supplemental Response to Plaintiff's First Set of Interrogatories, #10). Pre-testing requires the following tests: (1) autorefractor; (2) visual field; (3) ocular pressure (to check for glaucoma); (4) color testing; and (5) depth perception (stereopsis). (*Id.*)

Jerome Ellis was the North Windham vision center manager for Wal-Mart during Plaintiff's employment. Ellis targeted vision center employees to perform between 80 and 100

vision screenings each week during Plaintiff's employment there. (Transcript of deposition of Jenilu Zboray, Wal-Mart Apprentice Optician, p. 55[4]; Transcript of deposition of Jerome Ellis, p. 58[5]). Ellis created a flyer (attached as Exhibit 7 to Plaintiff's Rule 56(a) 1 Statement) which was distributed to Wal-Mart customers by vision center employees (Gordon Dep., pp. 56-58; Ellis Dep., pp. 53-55) captioned "The Doctor Is In" and offered, at the bottom, a coupon which stated: "Complimentary Vision Screening: If your vision isn't as clear as it used to be, take this certificate to the Vision Center for a complimentary screening. It only takes a few minutes to check your vision to ensure it as good as it can be." (Ellis Dep., pp. 52-54). The flyer did not disclose that the screenings would be done by Wal-Mart vision center employees not the referenced "Doctor." (See Exhibit 7 to Plaintiff's Rule 56(a) 1 Statement). Ellis testified that the vision screenings were virtually meaningless. (Ellis Dep., pp. 55-56). Ellis testified that all vision center employees are told to ask the Optometrist questions whenever they are unsure about vision testing. (Ellis Dep., pp. 29-30). The Wal-Mart Academy of Vision training manual directs employees to "discuss the doctor's preferences prior to beginning the pre-testing process." (Exhibit 4 to Plaintiff's Rule 56(a) 1 Statement, p. 162).

On April 27, 2001, while performing a stereopsis test on one of Dr. Gordon's patients, Plaintiff attempted to ask Dr. Gordon questions about the testing. (Gordon Dep., pp. 103-04).

---

[4] Hereinafter referred to as "Zboray Dep., p.___" (cited pages attached as Exhibit 5 to Plaintiff's Rule 56(a) 1 Statement).
[5] Hereinafter referred to as "Ellis Dep., p. ___." (cited pages attached as Exhibit 6 to Plaintiff's Rule 56(a) 1 Statement)

According to Dr. Gordon, Plaintiff inquired "Am I doing this right? Is this what you want? Is this what I'm supposed to do?" and Dr. Gordon did not respond to his questions. (Gordon Dep., pp. 103-104). Dr. Gordon thereafter informed Ellis that the parent of his patient had an issue with Plaintiff. (Gordon Dep., p. 71). Ellis paged Edgar Morales, the store co-manager at North Windham. (Ellis Dep., p. 83). Morales spoke with the parent, Huong Nguyen. (Gordon Dep., p. 81; Deposition Transcript of Edgar Morales, pp. 9-10[6]).

Thereafter, Nguyen made a written report about Plaintiff (attached as Exhibit 9 to Plaintiff's Rule 56(a) 1 Statement). The report stated that: "I was here last year for my oldest daughter. I was impressed with [the] service your company provided to us. So today (4/27/01) I had [an] appointment for my twins but I was very worr[ied] because Marvin gave me the impression that he does not know what he's doing. First he asked me who's Kimi and who's Harrison? (my twins are boy and girl). Second, he started to exam Kimi's eyes but he asked Doctor Gordon all the questions even before he started with Kimi [and] I was very concern[ed] because Marvin had his optical license tag on but to me I was too concern[ed] I had to ask Dr. Gordon in front of Marvin that he knew what's he doing. Last, while Dr. Gordon started to exam Kimi, he [had] to go back and forth to ask Marvin questions. In my mind I was going to walk out and will go back to [sic] Dr. Omolk in Glastonbury. But I [was] very glad that Dr. Gordon brought this matter to the managers. Thank you." (Ngyuen report, attached as Exhibit 9 to

---

[6] Hereinafter referred to as "Morales Dep., p. ____" (cited pages are attached as Exhibit 8 to Plaintiff's Rule 56(a) 1 Statement).

