UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------X
MARVIN KEY,                           :
                                      :   CIVIL ACTION NO.:
                    Plaintiff,        :   3:03CV144(RNC)
                                      :
        v.                            :
                                      :
WAL-MART, INC. AND DR. ANTHONY        :
GORDON,                               :
                                      :
                    Defendants.       :   December 8, 2003
---------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Brown Raysman Millstein Felder &
  Steiner LLP
Gregory B. Reilly, Esq.
Federal Bar No. ct07101
900 Third Avenue
New York, New York 10022
(212) 895-2000

City Place II
185 Asylum Street
Hartford, CT  06103
(860) 275-6400
Attorneys for Defendant

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ........................................................................................1
II.  SUMMARY OF FACTS .....................................................................................................3
     A.   Plaintiff's Hiring, Job Duties and Training...............................................................3
     B.   The Progressive Discipline of Plaintiff....................................................................5
          (a) Verbal Coachings ...........................................................................................6
          (b) July 13, 2000 Written Warning......................................................................6
          (c) November 4, 2000 Decision-Making Day.....................................................7
          (d) Events of April 27, 2001 ................................................................................8
          (e) Plaintiff's Termination and Exit Interview..................................................10
          (f) Plaintiff's Post-Termination Actions ...........................................................11
          (g) Plaintiff's Allegations of An Alleged Public Policy Violation.....................11
          (h) Plaintiff's CTDOH Complaint .....................................................................13
III. THE COURT SHOULD GRANT THE DEFENDANTS SUMMARY JUDGMENT.....13
     A.   THE SUMMARY JUDGMENT STANDARD......................................................13
     B.   COUNT ONE – THE COURT SHOULD GRANT SUMMARY JUDGMENT
          DISMISSING PLAINTIFF'S CLAIM THAT HE WAS TERMINATED IN
          VIOLATION OF PUBLIC POLICY........................................................................14
     C.   COUNT TWO – THE COURT SHOULD GRANT SUMMARY JUDGMENT
          DISMISSING PLAINTIFF'S CLAIM AGAINST WAL-MART FOR BREACH
          OF CONTRACT.......................................................................................................19
     D.   COUNT THREE – THE COURT SHOULD GRANT SUMMARY JUDGMENT
          DISMISSING PLAINTIFF'S CLAIM AGAINST WAL-MART FOR
          NEGLIGENT MISREPRESENTATION................................................................20
     E.   COUNTS FOUR AND FIVE – THE COURT SHOULD GRANT SUMMARY
          JUDGMENT DISMISSING PLAINTIFF'S RACE DISCRIMINATION
          CLAIMS ...................................................................................................................21
     F.   COUNT SIX – THE COURT SHOULD GRANT SUMMARY JUDGMENT
          DISMISSING PLAINTIFF'S CLAIM AGAINST DEFENDANT DR. GORDON
          FOR ALLEGED AIDING AND ABETTING OF RACE DISCRIMINATION ..29
IV.  THE COURT SHOULD DENY PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
     JUDGMENT........................................................................................................................30
     A.   The Court Should Deny Plaintiff's Motion for Summary Judgment With Respect
          to Count One of the Complaint...............................................................................31
     B.   The Court Should Deny Plaintiff's Motion for Summary Judgment With Respect
          to Count Three of the Complaint ............................................................................32
V.   CONCLUSION...................................................................................................................34

# **TABLE OF AUTHORITIES**

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). .................................................. 13, 14

*Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999) .............................................. 22, 25

*Burrell v. Bentsen*, 91 Civ. 2654, 1993 WL 535076 at *8 (S.D.N.Y. Dec. 21, 1993) .................. 26

*Burnham v. Karl & Gelb, P.C.*, 252 Conn. 153 (2000) .................................................................. 15

*Campbell v. Town of Plymouth*, 74 Conn. App. 67, 74 (2002) ..................................................... 19

*Carbone v. Atlantic Richfield Co.*, 204 Conn. 460, 470 (1987) .............................................. 14, 32

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ..................................................................... 13

*Chi Ho Lin v. New York City Admin. For Children's Services*,
  2003 WL 21973361, *2, n. 2, (S.D.N.Y. Aug 19, 2003) ............................................................ 28

*Cunliffe v. Sikorsky Aircraft Corp.*, 9 F. Supp. 2d 125,132 (D.Conn. 1998) ................................ 25

*Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ................................................. 26

