Dr. Gordon's "abusive" statement. Key Dep. II at 133-34. Noll was not aware of it. Noll Dec., ¶3. Noll states that he advised Plaintiff that he was being fired for continued problems, including customer complaints like Nguyen's. Noll Dep. at 22-23. Plaintiff admits that he does not know if it was Nguyen incident (rather than his complaint concerning Dr. Gordon or his race) that was the cause of his termination. Key Dep. II at 136; Key Dep. at 203-04.

### (f) Plaintiff's Post-Termination Actions

Two months after his termination, on July 30, 2001, Plaintiff filed a complaint alleging race discrimination with the CHRO. In his CHRO Complaint Plaintiff alleged for the first time that Wal-Mart had discriminated against him because he is African-American. Plaintiff also alleged that Wal-Mart retaliated against him for complaining to Wal-Mart's management that Dr. Gordon, who is African-American himself, had made an "abusive" comment. Key Dep. at 143-150; Key Ex. 12.

### (g) Plaintiff's Allegations of An Alleged Public Policy Violation

More than three months after his termination, on August 7, 2001, Plaintiff amended his CHRO Complaint to allege that he was "required to perform vision screening duties for which I was neither formally trained and not licensed." Key Dep. 147-151. Key Ex. 12 (p. 4). Plaintiff had performed vision screenings and pre-testing at the Store's Vision Center for more than a year until his employment was terminated. Zboray Dep. at 79-80; Complaint, ¶¶6, 8. At no time during his employment or prior to amending his CHRO Complaint did Plaintiff ever complain about or refuse to perform these duties:

> Q:   Did you ever complain to anyone at Wal-Mart that you should not be conducting these tests because your license didn't provide for you to conduct them?
>
> A:   I didn't know that. I had no reason to suspect Wal-Mart at the time, so I did not complain.

11

> Q: Let me ask the question a little differently. Prior to your termination, did you ever tell anybody at Wal-Mart that it was your belief that you were not licensed to perform the glaucoma tests, the visual field tests, the color discrimination tests, the depth perception tests or to make what you call medical record entries?
>
> A: What was the first part of the question – the first part?
>
> MR. REILLY: It's a long question. Can you read it back to him. (Record Read)
>
> A: I didn't suspect, so no.
>
> Q: Prior to your termination at Wal-Mart did you ever refuse to engage in any of these activities?
>
> A: No.

Key Dep. II at 63-64. Prior to his termination Plaintiff never advised Wal-Mart that he believed having opticians conduct vision screening and pre-tests was illegal, because he did not suspect at the time that it was. Key Dep. II at 68. The person who made the decision to terminate Plaintiff, Store Manager Noll,[10] was not aware of any complaints from Plaintiff that Wal-Mart was allegedly requiring its opticians to perform unlicensed services or any refusal by Plaintiff to perform his duties on this basis. Noll Dec., ¶4.

One of Plaintiff's co-workers, Optician Jeff Kroll ("Kroll"), had earlier raised the issue of whether Wal-Mart's opticians could perform pre-tests and vision screenings. Kroll had raised the issue in early 2001 prior to Plaintiff's termination in a discussion with Christopher Adkins ("Adkins"), a Wal-Mart Vision Center district manager. Adkins Dec. ¶¶1, 5. Adkins investigated the issue by contacting the Connecticut Department of Health ("CTDOH"). Adkins Dec., ¶5. CTDOH representatives advised Adkins that Wal-Mart could have its opticians (and optician trainees) perform both pre-tests and vision screenings. Adkins Dec., ¶5. Adkins was

---

[10] Plaintiff acknowledged in his deposition that he did not know who made the termination decision. Key Dep. at 133.

advised by the CTDOH representatives that the only restriction was that an optometrist, such as Dr. Gordon, had to be available in the Vision Center to instruct and supervise the pre-testing as necessary. Adkins Dec., ¶6.

