UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------ X
MARVIN KEY,                                  :
                                             :    CIVIL ACTION NO.:
                       Plaintiff,            :    3:03CV144(RNC)
                                             :
              v.                             :
                                             :
WAL-MART, INC. AND DR. ANTHONY               :
GORDON,                                      :
                                             :
                       Defendants.           :    December 8, 2003
------------------------------------------------------------ X

## DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT

Defendants Wal-Mart, Inc. and Dr. Anthony Gordon ("Defendants"), by and through their undersigned counsel, submit this statement pursuant to Local Rule 56(a)(1) in support of their Motion for Summary Judgment.

### Plaintiff's Hiring, Job Duties and Training

1. On February 9, 2000 Plaintiff, having quit his job as an optician working for National Vision, accepted employment at Wal-Mart's North Windham store (the "Store") as an optician working in the Store's Vision Center ("Vision Center"). Key Dep. II at 88.[1]

2. Plaintiff changed jobs because Wal-Mart agreed to pay him more. Key Dep. II at 89-90.

---

[1] The following citations to Fed.R.Civ.P. 56(c) evidence are referenced herein: annexed excerpts from Plaintiff's July 24, 2003 deposition ("Key Dep. at ___") and August 13, 2003 deposition ("Key Dep. II at ___"); the deposition testimony of Defendant Dr. Anthony Gordon ("Gordon Dep. at ___"); Roger Noll ("Noll Dep. at ___"); Edgar Morales ("Morales Dep. at ___"); Gerry Ellis ("Ellis Dep. at ___"); Huong Nguyen ("Nguyen Dep. at ___"); and Jenilu Zboray ("Zboray Dep. at ___"); the declarations of Jerry Ellis ("Ellis Dec., ¶___"); Dr. Anthony Gordon ("Dr. Gordon Dec., ¶___"); Christopher Adkins ("Adkins Dec., ¶___); Roger Noll ("Noll Dec., ¶___"), and the Affidavit of Gregory Reilly ("Reilly Aff., ¶___"). The deposition excerpts, declarations, affidavit and exhibits are attached to Wal-Mart's accompanying Notice of Motion.

3. Plaintiff acknowledges that he accepted employment without a written contract of any type and, as far as he knew, either party could end the employment relationship at any time. Key Dep. II at 78-79.

4. The Vision Center was managed by Jerry Ellis ("Ellis"), who himself is a licensed optician (albeit in Massachusetts rather than Connecticut). Key Dep. at 78, 81; Ellis Dep. at 18; Zboray Dep. at 13.

5. There were other opticians who worked there as well, and an optician apprentice. Key Dep. at 80-81; Ellis Dep. 30-32; Zboray Dep. at 12-13.

6. All the Vision Center employees were required to wear name tags identifying their position. Ellis Dec., ¶4.

7. Dr. Gordon, who was an independent contractor, leased space from Wal-Mart to operate his optometry practice in the Vision Center. Key Dep. II at 8-19; Dr. Gordon Dep. at 32-33; 107-08; Gordon Ex. 3 (lease agreement); Zboray Dep. at 126-27.

8. Plaintiff acknowledges that Dr. Gordon was not his supervisor or manager. Key Dep. at 79-80.

9. Dr. Gordon did not hire, fire, discipline, evaluate, supervise or manage, promote, set schedules or determine benefits with respect to the Vision Center employees. Key Dep. II at 6-13; Dr. Gordon Dep. at 33-34, 106-07.

10. Ellis was responsible for these duties on a day-to-day basis. Ellis Dep. at 32-33, 34.

11. After Plaintiff's hire he was trained in the Vision Center's operations. Key Dep. at 85-86; Ellis Dep. at 45-46.

2

12. This training included how Wal-Mart wanted Plaintiff to perform "vision screenings" and "pre-testing." Key Dep. II at 85-87.

13. Plaintiff and other Wal-Mart associates at the Vision Center performed pre-tests and vision screenings throughout Plaintiff's tenure with the Store. Ellis Dep. at 45; Zboray Dep. at 12.

14. A vision screening is a test for visual acuity, *i.e.* how well a person sees without glasses. Ellis Dec., ¶6.

15. Plaintiff and the other Vision Center employees were trained in the use of a machine called an auto refractor which tests visual acuity. Ellis Dec., ¶6.

