FILED

2004 MAR 16 A 11: 03

U.S. DISTRICT COURT
HARTFORD. CT.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARVIN KEY,                          :
                                     :      CIVIL ACTION NO.
        Plaintiff,                   :      3:03CV144 (RNC)
                                     :
v.                                   :
                                     :
WAL-MART AND DR. GORDON              :
                                     :
        Defendants.                  :      MARCH 15, 2004

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Marvin Key, by and through his undersigned counsel, submits this memorandum of law in opposition to Defendants' motion for summary judgment and in reply to Defendant's opposition to Plaintiff's motion for summary judgment.

#### Preliminary Statement

Defendants have moved for summary judgment on all six counts of Plaintiff's Complaint. The motion fails on all six counts. It fails with respect to Plaintiff's discharge in violation of public policy claim (Count One) because it misapprehends Connecticut law with respect to what must be proven to make out a viable claim, misreads the Connecticut statutes which the claimed impropriety in the discharge derives from, scoffs at the public policies expressed therein and simply overlooks the record evidence that Plaintiff's direct supervisor expressed a fear that

Plaintiff would make a complaint to the Department of Public Health shortly before Plaintiff was discharged. It fails as to Plaintiff's claim that Wal-Mart breached his implied contract of hiring that limited his performance of duties to those consistent with his position as a "Licensed Optician" (Count Two) because it focuses only on the "at-will" nature of the employment which precludes Plaintiff's right to claim discharge in breach of contract but not his right to claim discharge as part of the damages arising from Wal-Mart's breach of an independent obligation. It fails as to Plaintiff's negligent misrepresentation claim (Count Three) because it simply ignores the favorable inferences that can be drawn from the record evidence that Plaintiff was given incomplete and incorrect information with respect to his employment which, at a minimum, gives rise to an issue of fact as to his justifiable reliance and resulting damages. It fails with respect to his claims of race discrimination and retaliation (Counts Four and Five) because the wrong legal standard is asserted, there is evidence that Plaintiff's supervisor, boasting of Plaintiff's discharge, tied it directly to his being Black and Defendants' contentions throughout the memorandum in support of their motion, that Plaintiff has "no evidence" of disparate treatment, is based upon Wal-Mart's own refusal to timely supply comparative data in response to Plaintiff's discovery requests.[1] When finally supplied, the favorable inferences that can be

---

[1]      Wal-Mart has been less than cooperative throughout the pendency of this matter as far as complying with deadlines and the rules of discovery. Plaintiff has been forced to argue about every discovery request he has made and to file a motion for sanctions, which was granted in part, as well as two separate motions to compel, the first of which was granted by The Honorable Donna F. Martinez in large part on November 3, 2003, with an order of compliance within twenty (20) days. Despite this Order, Wal-Mart did not fully comply until late-December -- well-past the filing of Defendants' motion for summary judgment. Even the most basic request, i.e., the identity of the purported decisionmaker with respect to Plaintiff's termination of employment was met with resistance and was not

drawn from the data prove more than sufficient to demonstrate that genuine issues of fact exist as to disparate treatment and retaliation and to deny summary judgment under applicable Second Circuit precedent.  Finally, the motion fails as to the "aiding and abetting" discrimination claim against Dr. Anthony Gordon (Sixth Count) because, again, it misapprehends what is required under Connecticut law and simply ignores the favorable inferences that can be drawn from the record evidence.

## Standard For Summary Judgment

In *Stern v. Trustees of Columbia University in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997), the Second Circuit articulated the standard which must be met for granting a motion for summary judgment:

> It is of course well established that a motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  See Fed. R. Civ. P. 56(c).  In assessing the record to determine whether there is such an issue, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought . . . ." (Citations omitted.)

---

provided until after Plaintiff filed his first motion to compel.  Accordingly, Plaintiff was forced to wait until December 17, 2003 to file his follow-up discovery requests, which included a request for comparative personnel data. Following discussions with Wal-Mart's former attorney, a letter to one of Wal-Mart's current attorneys, and a telephone conversation with yet another attorney, Wal-Mart asked Plaintiff to issue a subpoena for the information, which he did. True to form, Wal-Mart responded on March 5, 2004 by parsing out some responsive materials, filing a motion for protective order for some, and stating that the remainder could not be found.  (Affidavit of Pamela J. Coyne, ¶¶ 3-8 (hereinafter "Coyne aff."), attached as Exhibit 1).  Due to these tactics and the fact that evidence as to the treatment of other employees is not otherwise available to Plaintiff, it may be true that Plaintiff had little comparative data at the time of his deposition or when Wal-Mart moved for summary judgment.  Plaintiff's tenacity in pursuing his legitimate discovery requests paid off, however, as set forth below, because the comparative evidence he was able to obtain is more than enough to defeat Wal-Mart's motion for summary judgment.

Thus, the party opposing a motion for summary judgment need not present proof establishing his or her right to recovery as a matter of law, but need only present evidence when, read in the light most favorable to the non-movant, supports a possible version of events that could lead to a finding in his or her favor. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 78-82 (2d Cir. 2001). Even the non-movant's testimony alone may be sufficient for this purpose. *Id.* at 78.

## Argument

### Point I

### SUMMARY JUDGMENT IS NOT WARRANTED ON THE PUBLIC POLICY DISCHARGE CLAIM

Wal-Mart argues that Plaintiff's public policy discharge claim is subject to summary judgment because, it claims:

- as it did in its motion to dismiss, which was denied, that Connecticut recognizes such a claim only where the employee is discharged for refusing to perform an illegal act, for whistleblowing or for exercising (or to prevent the exercise of) rights associated with employment (Memorandum of Law in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment,[2] pp. 14-15);

- there was no violation of Connecticut licensing statutes because, contrary to their express language, a Wal-Mart manager was allegedly told by someone at the Connecticut Department of Public Health whose name he can't remember, that using Opticians for vision pre-tests is OK so long as an Optometrist is "available to supervise" (Def. Mem., pp. 16-18);

---

[2]      hereinafter "Def. Mem., p. __."

- 4 -

- if there was a violation of the licensing statutes, it was not "important" (Def. Mem., p. 18 n. 12);

- there was no "deception" by Wal-Mart in violation of CUTPA (Def. Mem., p. 18); and

- neither Plaintiff nor the claimed decisionmaker, Roger Noll, were aware of any public policy violation (Def. Mem., pp. 18-19).

## A. Wal-Mart Is Wrong About What Is Required To Make Out A Public Policy Discharge Claim In Connecticut

In *Thibodeau v. Design Group One Architects,* 260 Conn. 691, 699 (2002), the Connecticut Supreme Court, explaining its decision in *Antinerella v. Rioux,* 229 Conn. 479 (1994) overruled on other grounds by *Miller v. Egan,* 265 Conn. 301 (2003), made clear that no action or refusal to act by an employee is a prerequisite to a public policy discharge claim as first recognized in *Sheets v. Teddy's Frosted Foods,* 179 Conn. 471 (1980). The Supreme Court stated:

> On several occasions since the release of our decision in *Sheets*, we have recognized the sufficiency of a claim under the public policy exception to the at-will employment doctrine. For example, in *Antinerella v. Rioux,* supra, 229 Conn. 479, we held that the plaintiff, a deputy sheriff, had stated a claim for wrongful termination against the defendant, the high sheriff of Hartford county; id., at 493-94; predicated upon the deputy sheriff's allegation that the high sheriff had discharged him "in order to take [over] his [process serving] business and personally benefit under [a] statutorily forbidden and illegal fee splitting arrangement he had made with several appointed deputy sheriffs." Id., at 491. In so holding, we noted that the "case [had] present[ed] claims that genuinely involve[d] the mandates of public policy derived directly from the state statutes." Id., at 493.

260 Conn. at 699 (footnote omitted) (bracketed material in original).  The plaintiff in the *Rioux*

case had alleged no complaints of wrongdoing against the employer prior to his discharge, no

refusal to participate in the allegedly illegal activity and no exercise or feared exercise of

employment-related rights.    As explained in *Thibodeau* and as argued by Plaintiff in his

opposition to Defendant's motion to dismiss (Plaintiff's Memorandum In Opposition to Motion to

Dismiss, pp. 4-5), the flaw in Wal-Mart's argument is that it seeks to focus on the employee's

actions or refusal to act when the focus of the claim, as established in *Sheets* and reiterated in

*Thibodeau,* is a connection between the discharge and the employer's alleged acts in violation of

public policy.