5

Plaintiff's Rule 56(a) 1 Statement). Nguyen testified that she brought her twins to Wal-Mart for eye exams and glasses because it was cheaper than at other vision stores. (Deposition Transcript of Huong Nguyen,[7] pp. 38-39, 73).

On Monday, April 30, 2001, Plaintiff was told that his employment was being terminated because of Nguyen's report. (Morales dep., pp. 23-24; Exit Interview Form, attached as Exhibit 11 to Plaintiff's Rule 56(a) 1 Statement). Wal-Mart claims that Roger Noll, Store Manager of the North Windham store, made the decision to terminate Plaintiff's employment. (Deposition Transcript of Roger Noll, p. 19[8]). Noll did not review Plaintiff's personnel file in making his decision, but did read Nguyen's report. (Noll Dep., pp. 20-24). It is not Wal-Mart's policy to discharge or discipline employees for customer complaints when the employee acted as instructed by Wal-Mart. (Morales Dep., pp. 34-35).

### Standard for Summary Judgment

Rule 56 (c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where there exists "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); *see also Bishop v. National Health Insurance Co.*, 344 F.3d 305, 307 (2nd. Cir. 2003). In *Anderson v. Rochester-Genesee Regional Transportation Authority*, 337 F.3d 201 (2nd

---

[7] Hereinafter referred to as "Nguyen Dep., p. ___" (cited pages are attached as Exhibit 10 to Plaintiff's Rule 56(a) 1 Statement).

[8] Hereinafter referred to as "Noll Dep., p. ___" (cited pages attached as Exhibit 12 to Plaintiff's Rule 56(a) 1 Statement).

Cir. 2003), the Second Circuit upheld a grant of summary judgment to the plaintiffs on their claims that the defendants had violated the American's with Disabilities Act (ADA) by failing to provide paratransit transportation. In doing so, the Court determined the issues of law and then applied the facts documented by the parties' submissions in connection with the motion. *Id.* at 203, fn. 1. Specifically relying on the defendant's documentation of their business and practices, the Court found that defendant's violation of the ADA provisions had been established. *Id.* at 213. A similar resolution is appropriate in this case.

## ARGUMENT

### Point I

### PLAINTIFF IS ENTITLED TO SUMMARY JUDGEMENT ON HIS WRONGFUL DISCHARGE CLAIM IN COUNT ONE

**A.    Public Policy Exception to Employment At-Will Doctrine Under Connecticut Law**

Connecticut recognizes a common law cause of action for wrongful discharge where the reason for the discharge was based on an impropriety derived from some important violation of public policy. *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 480, 427 A.2d 385 (1980); *see also Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 698-99, 802 A.2d 731 (2002); *Faulkner v. Sikorsky Aircraft, United Technologies Corp.*, 240 Conn. 576, 580-81, 693 A.2d 293 (1997). In *Sheets*, the court balanced the competing interests of employers and employees, stating: "We are mindful that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation. We are, however, equally

mindful that the myriad of employees without the bargaining power to command employment contracts for a definite term are entitled to a modicum of judicial protection when their conduct as good citizens is punished by their employers." *Sheets*, 179 Conn. at 477; *see also Morris v. Hartford Courant Co.*, 200 Conn. 676, 679, 513 A.2d 66 (1986) (employee job security protected against *employer action* that contravenes public policy).

Connecticut has recognized the "inherent vagueness of the concept of public policy and the difficulty encountered when attempting to define precisely the contours of the public policy exception. In evaluating claims, Connecticut courts look to see whether "the plaintiff has . . . alleged that his discharge violated any explicit statutory or constitutional provision . . . or whether he alleged that his dismissal contravened any judicially conceived notion of public policy." *Faulkner*, 240 Conn. at 581 (internal quotation marks omitted.). When a relevant state statute exists, courts should not ignore the statement of public policy that it represents. *See Faulkner*, 240 Conn. at 583; *Sheets*, 179 Conn. at 480.