*Davis v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) ......................................................... 27

*Dister v. Continental Airlines*, 859 F.2d 1108 at 1116 ................................................................. 25

*D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*,
  202 Conn. 206, 217-18 (1987) .................................................................................................... 20

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992),
  cert. denied, 510 U.S. 826 (1993) ............................................................................................... 27

*Faulkner v. United Technologies Corp.*, 240 Conn. 576 (1997) ................................................... 14

*Fisher v. Jackson*, 142 Conn. 734, 736 (1955) .................................................................. 19, 22, 29

*Fisher v. Vassar College*, 114 F.3d 1332, 1344 (2d Cir. 1997) ............................................. 23, 29

*Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) .............. 14

*Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996),
  cert. denied, 520 U.S. 1228 (1997) ............................................................................................. 22

*Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1266 (7th Cir. 1993),
  cert. denied, 511 U.S. 1005 (1994) ............................................................................................. 27

*Ishman v. National Biological Corp.*, 53 F. Supp. 2d 970 (N.D. Ohio 1999) .............................. 23

*Jones v. Bessemer Carraway Medical Center*,
  137 F.3d 1306, 1311, 1313 (11th Cir. 1998) ......................................................................... 23, 24

*Kronholtz v. Connecticut State Board of Examiners in Optometry,*
21 Conn. Supp. 332, 340, 154 A.2d 619, 624 (1959) .................................................................. 19

*Lombardo v. Oppenheimer,* 701 F. Supp. 29, 30 (D. Conn. 1987).............................................. 14

*Mack v. Saars,* 150 Conn. 290, 294, 188 A.2d 863, 865 (1963).................................................. 19

*McCulley v. Southern Connecticut Newspapers, Inc.,* 98 F. Supp. 2d 216, 221
(D. Conn. 2000) .......................................................................................................................... 22

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)............................................ 22, 23

*Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. N.Y. 985), *cert. denied,*
474 U.S. 829 (1985).................................................................................................................... 14

*Munson v. United Technologies Corporation,* 28 Conn. App. 184, 192,
609 A.2d 1066, 1070-71 (1992).................................................................................................. 21

*Norton v. Sam's Club,* 145 F.3d 114, 120 (2d Cir. 1998)
*cert. denied,* 525 U.S. 1001 (1998)............................................................................................ 25

*O'Connor v. Viacom, Inc.,* 93 Civ. 2399, 1996 WL 194299 at *5
(S.D.N.Y. Apr. 23, 1996)............................................................................................................ 26

*Okon v. Medical Marketing Group, Inc.,* 1994 Conn. Super.
LEXIS 2103 (August 18, 1994) .................................................................................................. 15

*Parsons v. United Technologies Corp.,* 243 Conn. 66, 77 (1997).................................... 14, 15, 32

*Ponticelli v. Zurich American Ins. Group,* 16 F.Supp.2d 414, 427
(S.D.N.Y. 1998) .......................................................................................................................... 23

*Rosengarten v. J.C. Penney Co., Inc.,* 605 F. Supp. 154, 157 (E.D.N.Y. 1985) ......................... 29

*Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 64 (2d Cir. 1997).................................... 23

*Sheets v. Teddy's Frosted Food, Inc.,* 179 Conn. 371 (1980) ................................................ 14, 18

*Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir. 1980) .................................................................... 29

*Sorrentino v. All Seasons Services, Inc.,* 245 Conn. 756, 767, 717 A.2d 150,
155-56 (1998) .............................................................................................................................. 22

*St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507 (1993) ..................................................... 22

*Strohmeyer,* 989 F.Supp. 455, 460 (W.D.N.Y. 1997).................................................................. 27

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981).................................. 22

*Tighe v. All Brand Importers, Inc.,* 814 F. Supp. 237, 241 (D. Conn. 1992) .............................. 27

*Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir. 1996).................................. 28

*Vandel v. Standard Motor Products, Inc.,* 52 F.Supp.2d 344, 348 (D. Conn.),
*aff'd,* 201 F.3d 433 (2d Cir. 1999), *cert denied,* 530 U.S. 1274 (2000)...................................... 22

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. N.Y. 2000) ............................... 13, 14, 22

*Woroski v. Nashua Corp.*, 31 F.3d 105, 109-10 (2d Cir. 1994) ............................................... 14

**Statutes**

42 U.S.C. § 2000e, *et seq.* ............................................................................................................ 1