### (h) Plaintiff's CTDOH Complaint

Sometime after filing his CHRO Complaint, Plaintiff filed a complaint with the CTDOH charging that Dr. Gordon had required him to perform pre-testing and vision screenings, which he alleged were outside the scope of a Connecticut optician license. Dr. Gordon Dec., ¶3; Gordon Dep. at 120-21. Since Plaintiff lodged his CTDOH complaint, the CTDOH has taken no action against either Dr. Gordon or Wal-Mart. Noll Dec., ¶7; Dr. Gordon Dec., ¶4.

### III. THE COURT SHOULD GRANT THE DEFENDANTS SUMMARY JUDGMENT

#### A. THE SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure requires summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The Second Circuit has noted that "the salutary purposes of summary judgment - voiding protracted, expensive and harassing trials - apply no less to discrimination cases than to commercial or other areas of litigation." *Weinstock v. Columbia Univ.*, 224 F.3d

33, 41 (2d Cir. N.Y. 2000); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. N.Y. 985), *cert. denied*, 474 U.S. 829 (1985).

A party opposing a summary judgment motion has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 247, 256. *See also Lombardo v. Oppenheimer*, 701 F. Supp. 29, 30 (D. Conn. 1987). Conclusory statements, speculation, unsubstantiated allegations, or merely colorable evidence will not suffice. *See Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995); *Weinstock*, 224 F.3d at 41. Furthermore, "*some* evidence of discrimination is not sufficient to withstand a properly supported motion for summary judgment." *Woroski v. Nashua Corp.*, 31 F.3d 105, 109-10 (2d Cir. 1994) (emphasis in original). Rather, the evidence, taken as a whole, must be sufficient to support a finding that discrimination was more likely than not the real reason for the adverse action. *Id.* Application of the foregoing standards to the facts of this case demonstrates that Wal-Mart is entitled to summary judgment.

**B.    COUNT ONE – THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING PLAINTIFF'S CLAIM THAT HE WAS TERMINATED IN VIOLATION OF PUBLIC POLICY**

"The public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a <u>narrow one that is only to be invoked</u> when 'the reason for the discharge ... involves impropriety derived from some important violation of public policy.'" *Parsons v. United Technologies Corp.*, 243 Conn. 66, 77 (1997) (*quoting Carbone v. Atlantic Richfield Co.*, 204 Conn. 460, 470 (1987) (emphasis supplied)). Connecticut courts have recognized a claim for wrongful discharge in violation of public policy in only three situations. The public policy exception has been held to apply: (1) where employees are terminated because they refuse to commit an illegal act, *Sheets v. Teddy's Frosted Food, Inc.*, 179 Conn. 371 (1980); *Faulkner v. United Technologies Corp.*, 240 Conn. 576 (1997); (2) where employees are

14

exercising (or the employer seeks to avoid their exercising) legal rights associated with their employment, *Parsons v. United Technologies Corp.*, 243 Conn. 66; 80 (1997); *Okon v. Medical Marketing Group, Inc.*, 1994 Conn. Super. LEXIS 2103 (August 18, 1994); and (3) where an employee is discharged for whistle-blowing. *Burnham v. Karl & Gelb, P.C.*, 252 Conn. 153 (2000). The undisputed material facts show that none of these situations apply here.

### 1. Plaintiff's Assertions Do Not Fall Within the Public Policy Exception to the At-Will Doctrine

The person who made the decision to terminate Plaintiff, Store Manager Roger Noll, was not aware of any alleged public policy violation raised by Plaintiff (Key Dep. at 133; Noll Dec., ¶4) and Plaintiff neither refused to perform the alleged illegal job tasks nor asserted any alleged public policy violation until <u>after</u> his termination. Key Dep. II at 63-64, 68; Key Ex. 12 (p. 4); Noll Dec., ¶4. Thus, there is no connection between any alleged public policy violation and Plaintiff's termination necessary to sustain Plaintiff's cause of action.

By his claims in this case, Plaintiff is proposing a bold new expansion of the narrow public policy exception to Connecticut's rule of at-will employment. Connecticut common law has never provided for an exception to at-will employment when a terminated employee only after his termination allegedly learns and complains of a public policy violation having no bearing on his termination. This Court, interpreting Connecticut law, should not find to the contrary and, therefore, should grant Wal-Mart summary judgment.