16. An "autorefractor" is a machine that approximates the prescription for the eye. The test results from an autorefractor can suggest whether a person needs glasses. A prescription for eye glasses or contact lenses cannot be written on the basis of the results of an autorefracting machine. Dr. Gordon Dec., ¶2. *See also* Zboray Dep. at 11.

17. In contrast, "refracting" can be done only by a licensed optometrist or ophthalmologist. Refracting involves using different instruments to measure visual acuity, which when combined with an evaluation of eye health and professional judgment allows the optometrist or ophthalmologist to write a prescription. Dr. Gordon Dec., ¶2.

18. The auto refractor machine requires the patient to place his or her head on a chin rest and thereafter the machine automatically measures the patient's visual acuity and prints a paper receipt with the test results. After the test results are printed customers are advised that they should see the resident optometrist for an eye examination. Zboray Dep. at 10-11; Ellis Dep. at 23-24, 28, 50, 56.

19. The screening results are then provided to an optometrist, in this case Dr. Gordon, who interprets the test results, conducts the patient's eye exam, and, in some cases, issues a prescription for the patient to obtain eye glasses or contact lenses. Ellis Dep. at 47-48; Ellis Dec., ¶6.

20. Plaintiff also was trained in how to perform "pre-testing". Ellis Dec., ¶7; Key Dep. at 86-87.

21. The pre-tests (which required the use of automated machines to test peripheral vision, ocular pressure and visual acuity) likewise relied on automated machines in which the patients rested their chins on a head rest, the machine conducted a measurement and printed the test results. Ellis Dep. at 24-27; Ellis Dec., ¶7.

22. Color and depth perception pre-tests were also conducted by the Vision Center staff using handheld cards with pictures which were shown to the patients. Ellis Dec., ¶7.

23. The test results were later reviewed and interpreted by Dr. Gordon when he conducted the patient's eye exam. Key Dep. at 198-200; Key Dep. II at 62, 64; Zboray Dep. at 95.

24. Dr. Gordon always was present in the Vision Center when the pre-tests were being conducted. Ellis Dec., ¶7.

25. Plaintiff and the other Vision Center employees did not interpret the pre-test results, which was the responsibility of Dr. Gordon. Key Dep. II at 66-67; Ellis Dec., ¶8.

26. They were instructed that they were not to discuss the pre-testing results with the customers, but to instead advise the customers that such questions could be asked of Dr. Gordon during their eye exam by the doctor. Wal-Mart's training manual for Vision Center employees

4

echoes this instruction. Ellis Dec., ¶8, Ex. A at 160-61; Ellis Dep. at 136-137 (referencing Wal-Mart's Academy of Vision to which the training materials relate); Zboray Dep. at 95-96.

27. Plaintiff states that prior to his hire, Wal-Mart made no representation about whether he would be responsible for conducting vision screenings or pre-testing. Key Dep. II at 80-81, 84.

28. Plaintiff admits that he suffered no tangible detriment to his employment because of Wal-Mart's failure to provide him with this information. Key Dep. II at 96-98.

29. Plaintiff worked at the Vision Center for more than a year prior to his termination. Key Dep. II at ___.

**The Progressive Discipline of Plaintiff**

30. Wal-Mart has a progressive discipline policy which it uses to handle employee discipline and performance issues. Noll Dec., ¶5.

31. When necessary, Wal-Mart progressively disciplines its employees first through a verbal warning, followed by a written warning, followed by a "decision-making day", followed by termination. The decision-making day is a day off with pay in which employees are asked to consider their commitment to Wal-Mart employment, and to prepare a plan of action for correcting their employment problems. Noll Dec., ¶5; Ellis Dep. at 107; Zboray Dep. at 112-113.

32. If, after the decision-making day, an employee's problems persist, then the next and last step in the process is termination of employment. Noll Dec., ¶5; Zboray Dep. at 113.

**Verbal Coachings**

33. Ellis verbally coached Plaintiff on a number of occasions prior to Plaintiff's receipt of his first written coaching. but Plaintiff does not to remember several of these verbal coachings. Key Dep. at 129-139; Key Ex. 6, Ellis Dep. at 93-97.