Even Wal-Mart tacitly acknowledges, as it must, that discharging an employee for fear

that he might report, "employer deficiencies to supervisory authorities" is sufficient for a public

policy discharge claim.  *See Taylor v. Hall Neighborhood*, No. CV983560275, 1999 WL 185142

(Conn. Super. Mar. 17, 1999) (Motolese, J.) citing *Sheets,* 179 Conn. 471.  Wal-Mart claims

"there is no evidence that Wal-Mart was 'fearful' that Plaintiff would complain that he was being

asked to do pre-tests and vision screenings." (Def. Mem., p. 32).  The record is replete with

evidence, however, from which a factfinder could determine that such was the case.   For

example, Plaintiff's co-worker, Jenilu Zboray testified at deposition that Plaintiff did in fact

object to performing pre-testing for the resident optometrist while employed by Wal-Mart, and

- 6 -

expressed concern about losing his license because of Wal-Mart requiring him to do so.[3] (Deposition Transcript for Jenilu Zboray,[4] pp. 18, 79, 82, 91-92, 97). Both, the Vision Center Manager, Jerry Ellis, and North Windham Store Co-Manager, Edgar Morales, believed that Plaintiff asked Dr. Gordon questions in front of the customer whose report Wal-Mart relied upon to discharge him (Exhibit 1 to Nguyen dep., attached as Exhibit 14) because he did not want to perform the pre-testing.   (Deposition Transcript I for Jerome Ellis,[5] pp. 81-82; Deposition Transcript I for Edgar Morales,[6] p. 39).   In fact, Wal-Mart was aware of Plaintiff's objection to performing vision screenings and pre-testing patients, as evidenced by Jerry Ellis' notes in his Day Planner/diary expressing his suspicion that Plaintiff had reported a potential violation to the Department of Public Health as early as February 14, 2001,[7] and documenting his conversation with Vision Center District Manager, Chris Adkins, on April 6, 2001 writing that "We need to make sure all CT stores are at state standards for when Marvin gets terminated he doesn't cause any trouble."[8]  (Wal-Mart doc. nos.[9] 974, 1089).   Further, Edgar Morales, who completed Plaintiff's Exit Interview checked off "insubordination," as a reason for Plaintiff's discharge.

---

[3]       Ms. Zboray further testified that she similarly believes that it is "not legal" for Opticians and Optician Apprentices to conduct vision screenings, and that the current Vision Center Manager at the North Windham Wal-Mart, Jane Consoli, has directed Vision Center staff to stop conducting screenings because they are prohibited by law from doing so. (Deposition Transcript for Jenilu Zboray, pp. 15, 56-67, 136).

[4]       hereinafter "Zboray dep."; cited pages and exhibits are attached as Exhibit 2.

[5]       hereinafter "Ellis dep."; cited pages and exhibits are attached as Exhibit 3.

[6]       hereinafter "Morales dep."; cited pages and exhibits are attached as Exhibit 4.

[7]       This entry was approximately one month after Mr. Ellis gave Plaintiff a favorable performance evaluation (Exhibit 4 to Morales dep.).

[8]       This entry is exactly three (3) weeks before the "customer complaint," which Wal-Mart claims as the reason for Plaintiff's termination (Wal-Mart doc. nos.1088-89).

[9]       From Wal-Mart's production of documents; references are to Bates stamp numbers; cited documents are attached as Exhibit 5.

(Exhibit 6 to Morales dep. I).   At his deposition, Mr. Morales claimed that he checked off "insubordination" because Jerry Ellis told him that Plaintiff left work early on April 27, 2001 -- the day of the altercation between Dr. Anthony Gordon and Plaintiff, following which Wal-Mart managers solicited the customer complaint against Plaintiff,[10] and terminated Plaintiff's employment.   (Morales dep. I, pp. 36-37).   Mr. Ellis testified that he believed Mr. Key had permission to leave early.   (Ellis dep. I, p. 89).   Ms. Zboray testified at her deposition that Plaintiff requested and received permission to leave early that day from Mr. Ellis himself. (Zboray dep., pp. 102-03).   From this evidence, a reasonable jury could conclude that Wal-Mart believed Plaintiff was opposed to performing the pre-tests, believed he was taking action to oppose it and might make a complaint to the Department of Public Health and that the real reason for checking off "insubordination" for Plaintiff's discharge was the perception of Plaintiff's resistance, if not outright refusal, to participate in the challenged activities.[11]

None of the public policy discharge cases even suggest, nevertheless hold, that knowledge of a public policy breach by the employer or the employee, prior to the discharge decision is a requirement of the claim.   *See* analysis of cases cited in *Thibodeau*, 260 Conn. at

---

[10]     *See* Zboray dep., pp. 98-99; Deposition Transcript from Huong Nguyen, pp. 28, 64, 75 (hereinafter "Nguyen dep."; cited pages and exhibits are attached as Exhibit 7).

[11]     In fact, Plaintiff testified that during the incident with Dr. Gordon on April 27, 2001, Jerry Ellis was more concerned that Plaintiff would continue to pre-test Dr. Gordon's patients than any alleged customer service issue. (Key dep. I, pp. 187-89; cited pages and exhibits are attached as Exhibit 6).

697- 700.  Indeed, in one of the leading cases following the *Sheets* decision, *Parsons v. United Technologies Corp.*, 240 Conn. 576 (1997), the claim was upheld based upon the former employee's allegation that he had been discharged for refusing to perform a duty he had been hired to perform but which required him to go to a location he considered unsafe.  The Court did not consider whether the employer had ever conceived that requiring an employee to perform the job for which he was hired could be considered in violation of a public policy and it was quite obvious that it had not.  The same can be said of the plaintiff in *Rioux*.  There is simply no support for the claim that the availability of the claim requires knowledge of the illegality prior to the discharge.[12]  It has long been established that employers are not immune from liability because of ignorance of the law.  *See* <u>Cheek v. United States, 498 U.S. 192, 199, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991)</u>; and <u>Barlow v. United States, 32 U.S. 404, 411, (1833)</u> (stating that "ignorance of the law will not excuse any person, either civilly or criminally").  *See also Butler v. Biocore Medical Technologies, Inc.*, 348 F.3d 1163, 1174 (10th Cir. 2003); <u>Ruley v. Nelson, 106 F.R.D. 514, 518 (D.Nev.1985)</u> (noting ignorance of law is no excuse in civil or criminal law).  Neither would it make any sense to deprive an employee of a wrongful discharge claim because he was not aware of the employer's public policy breach which led to his discharge until

---

[12]    Mr. Key testified that he was not aware of Wal-Mart's violation until after his discharge because, as most employees would not, he did not research the issue or seek advice of counsel until after his discharge. (Key dep. I, pp. 68-74).  Nevertheless, he did question and challenge the practice for professional reasons prior to his discharge (Affidavit of Marvin Key, ¶ 4 (hereinafter "Key aff."), attached hereto as Exhibit 8); Zboray dep., pp. 18, 79, 82, 91-92, 97).

after the discharge occurred. *Thibodeau, supra, citing, Rioux; see Sheets,* 179 Conn. at 480 (employee should be protected from losing employment due to illegal acts of employer).

Finally, there is ample evidence in the record that Wal-Mart knew there was an issue with Opticians providing optometric services and had concerns. The declaration of Christopher Adkins (hereinafter "Adkins Dec."), a District Manager for Wal-Mart's Vision Centers, submitted by Wal-Mart in support of its motion, states that the issue had been raised by another Optician in "early 2001 prior to Plaintiff's termination."[13] (Adkins Dec. ¶ 5). That employee, Jeffrey Krol,[14] was discharged shortly thereafter. (Exhibit A to Affidavit of Attorney David Fabricant;[15] Wal-Mart doc. no. 1800, attached as Exhibit 5). In addition to Plaintiff and Mr. Krol, the only other Wal-Mart employee known to Plaintiff who has questioned Wal-Mart's practice of requiring opticians and optician apprentices to perform pre-testing and vision screenings, Dale Ceneviva, (Affidavit of Dale Ceneviva,[16] ¶¶ 7-11), was also terminated.[17] (Key aff., ¶¶ 9-10; Coyne aff., ¶¶ 9-11).