Wal-Mart argued in its motion to dismiss Plaintiff's public policy discharge claim that such a claim is cognizable only when an employee is discharged for: (1) complaining about or refusing to perform an illegal act[9], or (2) exercising legal rights in connection with the employment. Defendant's motion to dismiss was denied, and under Connecticut law, there is no such requirement. First, if the Connecticut Supreme Court contemplated such a restriction on the

8

public policy claim, it has had ample opportunity to articulate it, but has never done so despite having heard many such claims since *Sheets* was decided. *See e.g. Cimochowski v. Hartford Public Schools,* 261 Conn. 287, 802 A.2d 800 (2002); *Thibodeau, supra; Burhnam v. Karl and Gelb, P.C.,* 252 Conn. 153, 745 A.2d 178 (2000); *Daley v. Aetna Life and Cas. Co.,* 249 Conn. 766, 734 A.2d 112 (1999); *Parsons v. United Technologies Corp.,* 243 Conn. 66, 700 A.2d 655 (1997); *Faulkner, supra; Antinerella v. Rioux,* 229 Conn. 479, 642 A.2d 699 (1994), *overruled on other grounds by, Miller v. Egan,* 265 Conn. 301, 828 A.2d 549 (2003); *Tomlinson v. Board of Education,* 226 Conn. 704, 629 A.2d 333 (1993); *Carbone v. Atlantic Richfield Co.,* 204 Conn. 460, 528 A.2d 1137 (1987); *Morris v. Hartford Courant Co.,* 200 Conn. 676, 513 A.2d 66 (1986); *Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 479 A.2d 781 (1984). Rather, it has continued to adhere to the much broader definition of the claim as set forth in *Sheets* - - a discharge based on an impropriety derived from some important violation of public policy – which focuses on the employer's actions not the employee's and firmly contemplates violations where there has been no complaint about or refusal to perform an illegal act.

Indeed, in *Sheets*, the plaintiff employee simply communicated to his employer that he believed certain practices were in violation of the Connecticut Uniform Food, Drug and Cosmetic Act, although he never complained about performing or refused to perform any act

---

[9] Plaintiff does not concede as a factual matter that he never complained about or refused to perform the eye exams he claims are illegal and resulted in his discharge. However, that is a question of fact which cannot be disposed of by motion for summary judgment and, thus, is not addressed herein.

required by his employer. The Court noted that the plaintiff "was actually dismissed in retaliation for his efforts to ensure that the defendant's products would comply with the applicable law relating to labeling and licensing." *Sheets*, 179 Conn. at 473.

Similarly, in *Schmidt v. Yardney Electric Corp.*, 4 Conn. App. 69, 492 A.2d 512 (1985), the Connecticut Appellate Court sustained a wrongful discharge claim brought by an employee who had admittedly participated in the employer's activity from which the public policy claim arose. The Appellate Court stated:

> The allegations necessarily implied and the plaintiff could fairly prove under these allegations that the fraudulent insurance claim was presented and paid by Yardney's insurer, and that his motivation in cooperating with the auditors was, at least in part, to help redress the fraud in which he participated on orders of Yardney's president. His allegations imply, in this connection, that Yardney desired to keep that fraud a secret and that his dismissal was in retaliation for helping bring it to light.

Applying a standard comparable to that set forth in *Sheets*, other states recognizing a public policy exception to the employment at-will doctrine have held that terminating employment for an employee's performance of an act that public policy would encourage is actionable as a wrongful discharge. *See Smith v. Farmers Co-op Assoc. of Butler*, 825 P.2d 1323 (Okla., 1992) (copy attached) (employee cannot be terminated for acting in the public's interest in passing on zoning variance application in his outside capacity as zoning commissioner); *Cloutier v. The Great Atlantic & Pac. Tea Co., Inc.*, 121 N.H. 915, 436 A.2d 1140 (1981) (copy

attached) (actions by plaintiff in furtherance of employee safety concerns could not be used as grounds for discharge).