Conn. Gen. Stat. § 20-138a ................................................................................................. 16, 17

Conn. Gen. Stat. § 42-110b ................................................................................................. 16, 18

Conn. Gen. Stat. § 46a-60(1)(5) ................................................................................................ 30

## I. PRELIMINARY STATEMENT

This case essentially presents two issues. On one hand, Plaintiff Marvin Key ("Plaintiff") asserts that his employment as an optician was terminated by his former employer, Defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company"), on the basis of his race (African-American) and his alleged complaint about an "abusive" comment by individual Defendant Dr. Anthony Gordon ("Dr. Gordon"). On the other hand, Plaintiff asserts that he was terminated in violation of public policy because Wal-Mart allegedly required him to perform duties beyond the scope of his optician license.

Based on those two issues, Plaintiff manages to articulate six separate legal claims in his Complaint, five against Wal-Mart and a single claim against Dr. Gordon. Plaintiff's claims against Wal-Mart are: (1) discharge in violation of public policy ("Count One"); (2) breach of contract ("Count Two"); (3) negligent misrepresentation ("Count Three"); (4) violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq.* ("Title VII") ("Count Four"); and violation of the Connecticut Fair Employment Practices Act ("CFEPA") ("Count Five").[1] Plaintiff's single claim against Dr. Gordon is for aiding and abetting in the alleged discriminatory discharge of Plaintiff in violation of the CFEPA ("Count Six").

As we will show, each count of Plaintiff's Complaint should be dismissed:

- Count One should be dismissed because the material facts demonstrate that Wal-Mart did not terminate Plaintiff's at will employment in violation of public policy. As the undisputed material facts show, Plaintiff was not terminated because of (a) whistle blowing; (b) refusing to commit an illegal act; or (c) exercising (or threatening to exercise) legal rights associated with his employment. Moreover, this claim also should be dismissed because there are no material facts demonstrating that Plaintiff's termination relates to an alleged violation of some important public policy.

---

[1] Plaintiff effectively concedes that there are no material facts in dispute as to Counts One and Three because he filed a Fed.R.Civ.P. 56 motion with respect to these claims.

- Count Two requires dismissal because the undisputed material facts demonstrate that Plaintiff was an at will employee and, as such, his claim for breach of contract fails.

- Count Three, alleging negligent misrepresentation, requires dismissal because no material facts support Plaintiff's claim (a) that Wal-Mart supplied him with false information when it offered him a position; (b) that he reasonably relied on this alleged false information in accepting and continuing his employment with Wal-Mart for more than a year; and (c) that he suffered damages because of the alleged negligent misrepresentation.

- Counts Four and Five require dismissal because the undisputed material facts demonstrate that Plaintiff's race and his complaint about Dr. Gordon played no role in Wal-Mart's decision to terminate his employment. There is substantial documented evidence that Wal-Mart had problems with Plaintiff's performance, attitude and customer relations abilities. Wal-Mart's decision to terminate Plaintiff arose shortly after Plaintiff caused a customer to complain. Moreover, even crediting (for purposes of this motion) that Plaintiff had complained about Dr. Gordon making an "abusive" comment, there is no dispute that the person who made the decision to terminate Plaintiff's employment, Store Manager Roger Noll, was unaware of Plaintiff's alleged complaint.

- Count Six against Dr. Gordon for allegedly aiding and abetting Wal-Mart's discrimination should be dismissed because the material facts demonstrate (a) that Plaintiff was the not the victim of discrimination; and (b) that Dr. Gordon played no role in Wal-Mart's decision-making process that resulted in Plaintiff's termination.

For the above reasons, as more fully explained below, Defendants respectfully request that the Court dismiss Plaintiff's complaint in its entirety and with prejudice. Plaintiff also has filed a motion for partial summary judgment with respect to Counts One and Three of the Complaint. This memorandum demonstrates that Plaintiff's motion is without merit and should be denied in its entirety.

## II. SUMMARY OF FACTS[2]

### A. Plaintiff's Hiring, Job Duties and Training

On February 9, 2000 Plaintiff, having quit his job as an optician working for National Vision, accepted employment at Wal-Mart's North Windham store (the "Store") as an optician working in the Store's Vision Center. Key Dep. II at 88.[3] Plaintiff changed jobs because Wal-Mart agreed to pay him more. Key Dep. II at 89-90. Plaintiff acknowledges that he accepted employment without a written contract of any type and, as far as he knew, either party could end the employment relationship at any time. Key Dep. II at 78-79.