In sum, Wal-Mart is entitled to judgment as a matter of law because there are no material facts showing Plaintiff was terminated in violation of public policy.

### 2. Plaintiff Fails to Articulate Violation of An Important Public Policy

Plaintiff's claim also fails because there is no violation of public policy. Plaintiff asserts that Wal-Mart allegedly used a practice of:

> inducing customers to submit to vision screenings including
> glaucoma testing by unlicensed personnel under the pretense that
> such individuals are competent and lawfully able to perform such
> screenings in order to increase business in its optical stores and
> undermine the business of competing optical stores [in violation
> of] the public policy expressed in the applicable Connecticut
> licensing statutes, Conn. Gen. Stat. § 20-138a, and the Connecticut
> Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b
> [("CUPTA")]

Complaint, ¶10. Comparison of the two statutes cited by Plaintiff as the basis for his public policy claim against the undisputed material facts demonstrates that there is no public policy violation.

    (a)    Wal-Mart Did Not Violate Any Public Policy
             Articulated in Connecticut's Optometry Statute

Section 20-138a of Chapter 380 of Connecticut's Professional and Occupational Licensing law states in pertinent part:

> (a) No person shall engage in the practice of optometry in this
> state unless such person has first obtained a license from the
> Department of Public Health *but the provisions of this chapter
> shall not prevent a licensed optometrist from delegating optometric
> services* to either a trained optometric assistant or to an optometric
> technician. Such delegated services shall be performed only under
> the supervision, control, and responsibility of the licensed
> optometrist, except that optometric assistants and optometric
> technicians shall not be authorized to use prescription and or
> diagnostic drugs pursuant to this chapter or chapter 417 nor shall
> optometric assistants or optometric technicians be authorized to
> refract eyes, detect eye health, prescribe spectacles, eyeglasses or
> contact lenses. *Optometric services that may be delegated to an
> optometric assistant or to an optometric technician may be
> delegated to an optometric assistant trainee, provided that such
> services are performed only under the direct supervision, control
> and responsibility of the employing licensed optometrist.*

Conn. Gen. Stat. § 20-138a (emphasis supplied). The instruction given to Adkins (see supra at 13) by the CTDOH comports with the above statute. Specifically, Adkins was told that pre-testing and vision screenings could be done by non-optometrists so long as Dr. Gordon was available to supervise. Adkins Dec., ¶¶5-6. Indeed, Section 20-138b provides that there are very

16

few qualifications necessary for a person, including an optician such as Plaintiff, to act as a "trainee" such that he could assist the resident optometrist:

> (b)(2) "optometric assistant trainee" means a person who has completed less than two hundred hours of on-the-job training and who is under the direct supervision, control and responsibility of an employing, licensed optometrist when performing optometric services which may be delegated to optometric assistants and optometric technicians.

Conn. Gen. Stat. § 20-138a(b)(2) (emphasis supplied).

Plaintiff (and his Vision Center co-workers) acting as "trainees" were not using "prescription and or diagnostic drugs" and were not engaged in any activities "to refract eyes, detect eye health, prescribe spectacles, eyeglasses or contact lenses." Key Dep. at 198-200; Key Dep. II at 62, 64; Zboray Dep. at 95; Ellis Dec. ¶¶6-8; Gordon Dec., ¶2. To be sure, they conducted tests, the results of which Dr. Gordon would consider and use prior to *his* refracting eyes, detecting eye health or issuing a prescription. *Id.* The tests conducted by Plaintiff and his co-workers were automated and simple.[11] For instance, they required the patient to place his or her head on a machine's chin rest and to look into a viewing device. The machine did the rest, printing out a receipt with the test results. Ellis Dec., ¶¶6-8. There is no dispute that Dr. Gordon, and only Dr. Gordon, was responsible for analyzing the test results when conducting the patient's eye exam. Key Dep. at 198-200; Key Dep. II at 62, 64; Ellis Dec., ¶¶6-8.