34. Ellis verbally coached Plaintiff, *inter alia,* for:

- missing department meetings, Key Dep. at 128-29, 136, Key Ex. 6;

- how he greets customers and his manner when he talks with them, Key Dep. 135-36; Key Ex. 6; and

- not wearing his lab coat, Key Dep. at 122-23; Key Ex. 6;

35. Plaintiff's co-worker, Zboray, also observed that Plaintiff in dealing with customers would "talk short and not sweet, but more like sassy, kind of, like cocky to them." Zboray Dep. at 61.

**July 13, 2000 Written Warning**

36. On July 13, 2000, Ellis issued a written warning to Plaintiff. Key Dep. 135-36, Key Ex. 6; Ellis Dep. at 92-93.

37. The warning first sets forth that Ellis had given Plaintiff several verbal warnings: "[I] [s]poke to Marvin many times about the way he greets customers, his manner in how he talks to them, about attending meetings, and wearing his lab coat during office hours." Ellis Dep. at 93-95; Key Ex. 6.

38. The written warning then criticizes Plaintiff, *inter alia,* because it states Wal-Mart had received "complaints from two separate customers concerning the way Marvin handled them." Ellis Dep. at 93-95; Key Ex. 6.

39. The warning also noted that Plaintiff had failed to attend two department meetings and had been observed "failing to approach and seek to assist a customer." Ellis Dep. at 93-95; Key Ex. 6.

40. Plaintiff acknowledges that he received the written coaching. Key Dep. at 134-35.

**November 4, 2000 Decision-Making Day**

41. On November 4, 2000, Ellis issued Plaintiff a decision-making day. Key Dep. at 143-44, Key Ex. 7.

42. Plaintiff does not know if his receipt of the decision-making day was based on his race. Key Dep. at 165.

43. The "Coaching for Improvement" form memorializing the reasons for Plaintiff's decision-making day states:

> <u>The following was observed of this Associates behavior and/or performance</u>: Customer complaints of service, Marvin told customer to go home and bring her husband into explain to him because the woman had [a] brain injury and was a little slow at learning. I [Jerry Ellis] spent 5 mins with her and answered all her questions. She didn't want to deal with him [Plaintiff] any more.

Key Dep. at 143-44, Key Ex. 7; Ellis Dep. at 103-106.

44. The same form also noted that another customer had complained: "said when she came into store, Marvin wouldn't take care of her when asked, told other associate to get someone else." Key Dep. at 143-44, Key Ex. 7.

45. The form was signed not only by Plaintiff and Ellis, but by Store Manager Roger Noll ("Noll"), who approved Ellis' decision to place Plaintiff on a decision-making day. Key Dep. at 144, Key Ex. 7; Ellis Dep. at 41.

46. Plaintiff testified that he understood that a decision-making day was " a day off" and it was "just a strange day off." Key Dep. at 144-45; Ellis Dep. at 106-07.

47. Plaintiff acknowledges, however, that he was told at the time a decision-making day was more serious:

> Q: When you received the decision-making day, did they explain to you that if they viewed your performance as continuing to be poor that you would be terminated?

> A: This here [Key Ex. 7] say the next thing – oh, yes. They wrote that.
>
> Q: Right. And you understood that at the time you received the decision-making day, correct?
>
> A: Well, that's what they wrote.
>
> Q: And did you read this document [Key Ex. 7] before you signed it?
>
> A: Yes.

Key Dep. 145-46, 149, Key Ex. 7.

48. Store Manager Noll was concerned enough about Plaintiff's conduct, including customer service problems, that he provided Plaintiff with a book to read on how to improve his customer relations. Key Dep. at 150, Key Ex. 9; Noll Dep. at 25; Ellis Dep. at 106.

49. Plaintiff later wrote Noll a note stating "[p]lease file this note . . . to show my compliance with the reading suggested." Key Dep. at 167-68; Key Ex. 9.

50. Plaintiff acknowledged in his deposition that he merely "skimmed" through Noll's book rather than reading it. Key Dep. at 167-69, Key Ex. 9.

**Events of April 27, 2001**

51. On April 27, 2001 Wal-Mart customer Huong Nguyen ("Nguyen") brought in her twin children, her girl Kimi and her boy Harrison, for eye examinations by Dr. Gordon. Key Dep. II at 128; Nguyen Dep. at 11-13.