---

[13] The very fact that Mr. Adkins claims he responded to this legal issue by calling the State of Connecticut Department of Public Health, without noting with whom he spoke or requesting confirmation in writing is questionable at best, especially in light of Mr. Ellis' testimony that all legal questions are to be directed to the Legal Department at Wal-Mart's home office. (Ellis dep. I, pp. 123-24).

[14] Mr. Krol is now deceased. (Fabricant aff., ¶ 4).

[15] hereinafter "Fabricant aff."; attached as Exhibit 9.

[16] hereinafter "Ceneviva aff."; attached as Exhibit 10.

[17] It is also interesting to note that on Saturday, March 6, 2004, Ms. Ceneviva received a telephone call from Wal-Mart's "home office" advising her that she was to be reinstated effectively immediately with full back pay -- just two (2) days after Attorney Coyne argued to Attorney Mackin that Ms. Ceneviva was a comparator to Plaintiff because of her prior objection to performing para-optometric services and termination. (Coyne aff., ¶¶ 12-13).

There is other evidence as well to suggest that Wal-Mart managers questioned or should have questioned the practice. As an Optician since 1983 in a wide variety of practices and retail establishments, Mr. Ellis had never been asked by any employer other than Wal-Mart (who has employed him since April 2000) to perform pre-testing or vision screenings. (Ellis dep. I, pp. 6-16). Lenscrafters and National Vision carefully maintain the separateness of the optometric practices located in their stores (Key aff., ¶¶ 5-8). Importantly, the National Vision store Plaintiff worked for prior to taking the position with Wal-Mart was located inside a Wal-Mart store (although not affiliated with Wal-Mart), but unlike Wal-Mart's visions centers, kept its Opticians completely independent from the optometrists and their para-optometric employees. (Key dep. II, pp. 90-91). Plaintiff's current employer, Lenscrafters, similarly maintains the requisite separateness of its optometric and optical services, the former being performed by an Optometrist and his/her staff, and the latter being performed by Opticians. (Key aff., ¶¶ 6-7).

**B.    Wal-Mart's Practice of Having Opticians Perform Para-Optometric Duties Violates The Applicable Licensing Statutes**

Wal-Mart relies primarily upon the alleged statements of unidentified employees of the Connecticut Department of Public Health to justify its contention that the practice of using its own employees to provide para-optometric services is not in violation of the applicable Connecticut licensing statutes. Wal-Mart submits an affidavit of one of its Vision Center District Managers, claiming that he was advised by "CT DOH representatives," after one of Wal-Mart's opticians, Jeffrey Krol, allegedly complained in "early 2001" that the Opticians should not be

performing the vision pre-testing that Wal-Mart could have its Opticians do so, but "an Optometrist, such as Dr. Gordon, had to be available in the Vision Center to instruct and supervise the pre-testing as necessary." (Adkins Dec., ¶¶ 5-6). Mr. Adkins asserts that he "cannot recall the names of all the CT DOH personnel I spoke with" (id., ¶ 6) and, indeed, names not a single one. This affidavit is an insufficient basis upon which to grant summary judgment for a variety of reasons.[18]

### 1. The Affidavit Constitutes Unreliable Hearsay And Is Inadmissible

#### a. Summary Judgment Requires Submission Of Admissible Evidence

First, the federal rules require the submission of "admissible evidence" to support a motion for summary judgment. The moving party must show "on the basis of admissible evidence . . . that there is no genuine issue as to any material fact." *United States v. Pent-R-Books, Inc.*, 538 F.2d 519, 529 (2d Cir. 1976). *See also Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (stating that the movant "must show that there is admissible evidence sufficient to support a finding in [his] favor on the issue that is the basis for the motion"). "Where this initial showing is not made, summary judgment will be denied . . . ." *Pent-R-Books, Inc.*, 538 F.2d at 529. Despite this clear mandate, Wal-Mart is asking this Court to grant summary judgment based on inadmissible evidence regarding a key issue of law in this case -- whether Wal-Mart's practice of requiring Licensed Opticians to perform pre-testing and

---

[18]    *see* n. 13, *supra*.

vision screenings complies with state law.  Plaintiff, on the other hand, is submitting the plain language of the statutes and a decision by the Connecticut Board of Examiners for Optometrists[19] in opposition to Wal-Mart's motion and in furtherance of his claims.

        b.     The Alleged Statements Of The Unidentified "CT DOH Representatives" Are Inadmissible Hearsay

Second, Christopher Adkins' statements are clearly offered for the truth of the matters asserted, and are therefore inadmissible hearsay.  *See* Fed. R. Evid. 801-802.  The statements by the unidentified DOH representatives do not fall within any exception to the hearsay rule and are inadmissible for any reason.  Further, the requisite "guarantees of trustworthiness and reliability" for the residual exception to the hearsay rule are entirely lacking.  *See* Fed. R. Evid. 809. It is inconceivable that an issue as important as compliance with state licensing laws by every Wal-Mart Vision Center in the State of Connecticut would be handled so haphazardly -- no notes identifying the individuals spoken to and no request for written confirmation -- especially when employees are directed to submit legal questions to the Legal Department at Wal-Mart's home office. (Ellis dep. I, pp. 123-24).

        c.     An Opinion As To An Issue Of Law Is Inadmissible

Third, it is well-established that no witness -- fact or expert -- may testify as to legal conclusions.  *See United States v. Scop*, 847 F.2d 135, 139 (2d Cir. 1988); *Pagnucco v. Pan American World Airways, Inc.*, 37 F.3d 804, 826-27 (2d Cir. 1994); *In re Initial Public Offering*

---

[19]     attached hereto as Exhibit 11.

*Securities Litigation*, 174 F.Supp.2d 61, 64 (S.D.N.Y. 2001). All issues of law are to be left to the Court, and therefore, Mr. Adkins' Declaration as to the legality of the challenged Wal-Mart practices should be rejected.

2. **Wal-Mart's Interpretation Is Contrary To The Express Language Of The Statute**

It is telling that nowhere even mentioned in Wal-Mart's thirty-four (34) page brief is Plaintiff's argument that the licensing statutes require that those performing vision screenings and pretesting be employed by a licensed Optometrist. The applicable statutes, even that section quoted in Defendant's brief (pp. 16-17), are replete with references to these services being performed by optometric assistants or technicians or trainees "under the direct supervision, control and responsibility of the **employing** licensed optometrist." Conn. Gen. Stat. §20-138a. *See also* Conn. Gen. Stat. § 20-146(b). Wal-Mart does not and cannot argue that any of its Vision Center employees are employed by a licensed Optometrist. To the extent any "CT DOH representatives" who may have spoken with Mr. Adkins understood that the Opticians in question were employed by Wal-Mart and not by an Optometrist and still gave the answer Wal-Mart claims to have received, their statements were contrary to the express language of the applicable statutes.

3. **Dr. Gordon Did Not Supervise And Was Not Available To Supervise The Wal-Mart Vision Center Employees.**

Moreover, even if the statutes only require supervision by an Optometrist, the evidence does not support Wal-Mart's contention that its practices complied with that requirement. Dr.

Gordon testified that he had no responsibility or control over the employees Wal-Mart provided to perform pre-testing and vision screenings. (Gordon dep., pp. 33-34).[20]  Nor has he provided those employees with any type of training. (*Id.*, p. 42).  Dr. Gordon was not involved in pre-testing in any way, and he has no idea who supervised those employees assigned to perform pre-testing of his patients. (*Id.*, pp. 51-52).  Dr. Gordon had no idea what the Wal-Mart employees' job responsibilities entailed. (*Id.*, pp. 55-56).  Dr. Gordon had no idea what licenses the Wal-Mart employees had or what they were, or were not, qualified to do. (*Id.*, p. 58-59).  In fact, when presented with questions about pre-testing, Dr. Gordon simply refused to answer the Wal-Mart employees performing the tests.[21]  (*Id.*, p. 103-06).  Dr. Gordon testified:

> I had no responsibilities for any of the Wal-Mart employees. (*Id.*, p. 34).
>
> Q: Oka y.  During the time that you've provided services at the North Windham store, have you provided any of the Wal-Mart employees with training on any of these machines?
> A: That's not m y duty to do that.
> Q: Have  you taken any steps to see whether the testing on these machines is being done properly by the Wal-Mart employees?
> A: I t's not my responsibility to do that. (*Id.*, p. 42).
>
> * * *
>
> Q: Are  you ever involved in that pretesting in any way?
> A: No.  Not that  I recall.
> Q: I s there anyone who oversees the Wal-Mart employees in performing that pretesting, if you know?
> A: That's Wal -Mart's responsibility.