Thus, the question for the Court's determination on this motion is whether the undisputed and indisputable facts establish that Plaintiff was discharged as a result of Wal-Mart's unlawful acts and/or for acting in a matter that public policy would encourage. Wal-Mart admits that it discharged Plaintiff for Nguyen's report. It is indisputable that the report would not have been written if Plaintiff had not been performing the vision pre-testing on her daughter and if Plaintiff had not questioned Dr. Gordon to ensure he was doing the pre-testing as Dr. Gordon wanted. As set forth below, Connecticut licensing laws require that such pre-testing be done by a licensed optometrist or certain of their trained employees; Plaintiff was neither. Wal-Mart's practice of requiring its employees to perform vision testing thwarted the Connecticut licensing requirements and allowed Wal-Mart to create a more competitive joint venture with its resident optometrists who are, by law, required to be independent and to hire their own employees for such testing. By increasing its competitive edge through these means, Wal-Mart also violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42-110b ("CUTPA"). Discharging Plaintiff as a direct result of these violations of law by Wal-Mart indisputably involves an *impropriety* derived from an important *violation of public policy, Sheets, supra,* and summary judgment should be granted. *Id.*

### B.      Wal-Mart Actions in Violation of Connecticut's Licensing Requirements

The practice of optometry includes "the examination of the human eye and eyelid for the purpose of diagnosis [and] treatment" and "the use of tests, instruments, devices . . . and noninvasive procedures for the purpose of investigation, examination, diagnosis, treatment . . . or correction . . . of visual defects, abnormal conditions or diseases of the human eye and eyelid." Conn. Gen. Stat. § 20-127 (a) (3). Connecticut permits only a licensed optometrist to engage in the practice of optometry. Conn. Gen. Stat. § 20-138a; *see also* Conn. Gen. Stat. § 20-127 (a) (2). While Connecticut law allows some optometric services to be delegated by an optometrist to "either a trained optometric assistant or optometric technician [,s]uch delegated services shall be performed only under the supervision, control, and responsibility of the licensed optometrist, except that optometric assistants and optometric technicians shall not be authorized to . . . detect eye health . . . ." Conn. Gen. Stat. § 20-138a. To be an optometric assistant, the individual must be employed by a licensed optometrist. *Id.*[10] Plaintiff and other opticians employed by Wal-Mart do not meet the definition of optometric assistant or technician because they do not have the training required nor are they employed by an optometrist. Conn. Gen. Stat. §20-146(b).

---

[10] The statute provides that:
   (b) For the purposes of this section: (1) "Optometric assistant" means a person who has either completed two hundred hours of on-the-job training, an affidavit in support of which shall be kept by the *employing* optometrist on the premises, or graduated from a vocational program in optometric technicianry; (2) "optometric assistant trainee" means a person who has completed less than two hundred hours of on-the-job training and who is under the direct supervision, control and responsibility of an *employing*, licensed optometrist when performing optometric services which may be delegated to optometric assistants and to optometric technicians.... Conn. Gen. Stat. §20-146(b)

Conversely, licensing as an optician allows an individual to "produce or reproduce ophthalmic lenses and similar products or mount the same to supporting materials or fit the same by mechanical manipulation, molding techniques or other related functions . . ." which does not include vision screenings and vision pre-testing. Conn. Gen. Stat. § 20-146a.

Although Wal-Mart's customers may not have known the difference and may have been led to believe otherwise by the vision center flyers, Plaintiff and the other Wal-Mart Vision Center employees required to perform vision screenings and pre-testing are not licensed or authorized to do so under the Connecticut licensing statutes. If Plaintiff had not been required to conduct the unlawful testing, Nguyen's report, which Wal-Mart advances as the reason for his discharge, would not have been written. Moreover, by seeking the assistance of Dr. Gordon, the optometrist, in connection with the vision pre-tests he was performing on April 27, 2001, Plaintiff was acting consistently with the optometrist oversight mandated by the licensing statute in furtherance of the patient's well-being. Discharging Plaintiff because a customer became unsettled by the revelation that Plaintiff was not what Wal-Mart had held him out to be is patently improper. It involves an important violation of the public policy set forth in the licensing requirements and is, indeed, in direct violation of it. *Sheets, supra.*