The Vision Center was managed by Jerry Ellis ("Ellis"), who himself is a licensed optician (albeit in Massachusetts rather than Connecticut). Key Dep. at 78, 81; Ellis Dep. at 18; Zboray Dep. at 13. There were other opticians who worked there as well, and an optician apprentice. Key Dep. at 80-81; Ellis Dep. 30-32; Zboray Dep. at 12-13. All the Vision Center employees were required to wear name tags identifying their position. Ellis Dec., ¶4.

Dr. Gordon, who was an independent contractor, leased space from Wal-Mart to operate his optometry practice in the Vision Center. Key Dep. II at 8-19. Dr. Gordon Dep. at 32-33; 107-08; Gordon Ex. 3 (lease agreement); Zboray Dep. at 126-27. Plaintiff acknowledges that Dr. Gordon was not his supervisor or manager. Key Dep. at 79-80. Dr. Gordon did not hire, fire, discipline, evaluate, supervise or manage, promote, set schedules or determine benefits with

---

[2] The facts below are undisputed for purposes of this motion only. Defendants' Local Rule 56(a)(1) statement of undisputed material facts accompanies this memorandum.

[3] In support of its motion Wal-Mart has annexed excerpts from Plaintiff's July 24, 2003 deposition ("Key Dep. at ___") and August 13, 2003 deposition ("Key Dep. II at ___"). It has also annexed the deposition testimony of Defendant Dr. Anthony Gordon ("Gordon Dep. at ___"); Roger Noll ("Noll Dep. at ___"); Edgar Morales ("Morales Dep. at ___"); Gerry Ellis ("Ellis Dep. at ___"); Huong Nguyen ("Nguyen Dep. at ___"); and Jenilu Zboray ("Zboray Dep. at ___"). Also annexed are the declarations of Jerry Ellis ("Ellis Dec., ¶___"); Dr. Anthony Gordon ("Dr. Gordon Dec., ¶___"); Christopher Adkins ("Adkins Dec., ¶___); Roger Noll ("Noll Dec., ¶___"), and the Affidavit of Gregory Reilly ("Reilly Aff., ¶___"). The deposition excerpts, declarations, affidavit and exhibits to this memorandum are attached to Defendants' accompanying Motion for Summary Judgment.

3

respect to the Vision Center employees. Key Dep. II at 6-13; Dr. Gordon Dep. at 33-34, 106-07. Ellis was responsible for these duties on a day-to-day basis. Ellis Dep. at 32-33, 34.

After Plaintiff's hire he was trained in the Vision Center's operations. Key Dep. at 85-86; Ellis Dep. at 45-46. This training included how Wal-Mart wanted Plaintiff to perform "vision screenings" and "pre-testing." Key Dep. II at 85-87. Plaintiff and other Wal-Mart associates at the Vision Center performed pre-tests and vision screenings throughout Plaintiff's tenure with the Store. Ellis Dep. at 45; Zboray Dep. at 12.

A vision screening is a test for visual acuity, *i.e.* how well a person sees without glasses. Ellis Dec., ¶6. Plaintiff and the other Vision Center employees were trained in the use of a machine called an auto refractor which tests visual acuity.[4] *Id.* The auto refractor machine requires the patient to place his or her head on a chin rest and thereafter the machine automatically measures the patient's visual acuity and prints a paper receipt with the test results. After the test results are printed customers are advised that they should see the resident optometrist for an eye examination. Zboray Dep. at 10-11; Ellis Dep. at 23-24, 28, 50, 56, Ellis Dec. ¶6. The screening results are then provided to an optometrist, in this case Dr. Gordon, who interprets the test results, conducts the patient's eye exam, and, in some cases, issues a prescription for the patient to obtain eye glasses or contact lenses. Ellis Dep. at 47-48; Ellis Dec., ¶6.

Plaintiff also was trained in how to perform "pre-testing". Ellis Dec., ¶7, Key Dep. at 86-87. The pre-tests (which required the use of automated machines to test peripheral vision,

---

[4] An "autorefractor" is a machine that approximates the prescription for the eye. The test results from an autorefractor can suggest whether a person needs glasses. A prescription for eye glasses or contact lenses cannot be written on the basis of the results of an autorefracting machine. Dr. Gordon Dec., ¶2. *See also* Zboray Dep. at 11. In contrast, "refracting" can be done solely by a licensed optometrist or ophthalmologist. It involves different instruments to measure the prescription of the eye, including a phoropter, when making a professional judgment, along with evaluating the health of the eyes, before writing a prescription. Dr. Gordon Dec., ¶2.