Plaintiff, in his quest to find public policy violations where none exist, suggests that it is against public policy for opticians to perform these simple tests. Plaintiff claims that his conducting of the pre-testing, in particular the ocular pressure test used to test for glaucoma, constitutes "detect[ing] eye health." Again, however, Plaintiff (and his Vision Center co-

---

[11] Ellis described the pre-testing for instance as "not really a complicated task. It's a matter of pushing buttons." Ellis Dep. at 47-48. *See also* Dr. Gordon Dep. at 35-37.

17

workers) merely conducted the tests – Plaintiff has never suggested that they "detected" nor "evaluated" any of the test's results.

    (b) <u>Wal-Mart Did Not Violate Any Public Policy Articulated in CUPTA</u>

Plaintiff also complains that Wal-Mart somehow violated the public policies underlying CUPTA, Connecticut's generalized unfair trade practices law. Conn. Gen. Stat. § 42-110b. That statute provides only that:

> (a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

*Id.* There are no material facts suggesting Wal-Mart engaged in any type of "unfair" competition or "deception." As stated, Wal-Mart's practices did not violate the more specific Optometry statute (which conclusion was confirmed by the CTDOH to Adkins). Adkins Dec., ¶¶5-6. Moreover, there could be no confusion to the public that an optometrist was not conducting the pre-testing and vision screenings since all the Vision Center employees were required to wear name tags with labels identifying their position. Ellis Dec., ¶4. Thus, Jerry Ellis wore a tag stating "Vision Center Manager," Plaintiff (and the other Connecticut opticians) wore a tag identifying themselves as "optician," and Jenylou Zboray wore a tag identifying herself as an "intern." Ellis Dec., ¶4.

           \*  \*  \*

The fact that there was no public policy violation is mere gilding of the lily.[12] The undisputed material facts show Plaintiff was unaware of any alleged public policy violation prior to his

---

[12] Even if the Court could somehow be concerned that a public policy violation occurred, Plaintiff's claim fails because the undisputed material facts show that Plaintiff has certainly not articulated a violation of an "important" pubic policy. *Sheets*, 179 Conn. at 475. The CTDOH has known about Plaintiff's public policy allegations for more than six months, and yet it has not shut down Wal-Mart's Vision Center operations, issued any fines or penalties or commanded Wal-Mart to stop using opticians to conduct vision screenings and pre-testing or taken any steps to do so. Noll Dec., ¶7; Dr. Gordon Dec., ¶4. Moreover, if the sparse case law interpreting Connecticut's optometry statute makes only one thing clear, it is that historically the Connecticut legislature has been unclear in its legislative

18

termination and, consequently, did not complain of one or refuse to perform pre-tests or vision screenings because of any alleged public policy violation. Moreover, the decision-maker, Store Manager Noll, was unaware of any alleged public policy violation, and Plaintiff's *post-hoc* claim that one existed played no role in Plaintiff's termination. Thus, Wal-Mart should be granted summary judgment dismissing Plaintiff's claim that he was terminated in violation of public policy.

### C. COUNT TWO – THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING PLAINTIFF'S CLAIM AGAINST WAL-MART FOR BREACH OF CONTRACT

The undisputed material facts show Plaintiff was an at-will employee, and Plaintiff acknowledged his at will status in his deposition. Key Dep. II at 78-79. As stated by the Connecticut Supreme Court, at-will employment may be terminated by either the employee or the employer with impunity. *Campbell v. Town of Plymouth*, 74 Conn. App. 67, 74 (2002) (*citing Fisher v. Jackson*, 142 Conn. 734, 736 (1955)). Plaintiff does not allege the existence of a contract, either express or implied, that in any way altered the at-will nature of his employment with Wal-Mart.[13] Therefore, the Court should grant Wal-Mart summary judgment dismissing Plaintiff's Count Two for breach of contract.