52. Plaintiff conducted the pre-testing for Kimi in the presence of her mother while Dr. Gordon was nearby. Nguyen Dep. at 19-21; Dr. Gordon Dep. at 93-94.

53. Mr. Key alleges that at some point during the course of Kimi's pre-testing, Dr. Gordon yelled at Plaintiff and accused him of stapling one of the children's files incorrectly. Key Dep. at 179-80.

54. The machines used by the Vision Center to conduct pre-testing create printed records of the test results that resembles an itemized customer receipt from a grocery store. Ellis Dec., ¶7.

55. Ellis had instructed the employees about how the pre-testing "receipts" should be stapled to the patients' files prior to Dr. Gordon's review, and Ellis even posted a model in the Vision Center for reference. Ellis Dep. at 77-78; Zboray Dep. at 92-93.

56. Plaintiff claims that Dr. Gordon also stated "words to the affect that he's [Dr. Gordon] tired of black people messing up," which Plaintiff considered to be an "abusive" statement. Key Dep. at 180.

57. Plaintiff refers to Dr. Gordon's alleged comment as "abusive" rather than discriminatory. Key Dep. at 59, 179, 200.

58. Plaintiff states that those were the only words said that day by Dr. Gordon which he considered "abusive" and that Dr. Gordon had not made "abusive" statements in the past. Key Dep. at 180-81.

59. Dr. Gordon's comments were "totally out of the blue." Key Dep. at 201.

60. Dr. Gordon is African-American. Key Dep. at 80.

61. Ms. Nguyen did not hear the "abusive" statement. Nguyen Dep. at 36.

62. Plaintiff cannot recall Dr. Gordon (or anyone else at Wal-Mart) ever before making any race-related remarks. Key Dep. at 201-02.

63. Plaintiff says that he complained about Dr. Gordon's "abusive" statement to a group of managers in a room in the back of the Store. Key Dep. at 183-84. Plaintiff testified that he cannot identify any of the managers to whom he complained although he thought that one of the managers was named "Lenny." Key Dep. at 183-84.

64.  The Store does not have any managers by the name of "Lenny." Noll Dep. at 26-27.

65.  Although Plaintiff had worked at the Vision Center for more than a year and conducted many pre-tests, and although he could not recall ever before asking for Dr. Gordon's assistance, Plaintiff asked several questions to Dr. Gordon about how to conduct Kimi's pre-testing. Key Dep. at 191-94; Key Dep. II at 118-20, 123; Nguyen Dep. at 31-33.

66.  As a result of Plaintiff's questions to Dr. Gordon, Ms. Nguyen came to believe that Plaintiff may not know what he was doing. Nguyen Dep. at 26-27, Nguyen Ex. 1.

67.  Ms. Nguyen also was upset during the pre-testing because Plaintiff kept asking which of her children was Kimi, even though to Ms. Nguyen it should have been obvious which of her pre-teen children was a girl and which was a boy. Nguyen Dep. at 30; Nguyen Ex. 1; Ellis Dep. at 81.

68.  Thereafter, Ms. Nguyen complained to Dr. Gordon about Plaintiff's conduct. Nguyen Dep. at 21-22.

69.  Ms. Nguyen considered walking out of the Vision Center, but Dr. Gordon calmed her down and brought Nguyen's complaint to Ellis' attention. Nguyen Dep. at 37-42; Nguyen Ex. 1.

70.  Ellis then contacted Assistant Manager Edgar Morales ("Morales") to speak with Nguyen. Ellis Dep. at 74, 83; Morales Dep. at 9.

71.  Nguyen provided Morales with a written complaint concerning Plaintiff's actions. Nguyen Dep. at 43; Nguyen Ex. 1.

72.     Other than the fact that he did not see any customer's complaint in writing, Plaintiff states that he has no reason to believe that Nguyen or the other earlier customers did not complain about him.  Key Dep. at 195-96.