---

[20]     Deposition trans. of Dr. Gordon (hereinafter "Gordon Dep."), cited pages attached as Exhibit 12.
[21]     Jenilu Zboray testified that she directed questions about vision screenings and pre-testing to "[t]he licensed optician," not Dr. Gordon. (Zboray dep., p. 15).

Q: Well, based on your experience working there, have you observed anyone who oversees their work in that regard?

A: Again, that would be Wal-Mart's responsibility.

Q: Okay, but I'm asking about your own observation of what goes on in the Vision Center.

A: I don't know who supervises who. In the sense that who trained who, and there's a supervisor there who is a manger. (*Id.*, pp. 51-52).

Accordingly, the public policy expressed in the licensing statutes has been breached under any interpretation of their terms. If, as Plaintiff claims, the licensing statute does not permit other than persons employed by an Optometrist to perform para-optometric services, the breach is apparent by Wal-Mart's requiring its own employees, unaffiliated with the resident Optometrist to perform them in order for Wal-Mart to receive a share of the optometric profits.[22]

If, on the other hand, Defendant's contention that it was permissible for Wal-Mart to do so as

---

[22]   Wal-Mart's claim that that the public policy violated is not "important," because the State of Connecticut Department of Public Health ("DPH") has known of Wal-Mart's practices and has not yet taken action (Def. Mem., p. 18 n.12) underscores Wal-Mart's continuing misunderstanding of what has transpired here and the applicable law. First of all, Plaintiff did not file a complaint with DPH, but merely sent that agency a copy of his Complaint filed in the instant action. (Key aff., ¶ 12). Upon receipt of the Complaint, DPH immediately undertook an investigation, on its own initiative, which continues to this day. (*See* Letter from Gary J. Griffin attached hereto as Exhibit 13). Wal-Mart's assertion that because its stores have yet to be shut down means that they are in compliance with the law shows that they do not understand the implications and penalties associated with a DPH investigation. Further, it has already been established that an independent optometrist, must maintain complete independence from the unlicensed organization, which includes among other things, collecting his own fees, and "control [of] the hiring, staffing, training, office and employment policies of the individuals employed to assist the optometrist in the management and administrative aspects of his practice and in patient care." Connecticut Board of Examiners for Optometrists, Declaratory Ruling, p. 9 (May 1, 2002), Exhibit 11 hereto. (The record herein clearly indicates that neither was true of the arrangement between Wal-Mart and Dr. Gordon). In addition, the timing of the filing of the initial complaint and the final decision in that declaratory ruling indicates that investigations of this sort take a considerable amount of time -- in that case, approximately two and one-half (2-1/2) years, which also negates Wal-Mart's assertions in this regard. Perhaps most disturbing is Wal-Mart's cavalier attitude towards the clear legislative and regulatory directives involved, when it describes these highly regulated vision related procedures over and again as "simple" (Def. Mem., p. 17) and not "important" (Def. Mem., p. 18 n.12).

long as the employees were under the direct supervision, control and responsibility of a licensed optometrist, the breach is apparent because Dr. Gordon denied over and over that he had any supervision of, control over or responsibility for the Wal-Mart employees including Mr. Key[23] and even admitted denying Mr. Key requested assistance which directly led to Wal-Mart's pretext for his discharge.

**B.     Wal-Mart's Argument Of No CUTPA Violation Establishes At Least One Deceptive Practice In Violation of CUTPA**

Wal-Mart argues that the Court should grant summary judgment on Plaintiff's claim that his discharge involved an impropriety derived from the public policy set forth in the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, simply because "[t]here are no material facts suggesting Wal-Mart engaged in any type of 'unfair' competition or 'deception.'" (Def. Mem., p. 18). Wal-Mart ignores all the evidence discussed above as well as that set forth in Plaintiff's memorandum in support of his own motion for summary judgment on this issue (pp. 2-6; 13-17). Instead, after having argued for several pages that Wal-Mart's Vision Center employees are acting as "optometric assistant trainees" under the licensing statutes when performing the vision screenings and pre-tests (Def. Mem., p. 17), it goes on to point out that "Plaintiff (and the other Connecticut opticians) wore a tag identifying themselves as 'optician.'" (Def. Mem., p. 18). "Licensed Optician" is what the tags actually said (Key aff., ¶ 2) and even if

---

[23]     Dr. Gordon even told his patients' mother, Ms. Nguyen, that he was not responsible for Wal-Mart's staff. (Nguyen dep., p. 39).

Wal-Mart's argument as to the meaning of the licensing statutes is accepted then these identification tags were admittedly deceptive. Indeed, in the customer report upon which Wal-Mart's articulated reason for discharging Plaintiff is based, the customer makes direct reference to Mr. Key's "Licensed Optician" badge and the fact that he wasn't living up to the expectation conveyed by that identification. (Customer Complaint, Exhibit 1 to Nguyen dep., attached as Exhibit 14). That customer, Huong C. Nguyen, also testified several times over that she thought the tag Plaintiff was wearing indicated that he was qualified to perform the pre-testing. (Nguyen dep., pp. 32, 59-60, 74-75).

**C.    Summary Judgment For Defendant Is Not Warranted.**

In light of the record evidence discussed above, a reasonable juror could conclude that Wal-Mart became concerned about the legality of its more profitable[24] Vision Center practices in early 2001 when Mr. Krol first complained, that although Mr. Key's performance was judged as "meets standards" in January 2001, it subsequently became concerned that Mr. Key was also adverse to those practices and might eventually go to the Connecticut Department of Public Health, that when Mr. Key asked Dr. Gordon questions about performing the pre-tests in front of a customer, he was being "insubordinate" in an effort to challenge the practice whereupon Dr.

---

[24]    Wal-Mart nowhere contests that the services can be provided more cheaply by Wal-Mart supplying its own Vision Center employees for these services rather than having the Optometrist hire his or her own employees. It can't deny that it shares in the resulting increased profitability of the Optometrist's practice by doing so and also gets around Connecticut's proscription against licensed Optometrists being employed by unlicensed corporations such as Wal-Mart, Conn. Gen. Stat. § 20-133a.

Gordon and Mr. Ellis urged the customer to make a written report as a pretext to discharge Plaintiff and, subsequently, it also terminated two other Vision Center employees who had similarly raised concerns. Summary judgment is not appropriate on such a record. *Holtz, supra.*

**D.    Summary Judgment For Plaintiff Should Be Granted If The Court Finds That A Violation Of Law Has Been Made Out**

Moreover, if the Court finds that a deceptive practice in violation of CUTPA has been established as set forth in Plaintiff's motion for summary judgment or by Wal-Mart's own admission as to the deception in its use of vision center identification tags or that Plaintiff's interpretation of the licensing statutes is the correct one, his motion for summary judgment as to Count One must be granted. That Wal-Mart's practice of having employees identified as "Licensed Optician" acting as "optometric assistant trainees" without properly identifying them as such and/or in violation of the licensing statutes led directly to the reason given for Plaintiff's discharge -- Huong Nguyen's report -- cannot be contested because the report itself clearly so states. Since Wal-Mart has raised no issue of fact on the issue of causation, Plaintiff should be granted summary judgment on Count One.

**Point II**

**WAL-MART'S ARGUMENT AS TO THE IMPLIED CONTRACT CLAIM IS IRRELEVANT**

In support of its request for summary judgment on Plaintiff's implied contract claim, Wal-Mart makes a one paragraph argument that, because Plaintiff's employment was at-will, there can be no implied contract claim. (Def. Mem., p. 19). This is simply, in abbreviated form,

the argument it made and which was rejected in its motion to dismiss. Wal-Mart's assertion that at-will employees can have no enforceable rights in connection with their employment is untenable under Connecticut law.

Plaintiff's claim is not that Defendant breached an implied contract by discharging him but that the assignment to him of duties that a Licensed Optician may not perform under Connecticut law, or as asserted by Wal-Mart, assignment to him of duties of an "optometric assistant trainee," breached the implied contract pursuant to which Defendant hired him as a Licensed Optician. Since that breach resulted in the customer report Wal-Mart claims as the reason for discharging him, Plaintiff claims as damages for the breach, those arising from the loss of his employment. As noted by the Connecticut Supreme Court in *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 12-14 (1995):

> All employer-employee relationships not governed by express contracts involve some type of implied "contract" of employment . . . . To determine the contents of any particular implied contract of employment, the factual circumstances of the parties'; relationship must be examined . . . .