C. **Wal-Mart's Actions in Violation of CUTPA**

The practice which resulted in Plaintiff's discharge also violates CUTPA and the public policy set forth therein. CUTPA provides, in relevant part, that: "No person shall engage in unfair methods of competition and unfair or deceptive practices in the conduct of any trade or

commerce." Conn. Gen. Stat. § 42-110b (a). "It is well settled that in determining whether [an act or] practice violates CUTPA [Connecticut has] adopted the criteria set out in the cigarette rule by the federal trade commission for determining when [an act or] practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]." *Jacobs v. Healy Ford-Subaru, Inc.*, 231 Conn. 707, 725, 652 A.2d 496 (1995); see *Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038 (2nd Cir. 1995). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." *Saturn Construction Co. v. Premier Roofing Co.*, 238 Conn. 293, 311, 680 A.2d 1274 (1996).

Connecticut courts have recognized that a business can violate CUTPA by engaging in unlawful acts which result in that business obtaining an advantage over competitors and/or harm to a consumer. For example, in *Schultz v. Direct Mail Services, Inc.*, No. CV93-0305653S, 1995 WL 23533 (Conn. Super. Jan. 3, 1995) (Vertefeuille, J.) (copy attached), the plaintiff and defendant company engaged in a business arrangement whereby they rendered different, but

14

related, services to customers seeking direct mail assistance at a single site. The plaintiff provided data processing while the defendant provided letter shop to customers. The defendant later terminated the arrangement. When the plaintiff retrieved his computer equipment from the defendant's premises one month later, the information necessary to his data processing business was erased. The facts demonstrated that the defendant had used the erased information and the plaintiff's computers to continue operation of the plaintiff's data processing enterprise. The court awarded the Plaintiff a prejudgment remedy finding probable cause to believe the plaintiff would prevail on his claim that defendant had engaged in the crime of larceny and that its actions thereby precluded the plaintiff from competing in the marketplace in violation of CUTPA.

Similarly, in *Aldin Associates Limited Partnership v. McNeil*, No. CV98-0409480, 2003 WL 21101056, 34 Conn L. Rptr. 457, (Conn. Super. April 28, 2003) (Licari, J.) (copy attached), the plaintiffs and defendant were direct competitors in the operation of adjacent retail gasoline stations. The plaintiffs alleged a violation of CUTPA by the defendant's negligently contaminating the soil and ground water of the plaintiff's property, causing the plaintiffs to suffer remedial costs, a decrease in the value of their property and business. In denying the defendant's motion to strike, the court held that the complaint sufficiently alleged that "the defendants have gained an unfair competitive advantage as a result of their negligence" in violation of CUTPA.

As in the above cases, Wal-Mart's challenged practice was based on unlawful and illegal conduct in requiring its personnel to perform eye examinations in violation of the applicable

licensing statute. The established facts show that Wal-Mart made it appear as if those services would be performed by a doctor of optometry when they were actually done by Wal-Mart employees. Wal-Mart utilized licensed opticians who wear "Licensed Optician" badges, which according to Nguyen's report, made her believe that the vision pre-testing was being conducted by employees licensed to do so when, in fact, they were not. In this way, Wal-Mart's practice was deceptive and harmful to consumers.

By its practice, Wal-Mart also gained an unfair advantage over its competitors which admittedly include private Optometrists who, consistent with the licensing statutes, hire their own optometric assistants to perform vision screenings and pre-testing. By using its opticians to perform pre-testing for the optometrist who is supposed to be "independent" from the retail vision center[11] as well as to make, fit and sell eyeglasses, Wal-Mart's arrangement allows their optometrists to charge lower fees, attracting more customers to Wal-Mart, because the optometrists do not have to hire anyone. Since Wal-Mart also receives a share of the optometrists' profits, it benefits in this way as well. Those who obey the licensing statutes and maintain the independence of the optometric practice allow only the optometrist or personnel employed by the optometrist to perform the eye exams. They use their own employee licensed opticians to make and fit the eyeglasses they sell. The competitive advantage is obvious. Wal-Mart can attract more customers with lower prices, as testified to by Nguyen, but only as a result