4

ocular pressure and visual acuity) likewise relied on automated machines in which the patients rested their chins on a head rest, the machine conducted a measurement and printed the test results. Ellis Dep. at 24-27; Ellis Dec. ¶7. Color and depth perception pre-tests were also conducted using handheld cards with pictures which were shown to the patients. Ellis Dec., ¶7. The test results were later reviewed and interpreted by Dr. Gordon when he conducted the patient's eye exam. Key Dep. at 198-200; Key Dep. II at 62, 64; Zboray Dep. 1t 95. Dr. Gordon always was present in the Vision Center when the pre-tests were being conducted. Ellis Dec., ¶7. Plaintiff and the other Vision Center employees did not interpret the pre-test results, which was the responsibility of Dr. Gordon. Key Dep. II at 66-67. They were instructed that they were not to discuss the pre-testing results with the customers, but to instead advise the customers that such questions could be asked of Dr. Gordon during their eye exam by the doctor. Wal-Mart's training manual for Vision Center employees echoes this instruction. Ellis Dec., ¶8, Ex. A at 160-61; Ellis Dep. at 136-137 (referencing Wal-Mart's Academy of Vision to which the training materials relate); Zboray Dep. at 95-96.

Plaintiff states that prior to his hire, Wal-Mart made no representation about whether he would be responsible for conducting vision screenings or pre-testing. Key Dep. II at 80-81, 84. He admits that he suffered no tangible detriment to his employment because of Wal-Mart's failure to provide him with this information. Key Dep. II at 96-98. As noted, Plaintiff worked at the Vision Center for more than a year prior to his termination. Key Dep. II at 120.

### B.  The Progressive Discipline of Plaintiff

Wal-Mart has a progressive discipline policy which it uses to handle employee discipline and performance issues. Noll Dec., ¶5. When necessary, Wal-Mart progressively disciplines its employees first through a verbal warning, followed by a written warning, followed by a "decision-making day", followed by termination. The decision-making day is a day off with pay

5

in which employees are asked to consider their commitment to Wal-Mart employment, and to prepare a plan of action for correcting their employment problems. Noll Dec., ¶5; Ellis Dep. at 107; Zboray Dep. at 112-113. If, after the decision-making day, an employee's problems persist, then the next and last step in the process is termination of employment. Noll Dec., ¶5; Zboray Dep. at 113.

As shown below, Wal-Mart's termination of Plaintiff in this case followed these steps exactly.

### (a) Verbal Coachings

During his employment Ellis gave Plaintiff verbal warnings (called coachings by Wal-Mart) on several occasions.[5] Thus, Ellis verbally coached Plaintiff, *inter alia*, for:

- missing department meetings, Key Dep. at 128-29, 136, Key Ex. 6;
- how he greets customers and his manner when he talks with them, Key Dep. 135-36; Key Ex. 6;[6]
- not wearing his lab coat, Key Dep. at 122-23; Key Ex. 6;

### (b) July 13, 2000 Written Warning

On July 13, 2000, Ellis issued his first written warning to Plaintiff. Key Dep. 135-36, Key Ex. 6; Ellis Dep. at 92-93. The warning first sets forth that Ellis had given Plaintiff several verbal warnings: "[I] [s]poke to Marvin many times about the way he greets customers, his manner in how he talks to them, about attending meetings, and wearing his lab coat during office hours." Ellis Dep. at 93-95; Key Ex. 6. The written warning then criticizes Plaintiff, *inter alia*, because it states Wal-Mart had received "complaints from two separate customers concerning the

---

[5] Ellis testified that he verbally coached Plaintiff on several occasions prior to Plaintiff's receipt of his first written coaching. Ellis Dep. at 93-97; Key Dep. at 129-139; Key Ex. 6. Plaintiff claims not to remember several of these verbal coachings. Key Dep. at 129-139.

[6] Plaintiff's co-worker, Zboray, also observed that Plaintiff in dealing with customers would "talk short and not sweet, but more like sassy, kind of, like cocky to them." Zboray Dep. at 61.