---

(Footnote Cont'd)

pronouncements in this area and, therefore, the underlying public policies themselves are unclear. *Mack v. Saars*, 150 Conn. 290, 294, 188 A.2d 863, 865 (1963) (discussing an optometrist's right to operate an optometrical office furnished and equipped by an employer and stating "[t]he statute is far from clear on this question"); *Kronholtz v. Connecticut State Board of Examiners in Optometry*, 21 Conn. Supp. 332, 340, 154 A.2d 619, 624 (1959) (lamenting that it "is unfortunate the legislature has not seen fit to more clearly define the rights and duties concerning optometry, as it has done, for instance, concerning dentistry"). Considering the absence of CTDOH alacrity in pursuing Plaintiff's allegations and the judicial pronouncements critical of the statute, even if Plaintiff's public policy allegations were true – which they are not – they do not rise to the level of an important public policy.

[13]   All Plaintiff has done is to allege that he had an implied contract that he would only be assigned duties consistent with his optician license Complaint, ¶¶ 12-13. Of course, even if he had such an implied contract, it is irrelevant because (a) he would still be employed at will and could be, as he was, terminated for poor performance; and (b) Wal-Mart did not assign him duties inconsistent with the Connecticut optometry law in any event.

19

D.   **COUNT THREE – THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING PLAINTIFF'S CLAIM AGAINST WAL-MART FOR NEGLIGENT MISREPRESENTATION**

Connecticut recognizes a common law cause of action for negligent misrepresentation: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 217-18 (1987) *quoting* 3 Restatement (Second) Torts § 552(1979). Under the above standard, the undisputed material facts demonstrate that Plaintiff comes nowhere close to establishing a claim for negligent misrepresentation.

First, to establish such a claim Plaintiff would have to present undisputed material facts that there was an alleged misrepresentation. Plaintiff's Complaint, however, fails to assert any misrepresentation but instead alleges only an omission:

> ¶15. Wal-Mart representatives who recruited and hired Mr. Key knew or should have known at the time of hiring that he would be required to perform duties inconsistent with those of a Licensed Optician, but failed to disclose that fact to him.

Complaint, ¶15. Plaintiff's deposition testimony confirms that no representations, false or otherwise, were made concerning whether he would be performing vision screenings or pre-testing. Key Dep. II at 80-81, 84.

Second, even if Wal-Mart had made such a representation, it would not have been false. As explained, *supra*, Wal-Mart's Vision Center employees may conduct vision screenings and pre-tests as long as they are under the supervision of an optometrist, in this case Dr. Gordon. Plaintiff cites no case law to the contrary.

Third, Plaintiff cannot demonstrate justifiable reliance. Because no representation was made to Plaintiff, he cannot *ipso facto* be said to have justifiably relied on the non-existent representation. In any event, Plaintiff identified the real reason he accepted a job with Wal-Mart: it paid more than National Vision, his former employer. Key Dep. II at 89-90. Plaintiff does not claim, nor can he, that Wal-Mart reneged such that Plaintiff's expectation of higher pay was thwarted.

Fourth, Plaintiff cannot demonstrate that he suffered any damages as a result of his alleged detrimental reliance. *Munson v. United Technologies Corporation*, 28 Conn. App. 184, 192, 609 A.2d 1066, 1070-71 (1992). *See also* Key Dep. II at 97-98. (Plaintiff's acknowledgment that he suffered no tangible damages as a result of Wal-Mart's failure to advise him that he would be responsible for conducting vision screenings and pre-testing.) Indeed, Plaintiff's inability to link his termination to the alleged misrepresentation means this claim fails. *Munson*, 28 Conn. App. at 192, 609 A.2d at 1071 (to prevail on claim for negligent misrepresentation, plaintiff's damages must relate to the alleged misrepresentation).

For these reasons (or any one of them) Wal-Mart respectfully requests that the Court grant it summary judgment dismissing Plaintiff's negligent misrepresentation claim.

### E.  COUNTS FOUR AND FIVE – THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING PLAINTIFF'S RACE DISCRIMINATION CLAIMS

Plaintiff contends that Wal-Mart discriminated against him because of his race by terminating his employment. Plaintiff cannot prevail on this claim.