**Plaintiff's Termination and Exit Interview**

73.     Plaintiff returned to work on April 30, 2001.  Key Dep. at 58.

74.     That morning he spoke with Store Manager Noll and asked him "What's up?" Key Dep. at 205.

75.     According to Plaintiff, Noll responded that "nothing was up," and there were no discussions between himself and Noll concerning the Dr. Gordon's alleged "abusive statement" or the Nguyen incident.  Key Dep. at 205.

76.     Plaintiff acknowledges that he does not know what, if anything, Noll knew of Dr. Gordon's "abusive" statement.  Key Dep. at 206.

77.     Later on that same day, April 30, 2001, Plaintiff attended a meeting (an "Exit Interview") with Morales and Noll, which Ellis may have also attended.  Key Dep. at 172-75, Key Ex. 8; Noll Dep. at 21.

78.     "As soon as I [Plaintiff] came in they terminated me."  Key Dep. at 176, 178-79.

79.     Plaintiff believes that he may have been terminated even before he came to the back of the store for the Exit Interview.  Key Dep. 178-79.

80.     Dr. Gordon played no role in Wal-Mart's decision to terminate Plaintiff.  Key Dep. II at 13, 17-21; Noll Dep. at 21; Noll Dec., ¶1.

81.     Store Manager Noll, who made the decision, did not consult with Dr. Gordon before making his decision.  Noll Dep. at 19-21; Noll Dec., ¶1.

82.     Dr. Gordon did not learn of Plaintiff's termination until after the fact.  Dr. Gordon Dep. at 87-88.

11

83. Plaintiff did not raise the issue of Dr. Gordon's alleged "abusive" statement or any alleged employment discrimination during the Exit Interview. Key Dep. II at 103-04; Ellis Dep. at 90-92.

84. Plaintiff acknowledges that he does not know if Noll was aware of his earlier complaint about Dr. Gordon's "abusive" statement, and Noll states that he was not aware of it. Key Dep. at 206; Key Dep. II at 133-34; Noll Dec., ¶3.

85. Noll advised Plaintiff that he was being fired for continued problems, including customer complaints like Nguyen's. Noll Dep. at 22-23.

86. Plaintiff admits that he does not know if it was Nguyen incident (rather than his complaint concerning Dr. Gordon or his race) that was the cause of his termination. Key Dep. II at 136; Key Dep. at 203-04.

**Plaintiff's Post-Termination Actions**

87. Two months after his termination, on July 30, 2001, Plaintiff filed a complaint alleging race discrimination with the CHRO. In his CHRO Complaint Plaintiff alleged for the first time that Wal-Mart had discriminated against him because he is African-American. Plaintiff also alleged that Wal-Mart retaliated against him for complaining to Wal-Mart's management that Dr. Gordon, who is African-American himself, had made an "abusive" comment. Key Dep. at 143-150; Key Ex. 12.

**Plaintiff's Allegations of An Alleged Public Policy Violation**

88. More than three months after his termination, on August 7, 2001, Plaintiff amended his CHRO Complaint to allege that he was "required to perform vision screening duties for which I was neither formally trained and not licensed." Key Ex. 12 (p. 4).

89. Plaintiff had performed vision screenings and pre-testing at the Store's Vision Center for more than a year until his employment was terminated. Zboray Dep. at 79-80; Amended Complaint, ¶¶6, 8.

90. At no time during his employment or prior to amending his CHRO Complaint did Plaintiff ever complain about or refuse to perform these duties:

> Q: Did you ever complain to anyone at Wal-Mart that you should not be conducting these tests because your license didn't provide for you to conduct them?
>
> A: I didn't know that. I had no reason to suspect Wal-Mart at the time, so I did not complain.
>
> Q: Let me ask the question a little differently. Prior to your termination, did you ever tell anybody at Wal-Mart that it was your belief that you were not licensed to perform the glaucoma tests, the visual field tests, the color discrimination tests, the depth perception tests or to make what you call medical record entries?
>
> A: What was the first part of the question – the first part?
>
> MR. REILLY: It's a long question. Can you read it back to him. (Record Read)
>
> A: I didn't suspect, so no.
>
> Q: Prior to your termination at Wal-Mart did you ever refuse to engage in any of these activities?
>
> A: No.

Key Dep. II at 63-64.

91. Prior to his termination Plaintiff never advised Wal-Mart that he believed having opticians conduct vision screening and pre-tests was illegal, because he did not suspect at the time that it was. Key Dep. II at 68.