> \* \* \*

> Typically, an implied contract of employment does not limit the terminability of an employee's employment but merely includes terms specifying wages, working hours, *job responsibilities,* and the like. (Emphasis added).

*Torosyan's* holding thus establishes that Plaintiff's implied contract claim based upon the addition of unlawful job duties is viable and that its resolution requires an examination of the

"factual circumstances of the parties' relationship," *id.*, inappropriate for determination on a motion for summary judgment.

To the extent Wal-Mart is arguing that Plaintiff can claim no damages due to his termination because Wal-Mart could otherwise terminate his employment at-will, a claim that the discharge resulted from breach of an implied contract stands on no different footing than, *e.g.*, a claim that the discharge resulted from unlawful discrimination -- in neither case are damages precluded because the employer could otherwise have terminated the employee for any or no reason at all.

### Point III

### SUMMARY JUDGMENT ON THE NEGLIGENT MISREPRESENTATION CLAIM IS WARRANTED ONLY IN PLAINTIFF'S FAVOR

Defendant argues, as it did in its motion to dismiss which was denied, that Plaintiff's negligent misrepresentation claim fails because "his allegation that he inquired about the position to Wal-Mart management with whom he interviewed for the position, [but] no one indicated to Mr. Key that he would be expected or required to perform vision screenings and testing for eye health (glaucoma), which is unlawful [for a licensed Optician]" (Complaint, ¶6) and that the "Wal-Mart representatives who recruited and hired Mr. Key knew or should have known at the time of hiring that he would be required to perform duties inconsistent with those of a Licensed Optician, but failed to disclose that fact to him" (Complaint, ¶15) "fails to assert any alleged misrepresentation but instead alleges only an omission" (Def. Mem., p. 20).

That the failure to fully disclose pertinent information when providing guidance to others in connection with employment constitutes a misrepresentation under Connecticut law is one of the key holdings of *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206 (1987).    The plaintiff there had alleged "that the defendants made unconditional representations of their plans to rehire the plaintiff, when in fact they knew or should have known that hiring plans would be contingent upon student enrollment levels for the following year." *D'Ulisse-Cupo*, 202 Conn. at 218.  This was held to properly allege the tort of negligent misrepresentation because "[i]t is sufficient to allege that the representations contained false information." *Id.*  Plaintiff's allegations of false information are almost identical to those alleged in *D'Ulisse-Cupo*.

Wal-Mart further argues that the failure to inform Plaintiff that he would be expected to perform duties not consistent with those of a Licensed Optician "would not have been false.  As explained, *supra*, Wal-Mart's Vision Center employees may conduct vision screenings and pre-tests as long as they are under the supervision of an optometrist, in this case Dr. Gordon." (Def. Mem., p. 20).  As set forth, *supra*, pp. 14-17, this interpretation as to what duties are consistent with those of Licensed Optician is expressly at odds with the statutes' requirements.  Moreover, as set forth *supra*, pp. 14-17, even if the statute only required supervision by Dr. Gordon, by Dr. Gordon's own admission, this supervision was not provided.[25]  Moreover, no one ever told

---

[25]     *See* Defendants' Local Rule 56(a)(1), ¶ 9: "Dr. Gordon did not hire, fire, discipline, evaluate, supervise or manage, promote, set schedules or determine benefits with respect to Vision Center employees."

Plaintiff that in addition to being a Licensed Optician, Wal-Mart also expected him to perform the duties of an optometric assistant trainee. Either way, Plaintiff was provided with false information. *D'Ulisse-Cupo, supra.*

Wal-Mart also asserts that Plaintiff cannot show justifiable reliance upon the misinformation because he testified that he took the job with Wal-Mart to make more money and did so and could not identify any damages suffered as a result of "Wal-Mart's failure to advise him that he would be responsible for conducting vision screenings and pre-testing." (Def. Mem., p. 21). The deposition testimony cited by Wal-Mart in this regard does not suggest that Mr. Key would not have acted differently had he known that the higher pay at Wal-Mart was tied to the performance of duties inconsistent with those of a Licensed Optician. Mr. Key was not performing any such duties in his Licensed Optician position with National Vision. (Key aff., ¶¶ 5-6). The fact that the plaintiff in *D'Ulisse-Cupo* could only speculate as to what she would have done differently if she had been given complete information did not defeat her claim. *See D'Ulisse-Cupo*, 202 Conn. at 218 n.5. In this case, Plaintiff had already given up his employment with National Vision when he learned that he had been given false information (Key dep. II, pp. 67, 94) so reliance has been established. That his performance of the undisclosed duties resulted in his discharge and damaged him also cannot be disputed whether or

not he understood that to be the legal implication of the question posed in his deposition as to "damages."[26]  Summary judgment is not appropriate. *Holtz, supra.*

Wal-Mart also argues that Plaintiff's motion for summary judgment should be denied on that part of the negligent misrepresentation claim based on the undisputable representation Wal-Mart and Ellis made to Vision Center employees that they should freely ask the optometrist any questions they had about vision screenings or pre-testing (Def. Mem., p. 33)[27].  Wal-Mart asserts that Plaintiff's "reliance on such a representation did not cause him any detriment" because "the complaint of Ms. Nguyen was simply the straw that broke the camel's back."  *(Id.)*[28]  Thus, Wal-Mart does not (and, indeed, cannot) dispute that without the "complaint" which, as it expressly states, was written, at least in part, because the customer felt uncomfortable with Mr. Key asking Dr. Gordon questions (See Exhibit 14) which Dr. Gordon refused to answer,[29] Plaintiff would not have been discharged.

Wal-Mart also argues that any reliance was not reasonable because "Plaintiff had conducted these pre-tests throughout his employment and, therefore, such questions were not necessary.  Moreover, even if they were arguably necessary they could have been asked of Dr. Gordon outside the earshot of the patient."  (Def. Mem., p. 33).  Wal-Mart presents no record

---

[26]     Contrary to Defendants' assertion that Plaintiff suffered no damages as a result of Wal-Mart's misrepresentation, Plaintiff's testimony clearly and directly linked his termination with Wal-Mart's misrepresentation. (Key dep. II, pp. 97-98).

[27]     Wal-Mart attempts to give the impression that this fact is not alleged in the Complaint by failing to mention that it is included in an Amended Complaint filed prior to Wal-Mart's Answer.

[28]     A very heavy straw given that the most recent analysis of Plaintiff's performance was a "meets standards" performance review rendered in January 2001. (Exhibit 4 to Ellis dep. I).

[29]     Gordon dep., pp. 103-06.

evidence that would support a finding by the jury that these reasons or any reason other than the

simple fact that Plaintiff had asked Dr. Gordon questions as directed, which is what the customer

"complaint" says, caused Plaintiff's discharge. Indeed, Plaintiff's termination notice refers only

to the "complaint" itself (Exhibit 6 to Morales dep.) and Morales and Noll both testified that it

was the fact of the Complaint that led to Plaintiff's discharge (Deposition Transcript for Roger

Noll I,[30] pp. 19-20; Morales dep. I, p. 19-20), not any attendant circumstances. Wal-Mart's

arguments are thus insufficient to create any issue of fact or to defeat Plaintiff's motion for

summary judgment on this claim.[31]

### Point IV

### PLAINTIFF'S DISCRIMINATION AND RETALIATION CLAIMS ARE NOT SUBJECT TO SUMMARY JUDGMENT

To begin with, the motion for summary judgment on the discrimination and retaliation

claims simply ignores prevailing Second Circuit precedent with respect to summary judgment on

such claims and suggests that Plaintiff must prove disparate treatment (Def. Mem., p. 23) and

then "show" in response to Wal-Mart's articulated reason for his discharge that the reason is false

---

[30]     hereinafter "Noll dep."; cited pages are attached as Exhibit 15.
[31]     Wal-Mart also argues that Plaintiff did not request permission to move for summary judgment on this claim (Def. Mem., p. 34). However, due to Wal-Mart's recalcitrance in discovery, *see supra*, n. 1, Plaintiff's August 15, 2003 request for the Court's permission to file for summary judgment (Exhibit A to Reilly aff.), which was approved by the Court had specifically requested "that if Defendants' discovery responses, once received, contain information which support summary judgment on Counts One and Two for different reasons or support summary judgment on counts other than those addressed herein, that Mr. Key be permitted to supplement any motion for summary judgment he is permitted to make accordingly." The evidence establishing this part of Plaintiff's negligent misrepresentation claim was uncovered in the deposition of Ellis taken on October 14, 2003 and in the Wal-Mart Academy of Vision manual, produced after the request for permission to file the motion for summary judgment.

and that discrimination was more likely than not the real reason for his discharge. (Def. Mem., p. 25).