---

[11] Section 20-133a of the Connecticut General Statutes provides: <u>Restrictions on employment of optometrists.</u> No licensed optometrist shall practice his profession as an employee of any unlicensed person, firm or corporation....

of its ignoring the licensing requirements and the public policy those requirements express. This violates CUTPA and the public policy expressed therein. Since Plaintiff's discharge was a direct result of the practice, it is established that it was for a reason whose impropriety involves a violation of public policy and summary judgment should be granted on Plaintiff's wrongful discharge claim in Count One. *Sheets, supra.*

### Point II

### PLAINTIFF IS ENTITLED TO SUMMARY JUDGEMENT ON HIS NEGLIGENT MISREPRESENTATION CLAIM IN COUNT THREE

Connecticut recognizes a cause of action of negligent misrepresentation. "The governing principles are set forth in similar terms in § 552 of the Restatement (Second) of Torts (1977): One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Craine v. Trinity College*, 259 Conn. 625, 660-61, 791 A.2d 518 (2002); see also *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 217-18, 520 A.2d 217 (1987). In the employment context, claims of negligent misrepresentation have been upheld where, as here, an employee has relied and acted upon directives of the employer which result in the loss of employment or a related benefit.

In *Craine v. Trinity College*, 259 Conn. 625, 791 A.2d 518 (2002), the defendant employer was found to be liable for negligent misrepresentation, where, in a letter of reappointment to the faculty, the defendant suggested that the plaintiff devote her scholarly energies to original research and publication and to continue along the lines she was currently pursuing. The defendant subsequently denied plaintiff tenure on the grounds that her research was not enough to satisfy the tenure requirement. The court held that "the jury reasonably could have found that the second letter of reappointment negligently misrepresented that as long as the plaintiff devoted her time and energy to the publication process, tenure would be forthcoming." Similarly, in *Patterson v. Sunrise Healthcare*, No. CV328870, 1996 WL 409297 (Conn. Super. Jun. 27, 1996) (Ballen, J.) (copy attached), the defendant encouraged its employees to bring complaints to its attention, but when the plaintiff did so, she was retaliated against. The court held that establishing those facts would be sufficient to support a cause of action based on negligent misrepresentation.

The established facts in the present case dictate a finding of liability on Plaintiff's negligent misrepresentation claim. Ellis testified that vision center employees were instructed to ask the optometrist questions whenever they were unsure about the vision testing. Wal-Mart vision center training materials encourage employees to discuss the procedures with the optometrist prior to performing them. There is also no question but that when Plaintiff followed Ellis' directions to ask Dr. Gordon for assistance, it resulted in a customer report for which Plaintiff was subsequently terminated. Clearly, in instructing vision center employees to ask the

optometrist questions, Wal-Mart misrepresented that such an action was acceptable and encouraged. Wal-Mart was negligent in providing this information which was false and upon which Plaintiff obviously relied in questioning Dr. Gordon on April 27, 2001 as a result of which he was discharged from his employment. Summary judgment should be granted on Count Three. *D'Ulisse-Cupo, supra.*

## CONCLUSION

For all the foregoing reasons, Plaintiff's motion for summary judgment should be granted in all respects.

Done at Bridgeport, Connecticut, this 30th day of October, 2003.

                                     Loraine M. Cortese-Costa, Esq.
                                     DURANT, NICHOLS, HOUSTON,
                                     HODGSON & CORTESE-COSTA, P.C.
                                     1057 Broad Street
                                     Bridgeport, CT 06604
                                     Tel. No. (203) 366-3438
                                     Federal Bar No. ct03984

                                     ATTORNEYS FOR PLAINTIFF

## **CERTIFICATION**

This is to certify that I have caused to be served, this 30th day of October, 2003, the above and foregoing via U.S. Mail, Certified Mail, Return Receipt Requested, to the following counsel and pro se parties of record:

Gregory Reilly, Esq.
Brown Raysman Millstein Felder & Steiner, LLP
900 Third Avenue
New York, NY 10022

Loraine M. Cortese-Costa, Esq.

P:\lit\pd\523818\001\00036374.DOC

20