6

way Marvin handled them." *Id.* The warning also noted that Plaintiff had failed to attend two department meetings and had been observed "failing to approach and seek to assist a customer." *Id.* Plaintiff acknowledges that he received the written coaching. Key Dep. at 134-35.

### (c) November 4, 2000 Decision-Making Day

On November 4, 2000, Ellis issued Plaintiff a decision-making day. Key Dep. at 143-44, Key Ex. 7. Plaintiff states that he does not know if his receipt of the decision-making day was based on his race. Key Dep. at 165. As stated in the "Coaching for Improvement" form memorializing the reasons for Plaintiff's decision-making day:

> <u>The following was observed of this Associates behavior and/or performance</u>: Customer complaints of service, Marvin told customer to go home and bring her husband into explain to him because the woman had [a] brain injury and was a little slow at learning. I [Jerry Ellis] spent 5 mins with her and answered all her questions. She didn't want to deal with him [Plaintiff] any more.

Key Dep. at 143-44, Key Ex. 7; Ellis Dep. at 103-106.

The same form also noted that another customer had complained: "said when she came into store, Marvin wouldn't take care of her when asked, told other associate to get someone else." Key Dep. at 143-44, Key Ex. 7; Ellis Dep. at 41. The form was signed not only by Plaintiff and Ellis, but by Store Manager Roger Noll ("Noll"), who approved Ellis' decision to place Plaintiff on a decision-making day. Key Dep. at 144, Key Ex. 7.

The seriousness of Plaintiff's situation was apparently lost upon him. When asked for his understanding of what a decision-making day was when he worked at Wal-Mart, Plaintiff stated: "I heard it was a day off" and it was "just a strange day off." Key Dep. at 144-45; Ellis Dep. at 106-07. Plaintiff acknowledges, however, that he was told at the time it was much more serious:

> Q: When you received the decision-making day, did they explain to you that if they viewed your performance as continuing to be poor that you would be terminated?

7

> A: This here [Key Ex. 7] say the next thing – oh, yes. They wrote that.
>
> Q: Right. And you understood that at the time you received the decision-making day, correct?
>
> A: Well, that's what they wrote.
>
> Q: And did you read this document [Key Ex. 7] before you signed it?
>
> A: Yes.

Key Dep. 145-46, 149, Key Ex. 7. Store Manager Noll was concerned enough about Plaintiff's conduct, including customer service problems, that he provided Plaintiff with a book to read on how to improve his customer relations. Key Dep. at 150, Key Ex. 9; Noll Dep. at 25; Ellis Dep. at 106. Plaintiff later wrote Noll a note stating "[p]lease file this note . . . to show my compliance with the reading suggested." Key Dep. at 167-68; Key Ex. 9. Plaintiff acknowledged in his deposition that he merely "skimmed" through Noll's book rather than reading it. Key Dep. at 167-69, Key Ex. 9.

### (d) Events of April 27, 2001

On April 27, 2001 Wal-Mart customer Huong Nguyen ("Nguyen") brought in her twin children, her girl Kimi and her boy Harrison, for eye examinations by Dr. Gordon. Key Dep. II at 128; Nguyen Dep. at 11-13. Plaintiff conducted the pre-testing for Kimi in the presence of her mother while Dr. Gordon was nearby. Nguyen Dep. at 19 21; Dr. Gordon Dep. at 93 94. Plaintiff states that at some point during the course of Kimi's pre-testing, Dr. Gordon yelled at Plaintiff and accused him of stapling one of the children's files incorrectly. Key Dep. at 179-80.[7] Plaintiff claims that Dr. Gordon also stated "words to the affect that he's [Dr. Gordon] tired of black people messing up," which Plaintiff considered to be an "abusive" statement. Key Dep. at

---

[7] The machines used by the Vision Center to conduct pre-testing create printed records of the test results that resembles an itemized customer receipt from a grocery store. Ellis Dec., ¶7. Ellis had instructed the employees about how the pre-testing "receipts" should be stapled to the patients' files prior to Dr. Gordon's review, and Ellis even posted a model in the Vision Center for reference. Ellis Dep. at 77 78; Zboray Dep. at 92 93.