To survive summary judgment, Plaintiff first must establish a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *McCulley v. Southern Connecticut Newspapers, Inc.*, 98 F. Supp. 2d 216, 221 (D.

21

Conn. 2000). If Plaintiff meets this *prima facie* burden, the burden of production then shifts to Wal-Mart, which must rebut the presumption by articulating a legitimate, non-discriminatory reason(s) for its action. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996), *cert. denied*, 520 U.S. 1228 (1997). To meet this burden Wal-Mart need do no more than offer an explanation and the presumption raised by Plaintiff's *prima facie* case is rebutted and it drops from the case. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993).

In order to avoid summary judgment, Plaintiff then must show that (1) Wal-Mart's articulated legitimate, non-discriminatory reasons are false, *and* (2) more likely than not discrimination was the real reason for the adverse employment action. *Weinstock*, 224 F.3d at 42, 50. This burden "merges with [Plaintiff's] ultimate burden to persuade the trier of fact that [she] has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999), *cert denied*, 530 U.S. 1242 (2000). The burden of proving intentional discrimination remains at all times with Plaintiff. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Vandel v. Standard Motor Products, Inc.*, 52 F.Supp.2d 344, 348 (D. Conn.), *aff'd*, 201 F.3d 433 (2d Cir. 1999), *cert denied*, 530 U.S. 1274 (2000). This burden shifting framework applies equally to Plaintiff's Title VII and Connecticut state law claims. *See Sorrentino v. All Seasons Services, Inc.*, 245 Conn. 756, 767, 717 A.2d 150, 155-56 (1998).

In the instant case, Plaintiff's race discrimination claims must be dismissed because he cannot make out a *prima facie* case. The *prima facie* elements Plaintiff must prove here are that: (1) he is a member of a protected class; (2) he was qualified for her position; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Fisher v. Vassar College*, 114 F.3d 1332, 1344 (2d Cir. 1997);

*see McDonnell Douglas*, 411 U.S. at 802. We address Plaintiff's inability to make a *prima facie* case below.

### 1. Plaintiff Cannot Meet His Prima Facie Burden On His Claim Of Race Discrimination

Plaintiff cannot meet his *prima facie* burden. Although Wal-Mart concedes for purposes of this motion only that Plaintiff is a member of a protected class, that his termination was an adverse action and that he was qualified for his position, the circumstances of Plaintiff's termination do not give rise to an inference of discrimination.

Plaintiff must show (but cannot) that he was treated less favorably than other opticians who engaged in the same type and quantity of misconduct. *See, e.g., Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (to make *prima facie* case, sex discrimination plaintiff fired for fraternization must show she was treated differently than similarly situated males who fraternized); *Ponticelli v. Zurich American Ins. Group*, 16 F.Supp.2d 414, 427 (S.D.N.Y. 1998) (granting summary judgment because sex discrimination plaintiff presented no *prima facie* case that male employees who committed the same rule infractions were treated less severely and that "allegations that Callas [plaintiff's supervisor] yelled at her, criticized her work, and generally treated her unfairly, therefore, are insufficient to establish a *prima facie* case of gender-based discrimination").[14]

Plaintiff has no comparators in this case. Key Dep. at 105-07. He acknowledges that he knows of no one who worked at the Store who had similar performance and customer relations problems, but

---

[14] See also *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311, 1313 (11th Cir. 1998) (plaintiff failed to make *prima facie* case by showing non-minority, similarly situated employees with poor attendance were treated differently); *Ishman v. National Biological Corp.*, 53 F. Supp. 2d 970 (N.D. Ohio 1999) (summary judgment to employer where race discrimination plaintiff failed to make *prima facie* case by showing that similarly situated white co-workers not fired for threatening their co-workers).

was not terminated. Key Dep. II at 105. There is no evidence that any optician of the North Windham Store had Plaintiff's level of problems and warnings because there was none. *Id.*

The only example Plaintiff cites of an optician engaging in any misconduct is optician David Peterson ("Peterson") who he says failed to sometimes wear his lab coat. Key. Dep. at 155-58, 162-63. However, even if Peterson's alleged misconduct was of the same quantity and quality as Plaintiff's – which it is not – he cannot be used as a comparator because there is no evidence that Peterson was not coached or otherwise disciplined for his misconduct. Key Dep. at 162-63. In any event, Ellis states that he did coach Peterson for failure to wear his lab coat. Ellis Dep. at 97; Ellis Dec., ¶9.