92. The person who made the decision to terminate Plaintiff, Store Manager Noll, was not aware of any complaints from Plaintiff that Wal-Mart was allegedly requiring its opticians to

13

perform unlicensed services or any refusal by Plaintiff to perform his duties on this basis. Noll Dec., ¶4; Key Dep. at 133.

93.  One of Plaintiff's co-workers, Optician Jeff Kroll ("Kroll"), had earlier raised the issue of whether Wal-Mart's opticians could perform pre-tests and vision screenings. Kroll had raised the issue in early 2001 prior to Plaintiff's termination in a discussion with Christopher Adkins ("Adkins"), a Wal-Mart Vision Center district manager. Adkins Dec. ¶¶1, 5.

94.  Adkins investigated the issue by contacting the Connecticut Department of Health ("CTDOH"). Adkins Dec., ¶5.

95.  CTDOH representatives advised Adkins that Wal-Mart could have its opticians (and optician trainees) perform both pre-tests and vision screenings. Adkins Dec., ¶5.

96.  Adkins was advised by the CTDOH representatives that the only restriction was that an optometrist, such as Dr. Gordon, had to be available in the Vision Center to instruct and supervise the pre-testing as necessary. Adkins Dec., ¶6.

**Plaintiff's CTDOH Complaint**

97.  Sometime after filing his CHRO Complaint, Plaintiff filed a complaint with the CTDOH charging that Dr. Gordon had required him to perform pre-testing and vision screenings, which he alleged were outside the scope of a Connecticut optician license. Dr. Gordon Dec., ¶3; Gordon Dep. at 120-21.

98.  Since Plaintiff lodged his CTDOH complaint, the CTDOH has taken no action against either Dr. Gordon or Wal-Mart. Noll Dec., ¶7; Dr. Gordon Dec., ¶4.

**Other Material Facts**

99.  Plaintiff suffered no tangible damages as a result of Wal-Mart's failure to advise him that he would be responsible for conducting vision screenings and pre-testing. Key Dep. II at 97-98.

100. Plaintiff acknowledges that he knows of no one who worked at the Store who had similar performance and customer relations problems, but was not terminated. Key Dep. II at 105.

101. The only example Plaintiff cites of an optician engaging in any misconduct is optician David Peterson ("Peterson") who Plaintiff says failed to sometimes wear his lab coat. Key. Dep. at 155-58; 162-63.

102. Although Plaintiff believes Peterson was not disciplined (or coached) for failure to wear a lab coat, Plaintiff acknowledges that he does not know this for a fact. Key Dep. at 162-63.

103. Vision Center Manager Ellis coached Peterson for failure to wear a lab coat. Ellis Dep. at 97; Ellis Dec., ¶9.

104. Dr. Gordon played no role in Plaintiff's performance evaluations, he never prepared nor attended Plaintiff's prior coachings, and he was not consulted concerning whether

Wal-Mart should discipline Plaintiff or terminate his employment. Key Dep. at 79-80; Key Dep. II at 6-19; Noll Dec., ¶1; Dr. Gordon Dep. at 33-34, 87-88, 106-07; Noll Dep. at 19-21; Ellis Dep. at 32-33.

Dated: December 5, 2003

                                                Brown Raysman Millstein Felder
                                                                                                                     & Steiner LLP
                                                900 Third Avenue
                                                New York, New York 10022
                                                (212) 895-2000

By: _____
      Gregory B. Reilly (ct07101)

                                                Cityplace II
                                                185 Asylum Street
                                                Hartford, CT  06103
                                                (860) 275-6400

                                                Attorneys for Defendants
                                                Wal-Mart Stores, Inc. and Dr. Anthony
                                                Gordon

## **CERTIFICATION**

This is to certify that a copy of the foregoing Defendants' Local Rule 56(a)(1) Statement has been sent by overnight courier this 5th day of December 2003 to:

>Loraine M. Cortese-Costa
>Durant Nichols
>1057 Broad Street
>Bridgeport, CT  06604
>
>Attorney for Plaintiff
>Marvin Key

Dated: December 5, 2003

_____
Gregory B. Reilly
(Federal Bar No.: ct07101)