In *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 77-78 (2d Cir. 2001), the Second Circuit held that:

> It is true that evidence of disparate treatment *may* establish the inference of discrimination necessary to satisfy a plaintiff's *prima facie* case under *McDonnell Douglas. See Abdu-Brisson*, 239 F.3d at 467-68. But such evidence is not always necessary. *See id.* "[A] plaintiff may rely on direct evidence of what the defendant did and said" in satisfying her initial burden under *McDonnell Douglas. Tarshis v. Riese Org.* 211 F.3d 30, 35 (2d Cir. 2000); *see also Abdu-Brisson*, 239 F.3d at 468. We have held, for instance, that evidence that "the employer had told the employee that he was being fired because of his age[,]…coupled with a firing (or refusal to hire) of a person in the protected age group, would support a finding that the firing was based on an impermissible criterion such as age." *Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921 (2d Cir. 1981).
>
> * * *
>
> Holtz's testimony is the only evidence in the record directly ascribing discriminatory intent to Cowan or RCI, and consists largely of her uncorroborated accounts of what Cowan said. We nonetheless conclude that her statements raise a genuine issue of fact as to the defendant's intent. *See Owens v. New York City Hous. Auth.*, 934 F.2d 405, 410 (2d Cir.) (stating that employer's contention that plaintiff's proffered evidence of discriminatory comments "is uncorroborated and not credible is a jury argument inappropriate on a motion for summary judgment"), *cert. denied*, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed 2d 451 (1991); *Sorlucco v. New York City Police Dep't.* 888 F.2d 4, 7 (2d Cir. 1989) ("The plaintiff may preclude summary judgment by producing evidence from which the trier of fact reasonably could draw an inference of discrimination.").

The same is true with respect to what a Plaintiff must show to defeat a motion for summary

judgment where the defendant has articulated a legitimate non-discriminatory reason for its

action:

> We first note that just as evidence of disparate treatment is not an essential element of a *prima facie* case of discrimination, *see Abdu-Brisson*, 239 F.3d at 467-68, such evidence is also not always necessary at the final stage of the *McDonnell Douglas* analysis. *See, e.g., Owens,* 934 F.2d at 410 (holding that evidence of remarks by employer reflecting discriminatory motive was sufficient to "raise[] a triable issue as to whether the articulated reasons for [the employer's conduct] were pretextual."). To defeat summary judgment within the *McDonnell Douglas* framework, moreover, "the plaintiff is not required to show that the employer's proffered  reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronis v. Aetna Life Ins. Co.,*  46 F.3d 196, 203 (2d Cir. 1995); *see also Reeves*, 530 U.S. at 147, 120 S.Ct. 2097; *Bickerstaff v. Vassar College*, 196 F.3d 435, 447 (2d Cir. 1999), *cert. denied, *79530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000); *Fields v. New York State Office of Mental Retardation and Development Disabilities*, 115 F.3d 116, 120 (2d Cir.1997).  The plaintiff's burden in this regard "may often be carried by reliance on the evidence comprising the prima facie case, without more." *Cronin*, 46 F.3d at 203.

*Id.* at 78-79.

**A.**    <u>**Summary Judgment Is Not Appropriate On the Discrimination Claims**</u>

In this case, there is sufficient evidence, both direct and indirect to defeat summary judgment applying this standard. That evidence is as follows:

- the statement of Plaintiff's direct supervisor[32] that he had wanted Plaintiff "fired because he was a '350 lb black fucking asshole.'"[33]    (Exhibit A to Fabricant aff.);

- Jerry Ellis documented several instances of customer service issues, insubordination and attendance issues for other Vision Center employees doing the same job Plaintiff did who are White and were not disciplined or terminated as was Plaintiff, as follows:

    <u>Phyllis Parmenter:</u>

    - four (4) separate customer service issues, including a prescription that was not in the file, turning customers away who sought exams. (Wal-Mart doc. nos. 963, 989, 1185, 1374, attached as Exhibit 5);

---

[32]    Although Wal-Mart claims that Roger Noll was the decisionmaker, it is clear from the record evidence that Jerry Ellis was the one who planned and coordinated Plaintiff's termination beginning in February, 2001 (just one month after giving Plaintiff a favorable performance evaluation), and culminating in seeking permission from the Vision Center District and Regional Managers to terminate Plaintiff's employment three (3) weeks prior to the incident for which he was purportedly terminated and acting in concert with Dr. Gordon, and encouraging Co-Manager, Edgar Morales, to make the final recommendation to Roger Noll. (Wal-Mart Doc Nos. 1084-89, 1130-31, 1136 (attached as Exhibit 5)); Ellis dep. I, pp. 74-85; Morales dep. I, pp. 9-20; Noll dep. I, pp. 19-23). Further, it was Jerry Ellis who oversaw the disciplinary process for Vision Center staff and ensured that Plaintiff received a written coaching and a decision-making day. (Exhibits 2 and 3 to Ellis dep. I). In fact, when Mr. Ellis first sought Roger Noll's approval to terminate Plaintiff's employment in early-April, Mr. Noll testified that he reviewed Plaintiff's "paperwork" and disagreed with termination. (Noll dep. II, p. 35). Therefore, Mr. Ellis continued with his plan to get rid of Plaintiff, whom he characterized as the "350 lb fucking black asshole," and needed to create at least one (1) more incident do so.

[33]    Mr. Ellis' statement is admissible evidence as an admission and because he made the statement as a Wal-Mart Manager acting within the scope of his duties. Fed. R. Evid. 801(d)(2)(D). *See Stern v. Trustees of Columbia University*, 131 F.3d 305, 313 (2d Cir. 1997). Attorney Fabricant's notes are admissible under the residual exception to the hearsay rule, because they bear the required "guarantees of trustworthiness," and are clearly offered as evidence of a material fact, i.e., Wal-Mart's discriminatory motive for terminating Plaintiff's employment. Fed. R. Evid. 807. Further, because Mr. Krol is deceased, this is the only source available to Plaintiff, and the nature of the statements speaks for itself -- the interests of justice will be served by admitting this statement. *Id.*

- eight (8) separate instances of insubordination, including refusing to check in orders, telling Mr. Ellis that "she was taking back her life, she wasn't taking shit from anyone any more," refusing to wait on customers and telling Mr. Ellis to do it himself, yelling at Mr. Ellis in the front of the store, and exhibiting hostile behavior in general (Wal-Mart doc nos. 923, 963, 964, 1012, 1021, 1035, 1046-47, 1719, attached as Exhibit 5); and

- twenty-one (21) separate instances of being late or calling out, one such occasion forcing the Vision Center to remain closed (Wal-Mart doc. nos. 921, 1020, 1050, 1066, 1078, 1080, 1082, 1084, 1116, 1120, 1122, 1124, 1126, 1128, 1325-26, 1329, 1439, 1518, 1520, 1689, attached as Exhibit 5);

Jenilu Zboray:

- seven (7) separate customer service issues,[34] including turning away customers who wanted exams, dispensing eyewear when not authorized and forcing a customer to make an unnecessary second trip to the Vision Center (Wal-Mart doc nos. 922, 949, 1008, 1054-55, 1374, 1460, 1521, attached as Exhibit 5);

- a "hotline" complaint by a customer against Ms. Zboray (Wal-Mart doc. no. 1730, attached as Exhibit 5);

- four (4) performance issues, including the need for re-training and "correction on several issues that she should know by now" (Wal-Mart doc nos. 992, 1010, 1064, 1483, attached as Exhibit 5); and

- five (5) separate instances of insubordination, including lying, forging Plaintiff's signature and obtaining an unauthorized loan (Wal-Mart doc nos. 925, 947, 1022-23, 1436, 1446, attached as Exhibit 5);

---

[34]    It is telling that Mr. Ellis characterized Ms. Zboray's customer service issues as "training" issues, and did not discipline her even though she and Plaintiff had allegedly received the same training, and the issues that Plaintiff was disciplined for had nothing to his qualifications or abilities as a Licensed Optician. (Ellis dep. II, pp.181, 224 and 243).