8

180. Plaintiff states that those were the only words said that day by Dr. Gordon which he considered "abusive" and that Dr. Gordon had not made "abusive" statements in the past. Key Dep. at 180-81. Dr. Gordon's comments were "totally out of the blue." Key Dep. at 201. Ms. Nguyen did not hear the "abusive" statement. Nguyen Dep. at 36. Plaintiff cannot recall Dr. Gordon (or anyone else at Wal-Mart) ever before making any race-related remarks. Key Dep. at 201-02. Plaintiff complained about Dr. Gordon's "abusive" statement to a group of managers in a room in the back of the Store. Key Dep. at 183-84. Plaintiff cannot identify any of the managers to whom he complained.[8]

Although Plaintiff had worked at the Vision Center for more than a year and conducted many pre-tests, and although he could not recall ever before asking for Dr. Gordon's assistance, Plaintiff asked several questions to Dr. Gordon about how to conduct Kimi's pre-testing. Key Dep. at 191-94; Key Dep. II at 118-20, 123; Nguyen Dep. at 31-33.[9] As a result of Plaintiff's questions to Dr. Gordon, Ms. Nguyen came to believe that Plaintiff may not know what he was doing. Nguyen Dep. at 26-27, Nguyen Ex. 1. Ms. Nguyen also was upset during the pre-testing because Plaintiff kept asking which of her children was Kimi, even though to Ms. Nguyen it should have been obvious which of her pre-teen children was a girl and which was a boy. Nguyen Dep. at 30; Nguyen Ex. 1; Ellis Dep. at 81. Thereafter, Ms. Nguyen complained to Dr. Gordon about Plaintiff's conduct. Nguyen Dep. at 21-22.

Ms. Nguyen considered walking out of the Vision Center, but Dr. Gordon calmed her down and brought Nguyen's complaint to Ellis' attention. Nguyen Dep. at 37-42; Nguyen Ex. 1.

---

[8] Plaintiff thought that one of the managers was named "Lenny," but the Store does not have any managers by that name. Key Dep. at 183-84; Noll Dep. at 26-27.

[9] Although not material to its motion, Wal-Mart notes that Plaintiff apparently asked questions in other situations when he apparently sought to irritate his co-workers. Zboray Dep. at 123-124; Ellis Dep. at 34-35, 81-82, 125-126. *See also* Morales Dep. at 39-40. Ellis also believes that Plaintiff may have intentionally stapled the patient's file incorrectly to aggravate Dr. Gordon and himself. Ellis Dep. at 78.

Ellis then contacted Assistant Manager Edgar Morales ("Morales") to speak with Nguyen. Ellis Dep. at 74, 83; Morales Dep. at 9. Nguyen provided Morales with a written complaint concerning Plaintiff's actions. Nguyen Dep. at 43; Nguyen Ex. 1. Other than the fact that he did not see their complaints, Plaintiff states that he has no reason to believe that Nguyen or the other earlier customers did not complain about him. Key Dep. at 195-96.

### (e) Plaintiff's Termination and Exit Interview

Plaintiff returned to work on April 30, 2001. Key Dep. at 58. That morning he spoke with Store Manager Noll and asked him "What's up?" Key Dep. at 205. According to Plaintiff, Noll responded that "nothing was up," and there were no discussions between himself and Noll concerning the Dr. Gordon's alleged "abusive statement" or the Nguyen incident. Key Dep. at 205. Plaintiff acknowledges that he does not know what, if anything, Noll knew of Dr. Gordon's "abusive" statement. Key Dep. at 206.

Later on that same day, April 30, 2001, Plaintiff attended a meeting (an "Exit Interview") with Morales and Noll, which Ellis may have also attended. Key Dep. at 172-75, Key Ex. 8; Noll Dep. at 21. "As soon as I [Plaintiff] came in they terminated me." Key Dep. at 176, 178-79. In fact, Plaintiff believes that he may have been terminated even before he came to the back of the store for the Exit Interview. Key Dep. 178-79.

Dr. Gordon played no role in Wal-Mart's decision to terminate Plaintiff. Key Dep. II at 13, 17-21; Noll Dep. at 21; Noll Dec., ¶1. Store Manager Noll, who made the decision, did not consult with Dr. Gordon before making his decision. Noll Dep. at 19-21; Noll Dec., ¶1. In fact, Dr. Gordon did not learn of Plaintiff's termination until after the fact. Dr. Gordon Dep. at 87-88. Plaintiff did not raise the issue of Dr. Gordon's alleged "abusive" statement or any alleged employment discrimination during the Exit Interview. Key Dep. II at 103-04; Ellis Dep. at 90-92. He acknowledges that he does not know if Noll was aware of his earlier complaint about

10