The undisputed facts show Plaintiff was treated just like his peers. For example, other opticians were assigned to do pre-testing and vision screenings. Likewise, Plaintiff admits that all the Vision Center's opticians, not just himself, were told by Ellis that they had to wear a lab coat. Plaintiff's race discrimination claims are so weak that he cannot make a *prima facie* case of discrimination, and Counts Four and Five should be dismissed.[15]

### 2.  Wal-Mart Has Articulated Legitimate Non-Discriminatory Reasons For Plaintiff's Termination

Even if Plaintiff could somehow overcome his inability to make out a *prima facie* case - - which he cannot - - Wal-Mart has met its burden of production in articulating legitimate,

---

[15] Plaintiff may argue that he has established a *prima facie* case because Dr. Gordon's alleged "abusive" comment raises an inference of discrimination. However, there is no evidence that Dr. Gordon's alleged comment played any role whatsoever in Plaintiff's termination. The decision-maker, Store Manager Noll, was unaware of the alleged comment at the time he decided to terminate Plaintiff's employment. Noll Dec., ¶3. Therefore, even if credited, Dr. Gordon's "abusive" comment cannot be used by Plaintiff to establish a *prima facie* case of discrimination. *See, e.g., Jones v. Carraway Medical Center*, 137 F.3d 1306, 1311, 1313 (11th Cir. 1998) (alleged racist statements by a supervisor go to alleged pretext, rather than aiding plaintiff in establishing a *prima facie* case).

non-discriminatory reasons why it terminated Plaintiff's employment. Wal-Mart terminated Plaintiff because he was a poor performer who treated customers poorly.[16]

Wal-Mart has articulated legitimate non-discriminatory reasons for terminating Plaintiff. Thus, the burden shifts to Plaintiff to show that these reasons are pretextual. *See Bickerstaff*, 196 F.3d at 446-47. We show below that Plaintiff cannot show pretext and, therefore, his race discrimination claims should be dismissed.

### 3. Plaintiff Cannot Rebut Wal-Mart's Legitimate Non-Discriminatory Reasons For His Termination

Plaintiff has no evidence sufficient to show Wal-Mart's decision to terminate his employment was a pretext for discrimination. Plaintiff cannot make the required showing that (1) Wal-Mart's articulated legitimate, non-discriminatory reasons are false, *and* (2) that more likely than not discrimination was the real reason for the adverse employment actions. *Weinstock*, 224 F.3d at 42, 50.

There are no material facts showing Wal-Mart's legitimate, non-discriminatory reasons for terminating Plaintiff are false. Even Plaintiff acknowledges that he could have been terminated on the basis of how he treated Nguyen's children. Key Dep. II at 136; Key Dep. at 203-04.

Plaintiff's only evidence to support his claim of race discrimination is that he is African American, he was terminated and that Defendant Gordon, an African-American himself, allegedly complained that he was tired of "black people messing up." Even assuming, *arguendo*, that

---

[16] Although Plaintiff may take exception to Wal-Mart's reasoning, "a court is not to second-guess the defendant's judgment as long as it is not for a discriminatory reason." *Cunliffe v. Sikorsky Aircraft Corp.*, 9 F. Supp. 2d 125,132 (D.Conn. 1998), *quoting Francis v. Runyon*, 928 F. Supp. 195, 203 (E.D.N.Y. 1996). An employer may exercise business judgment in making personnel decisions as long as they are not discriminatory. *Dister v. Continental Airlines*, 859 F.2d 1108 at 1116. Title VII does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating. *Cf. Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) *cert. denied*, 525 U.S. 1001 (1998).