<u>Dave Peterson:</u>

- five (5) separate customer service issues, including banging things in
  the lab, swearing, using F word (Wal-Mart doc. nos. 966, 1122, 1510,
  1614-15, attached as Exhibit 5);

- one (1) incidence of insubordination when he called Jerry Ellis a
  "fucking liar" (Wal-Mart doc. no. 1616, attached as Exhibit 5);

- Dave Peterson was not disciplined for any of these instances, but was
  later terminated for a reason that has not been fully explained,
  although he was given a full investigation, including interviews. Even
  Dave Peterson himself was interviewed and allowed to offer an
  explanation prior to being terminated. Plaintiff was not given the same
  opportunity, nor was anyone who might have supported Plaintiff
  allowed the opportunity to explain what really happened with Dr.
  Gordon and Jerry Ellis on April 27, 2002[35] (Ellis dep. I, pp. 40-42;
  Zboray dep., p. 34).

- Further, Wal-Mart received two (2) separate hotline complaints by
  customers about Mr. Ellis (Wal-Mart doc nos. 1730-31, attached as
  Exhibit 5), one of which stated that Mr. Ellis was "very abrupt and
  rude" and the other stated that he was of "no help" and "rude" to the
  point that the customer said that she had been warned about him by
  other customers, but decided to take her chances at the Vision Center

---

[35]    Mr. Morales also testified about investigating incidents regarding other Vision Center employees at the
North Windham Wal-Mart, all of whom were White (Wal-Mart doc nos. 1799-1800, attached as Exhibit 5), one of
whom he discharged after a full investigation. (Morales dep. I, pp. 25-29).

anyway.   Wal-Mart took no action against Jerry Ellis, a White manager; [36]

- Dr. Gordon's statement that he was "sick of Black people messing up"[37]

---

[36]      Again it is telling that Wal-Mart explains the lack of discipline against Jerry Ellis by saying that the complaints were received during the "shakedown period" (first six (6) months of operation of the Vision Center). (Letter from Gregory Reilly and Verification of Skeet Scoville, dated December 23, 2003).  Wal-Mart does not explain why it would take six (6) months for its managers to learn not to be rude or how Mr. Ellis established a reputation of rudeness in such a short period of time to warrant customers warning other potential customers about him, and why it took no action -- this is entirely inapposite to Wal-Mart's repeated claims that customer service is its first priority -- and Edgar Morales' testimony:

> Q:  Did you consider the incident that occurred on April 27, 2001, as misconduct on Mr. Key's part, as well?
> A:  Yes.
> Q:  And why did you consider that misconduct?
> A:  He upset a customer.  Customers pay our wages.
> Q:  Any other reason why you considered that misconduct?
> A:  If you upset a customer, a customer has neighbors, customer has relatives and friends.  That customer being upset, to bring it to a manager's attention is definitely going to go home and discuss it with their friends, family and anybody else who wishes to listen.  And they're going to get the impression that we have a bad reputation for customer service, and they won't come to our store.

(Morales dep. I, p. 38).
Accordingly, while Wal-Mart claims that it terminated Plaintiff's employment for fear that Ms. Nguyen "might" tell her neighbors or relatives that Wal-Mart has a bad reputation for customer service, Jerry Ellis who had already created such a reputation among Wal-Mart customers, was never disciplined in any way.

[37]      Wal-Mart contends that this comment is meaningless because Dr. Gordon had no role in Plaintiff's discharge (Def. Mem., p. 26), there was no "nexus between the comments and the adverse employment action (Def. Mem., p. 27) and Dr. Gordon is Black so no discriminatory animus can be inferred (Def. Mem., p. 27).  By encouraging Nguyen to submit the report that resulted in Plaintiff's discharge (See Exhibit 14; Gordon dep., pp. 69-71; Nguyen dep, p. 75), Dr. Gordon played a very important role in that discharge particularly given the inference of collusion with Ellis that can also be drawn from the evidence.  That the comment was followed immediately with Dr. Gordon's and Ellis' encouragement of the written report hardly renders it a "stray" remark with no nexus to the discharge that immediately followed the report.  That Dr. Gordon is also Black is of no moment; that a member of a protected class can discriminate against other members of that same protected class based upon the individual's view of how members of that class should conduct themselves is well established.  *See e.g. Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998 (1998) and explicitly rejecting any inference that one member of a protected class is unlikely to discriminate against another member of the same class); *Kang v. ULim America*, 296 F.32 810 (9th Cir. 2002) (supervisor discriminated against employees of same national origin when he held them to higher standard and made negative comments when they failed to live up to his notions of how they should act).

- the fact that Jerry Ellis, who initiated and carried out the campaign to terminate Plaintiff's employment, and Gordon were "best friends" (Zboray dep., p. 30);

- the fact that it appeared to the only eyewitness on April 27, 2001 that Mr. Ellis tried to "hurry up and cover for Dr. Gordon" (Zboray dep., p. 27);

- the fact that Dr. Gordon intentionally upset Plaintiff on April 27, 2001 by first yelling at him in front of his co-workers and Vision Center customers for allegedly stapling his patient's medical records "incorrectly," refusing to answer Plaintiff's questions regarding optometric services, making a racist remark, or as Ms. Zboray said a "slur," encouraging the customer to make a report and working with Ellis to get that done (Zboray dep., pp. 26, 38, 36-37, 42-43, 107; Gordon dep., pp. 69-71; Nguyen dep., p. 75);

- the fact that Mr. Ellis testified that "you don't discipline somebody for not knowing how," and allowing other Vision Center employees (all of whom were White) the opportunity for additional training when necessary (Ellis dep., II, p. 224).

Neither Wal-Mart, nor Dr. Gordon, can hide behind the purported decisionmaker, Roger Noll, and claim immunity from Plaintiff's discriminatory and wrongful termination. *See Quinn v. Monroe County*, 330 F.3d 1320, 1327 (11th Cir. 2003); *Dedmon v. Staley*, 315 F.3d 948, 949 n.2 (8th Cir. 2003); *Mato v. Baldauf*, 267 F.3d 444, 450 (5th Cir. 2001). The testimony of Edgar Morales makes clear that Roger Noll accepted his recommendation to discharge Plaintiff and that his recommendation was based primarily upon what he was told by Jerry Ellis (Morales dep. I, pp. 14-20). Had Roger Noll conducted an independent investigation, the causal link between Dr. Gordon's and Jerry Ellis' discriminatory animus toward Plaintiff may have been broken, but the fact is that no one investigated the incident on April 27, 2001 with Ms. Nguyen or took any action other than to insure that the customer "complaint" was made and in writing (Nguyen dep.,

pp. 28; 43; 64-75).  *See e.g., Mato*, 267 F.3d at 450.  No one spoke with Plaintiff and no one

spoke with the only eyewitness, Jenilu Zboray, although every other incident involving a White

Vision Center associate was investigated and the employee was allowed to explain him/herself.

"The causal link is not broken, however, where the decision-maker 'rubber-stamps' the firing

recommendation of subordinates; in such cases, we say that the decision-maker acts as a conduit

of the subordinates' improper motives."  *Id.*  The record evidence gives use to an inference that

Plaintiff's employment was terminated in part because of his race and Defendants' motion for

summary judgment should be denied.

**B.      There Is More Than Sufficient Evidence For a Finding In Plaintiff's Favor On the
          Retaliation Claim**

In *Holtz*, 258 F.3d at 79, the Second Circuit stated that:

> To establish a *prima facie* case of retaliation under Title VII, a plaintiff
> must show "(1) that she was engaged in protected activity by opposing a
> practice made unlawful by Title VII; (2) that the employer was aware of
> the activity; (3) that she suffered adverse employment action; and (4) that
> there was a casual connection between the protected activity and the
> adverse action." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136
> F.3d 276, 292 (2d Cir. 1998); *see McMenemy v. City of Rochester*, 241
> F.3d 279, 282-83 (2d Cir. 2001).

Defendant argues in a single paragraph that summary judgment is warranted on

Plaintiff's retaliation claim because Plaintiff "cannot identify the persons to whom he

complained . . . .  Roger Noll, the store manager who made the decision to terminate Plaintiff's

employment, was not aware of Plaintiff's alleged complaint about the 'abusive' remark . . . [and]

Plaintiff acknowledged in his deposition that he did not know whether he was terminated based

on the Nguyen incident, his race or because of his alleged complaint about the 'abusive' remark." (Def. Mem., p. 28).

All three arguments conveniently ignore that the Nguyen incident and the complaint about the 'abusive' remark which directly related to his race happened on the same day[38] and that the following working day, Plaintiff was discharged (Key dep. II, p. 140), that there is sufficient evidence upon which a jury could find that Plaintiff was complaining to Ellis about Dr. Gordon's behavior[39] (Key dep. I, pp. 182, 186-88), that Ellis and Dr. Gordon understood Plaintiff was going to make a complaint to other Wal-Mart managers about Dr. Gordon's behavior (Key dep. I, pp. 183-84; Ellis dep. I, p. 89; Zboray dep., pp. 101-02), which he did (Key dep. I, pp. 183-86), and that Ellis and Dr. Gordon orchestrated the customer report which led to Plaintiff's discharge after that became clear.[40]  The fact that Noll rubberstamped the decision made by Morales at Ellis' behest does not insulate Wal-Mart from liability based upon Noll's allegedly limited knowledge. *See Quinn*, 330 F.3d at 1327; *Dedmon*, 315 F.3d at 949; *Mato*, 267 F.3d at 450 and discussion, *supra*, pp. 32-33.  Neither does the fact that Ellis, Morales and Noll all deny knowledge of Plaintiff's complaints.  Plaintiff's and Zboray's testimony as to the circumstances of the incident raise a factual issue as to Ellis' knowledge.  (Key dep. I, pp. 182-186; Zboray

---

[38]    Thus, it is not surprising that Plaintiff alleges that all three (3) played a part in his discharge and that he could not tie the decision directly to any single factor as he was asked to do in his deposition.
[39]    Jenilu Zboray also complained to Jerry Ellis about Dr. Gordon's behavior during the incident, which complaints were similarly ignored. (Zboray dep., pp. 19-20, 26). Ms. Zboray also told Store Co-Manager Thomas that Plaintiff was treated unfairly. (*Id.*, p. 37).
[40]    Plaintiff also discussed Dr. Gordon's discriminatory remark at his exit interview, and Edgar Morales acknowledged that he knew that Plaintiff had so complained. (Key dep. I, pp. 177-79; Morales dep. I, p. 32).

dep., pp. 101-102.). The fact that Ellis brought Morales in (Ellis dep. I, p. 83; Morales dep. I, pp. 9-10) before Morales went to Noll for approval of the discharge (Morales dep., II, pp. 14-15) raise a factual issue as to Morales' and Noll's knowledge. The fact that the discharge followed on the heels of the complaint raise a factual issue as to the casual connection. *Holtz*, 253 F.3d at 81.

This situation is strikingly similar to the one in *Holtz* where the district court's grant of summary judgment on the plaintiff's retaliation claim was reversed by the Second Circuit:

> Holtz's termination occurred shortly after she complained to Massimo, the Director of Human Resources, about her confrontation with Cowan. That confrontation, in turn, arose from Holtz's desire to avoid interaction with Mumbach, whom she alleges was sexually harassing her. Massimo investigated the incident, and her ensuing conversations with Holtz about the investigation and more broadly about Holtz's stated desire to leave RCI eventually led to Holtz's termination by Massimo and John Leyden, RCI's Chief Financial Officer. 258 F.3d at 79 (footnote omitted).

* * *

> A rational jury could conclude from the circumstances of her termination -- the fact that it grew directly out of a dispute that may have been related to her complaints of sexual harassment, and the evidence that the persons who made the decision to terminate Holtz may have known of those complaints -- that retaliation for protected activity "was *a* substantial motivating factor" for the adverse employment action. (emphasis in original). *Id.* at 81 (citation omitted).

## C.   Summary Judgment Is Not Appropriate On The Aiding And Abetting Discrimination Claim Against Dr. Gordon

Wal-Mart's argument that there is no basis upon which Dr. Gordon can be considered to have done anything to "aid, abet, incite, compel or coerce" Plaintiff's discriminatory discharge as

defined under the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(1)(5), essentially is that there was no discriminatory act, that Dr. Gordon did nothing more than bring Nguyen's complaint to the attention of Wal-Mart management and played no role in Wal-Mart's decision to discharge Plaintiff. By its very terms, CFEPA's aiding or abetting provision does not require a finding that the defendant have made or substantially influenced the alleged discriminatory act. As stated by this Court in *Bolick v. Alea Group Holdings*, 278 F.Supp. 2d 278, 282 (D.Conn. 2003), "CFEPA aiding and abetting liability thus requires that the individual assists another person in discriminatory conduct" and, according to the Connecticut Supreme Court, there is no requirement that the aider and abettor intend that unlawful discrimination occur, *Evening Sentinel v. National Organization for Women*, 168 Conn. 26, 32-33 (1975).

From the record evidence that has already been cited extensively in this memorandum, a reasonable jury could easily conclude that Jerry Ellis, prior to the customer report used to justify the discharge, sought the termination of Plaintiff's employment due to his race and/or his complaint about Dr. Gordon's race-related comments, that Ellis and Dr. Gordon were "best friends" (Zboray dep., p. 30) and that Dr. Gordon sought to aid Ellis, provoking Key first by not responding to his questions when pre-testing Ms. Nguyen's child (Gordon dep., pp. 104, 106) and then by indicating with reference to Plaintiff that he was "sick of Black people messing up" (Key dep. I, pp. 156, 160-62, 177-78, 180; Zboray dep., p. 106). As set forth in Ms. Nguyen's report, Dr. Gordon encouraged her to make a report to Wal-Mart management about Plaintiff, although

he had never encouraged such action against other Wal-Mart employees about whom customers had expressed concerns previously (Gordon dep., pp. 69-71), which was then used by Wal-Mart to justify Plaintiff's discharge (*supra*, pp. 28-32). Summary judgment on the aiding and abetting claim is not appropriate. *Holtz, supra.*

## Conclusion

For all the foregoing reasons and those set forth in Plaintiff's memorandum in support of his motion for summary judgment, Defendant's motion for summary judgment should be denied in all respects and Plaintiff's motion for summary judgment granted.

Done at Bridgeport, Connecticut, this 15th day of March, 2004.

Pamela J. Coyne
Federal Bar No. ct22941
DURANT, NICHOLS, HOUSTON,
HODGSON & CORTESE-COSTA, P.C.
1057 Broad Street
Bridgeport, CT 06604
(203) 366-3438
ATTORNEYS FOR PLAINTIFF

Not Reported in A.2d
**(Cite as: 1999 WL 185142 (Conn.Super.))**
**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.

Carolyn TAYLOR,
v.
HALL NEIGHBORHOOD HOUSE, Inc.

No. CV 98356027S.

March 17, 1999.

Ruling on Defendant's Motion to Strike (# 101)

MOTTOLESE.

*1  *First Count.* Granted. The allegations are
insufficient as a matter of law to state a cause of
action for intentional infliction of emotional distress.
They do not rise to the level of extreme and
outrageous conduct nor are there any factual
allegations that support the conclusory statement that
the plaintiff suffered "extreme emotional distress."

*DeLaurentis v. New Haven,* 220 Conn. 225, 266-67,
597 A.2d 807 (1991).

*Second Count.* Same as first count.

*Third Count.* Denied. Even if the employment was
"at will" and even if the individual defendant
harbored only a perception that the plaintiff would
report her deficiencies to DCF, termination of the
plaintiff's employment for that reason would violate
an articulated public policy that protects an
employee's job security from retaliation for reporting
employer deficiencies to supervisory authorities.
*Sheets v. Teddy's Frosted Foods, Inc.* 179 Conn. 471
(1980); *Morris v. Hartford Courant, Co.,* 220 Conn.
676, 679 (1986).

*Fourth Count.* Denied. It cannot be said as a matter
of law that the individual defendant's conduct was not
unreasonable, *Parsons v. United Technologies Corp.,*
243 Conn. 66, 88, 89, 700 A.2d 655 (1997).

*Fifth Count.* Denied. Same as fourth count.

1999 WL 185142 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works