**FILED**

2004 MAR 16  A 11: 03

U.S. DISTRICT COURT
HARTFORD, CT.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARVIN KEY, | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:03CV144 (RNC) |
| | : | |
| v. | : | |
| | : | |
| WAL-MART AND DR. GORDON | : | |
| | : | |
| Defendants. | : | MARCH 15, 2004 |

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

Plaintiff, Marvin Key, by and through his undersigned counsel, submits this Local Rule 56(a)(2) Statement in support of his opposition to Defendants' motion for summary judgment.

1.    Denied.  Plaintiff terminated his employment relationship with National Vision after accepting employment with Wal-Mart.  (Key dep. II, pp. 90-92[1]).

2.    Admitted in part.  An increase in pay was a, not necessarily the only, reason for accepting employment with Wal-Mart.  (Key dep. II, pp. 90-91).

3.    Defendants' statement regarding the lack of a written contract is irrelevant to Plaintiff's claims.

4.    Admitted that during the relevant period of time Jerry Ellis managed the Vision Center and that he is not licensed to practice opticianry in Connecticut.

5.    Admitted.

---

[1]    Cited pages and Exhibits are attached to Plaintiff's memorandum as Exhibit 6.

6.      Admitted except that Wal-Mart's opposition indicates that the name tags were not accurate. (Def. mem., p. 18).

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Admitted except as to determination of benefits.

11.     Admitted in part. (*See* Response to ¶ 12, *infra*).

12.     Denied. (Key dep. II, pp. 86-87, 193).

13.     Admitted.

14.     Denied.   (Wal-Mart Vision Academy Training Manual, p. 160, attached as Exhibit 4 to Plaintiff's Local Rule 56(a)(1) Statement; Gordon dep., p. 57[2]).

15.     Denied. (Key dep. II, pp. 86-87).

16.     Denied. (Zboray, dep., pp. 11-12[3]; Ellis dep. I, pp. 55-56[4]).

17.     This paragraph has no relevance to Plaintiff's claims.

18.     Admitted that this statement describes Wal-Mart's practice of requiring a patient to place his/her head in a chin rest when using the auto-refractor machine, and that the machine prints a "receipt," and denied as to what the receipt actually means if anything. (Ellis dep. I, pp.

---

[2]     Cited pages and Exhibits are attached to Plaintiff's memorandum as Exhibit 12.
[3]     Cited pages and Exhibits are attached to Plaintiff's memorandum as Exhibit 2.
[4]     Cited pages and Exhibits are attached to Plaintiff's memorandum as Exhibit 3.

55-56; Wal-Mart Vision Academy Training Manual, p. 160, attached as Exhibit 4 to Plaintiff's Local Rule 56(a)(1) Statement).

19.    Admitted that Wal-Mart hopes that customers who submit to such "vision screenings" follow through with an eye exam by the resident Optometrist, and that customers are always told to see the Optometrist regardless of what the printed "receipt" says. (Ellis dep. I, pp. 53-54; Zboray dep., pp. 11-12).

20.    Admitted in part.  Plaintiff was trained to operate certain machines, but was not properly trained to pre-test Dr. Gordon's patients. (Key dep. II, pp. 86-87, 193).

21.    Admitted that this statement describes Wal-Mart's practice.

22.    Admitted that this statement describes Wal-Mart's practice.

23.    Admitted that Dr. Gordon referred to, and relied on, the results of the pre-testing; whether he conducted an independent interpretation is an issue of fact. (Key dep. I, pp. 198-200; Key dep. II, p. 62; Zboray dep., p. 95; Ellis dep. I, p. 79; Gordon dep., p. 35 ("[w]hatever pretesting Wal-Mart provided, I accepted it"), pp. 39, 48 (Dr. Gordon would "[l]ook at the printouts" as part of his examination).)

24.    Denied. (Gordon dep., pp. 50-52; Key dep II, p. 120-22).

25.    See response to ¶ 23, supra.

26.    Defendant's statement regarding instructions to Vision Center employees "not to discuss pre-testing results with the customers" is irrelevant to Plaintiff's claims.

27.    Admitted that Wal-Mart did not disclose the full extent of the duties it requires Licensed Opticians in Connecticut to perform and never told him that he would be required to perform para-optometric services for the resident Optometrist.

28.    Denied.  (Key dep. I, pp. 191-96; Key dep. II, pp. 96-98)

29.    Admitted.

30.    Admitted that Wal-Mart has a policy in place, but denied that it was equitably applied.  (Wal-Mart doc. nos. 921-23, 925, 936, 947, 949 963-64, 966, 989, 992, 1008, 1010, 1012, 1020-23, 1035, 1046-47, 1050, 1054-55, 1064, 1066, 1078, 1080, 1082, 1084, 1116, 1120, 1122, 1124, 1126, 1128, 1185, 1374, 1325-26, 1329, 1374, 1439, 1436, 1446, 1460, 1483, 1510, 1518, 1520-21, 1614-16, 1689, 1730-31[5]; Ellis dep. II, pp. 181, 224 and 243).

31.    Admitted as to the steps of the policy, but denied that it was equitably applied "[w]hen necessary."  (*See* Response to ¶ 30, *supra*).

32.    Admitted that termination may follow a decision-making day.

33.    Admitted.

34.    Admitted.

35.    Admitted.

36.    Admitted.

37.    Admitted as to the quoted text.

38.    Admitted.

---

[5]    Cited Wal-Mart documents are attached to Plaintiff's memorandum as Exhibit 5.

39.    Admitted.

40.    Admitted that Plaintiff received the written coaching, but denied that Plaintiff agreed with the coaching.  (Key dep. I, pp. 133-43).

41.    Admitted.

42.    Admitted.

43.    Admitted as to the quoted text, and denied as to the "reasons."  (Key dep. I, pp. 145-56, 148, 149-50, 155).

44.    Admitted.

45.    Admitted that Plaintiff signed form, but indicated that further investigation was warranted.

46.    Admitted.

47.    Admitted that Plaintiff so testified.

48.    Admitted that Roger Noll shared a book with Plaintiff at that time, but Plaintiff has no knowledge as to Mr. Noll's reason(s).

49    Admitted.

50.    Admitted.

51.    Admitted.

52.    Denied that Dr. Gordon "was nearby."   He was in his office performing an examination at the time Plaintiff pre-tested Ms. Nguyen's daughter.  (Gordon dep., pp. 94-95).

53.    Admitted.

54.    Wal-Mart's statement does not specify which machines it is referring to, and therefore is denied.  Further, this claimed "fact" is irrelevant to Plaintiff's claims.

55.    Admitted.

56.    Admitted that Dr. Gordon told Plaintiff "he's [Dr. Gordon] tired of black people messing up."  Further admitted that Ms. Zboray testified to Dr. Gordon's racial "slur," and that Mr. Key characterized Dr. Gordon's racist remark as "abusive" at times, and as "discriminatory" at other times.  (Zboray Dep., p. 106; Key Dep. I, pp. 156-57, 159-61).

57.    Denied.  (*See* Response to ¶ 56, *supra*).

58.    Admitted.

59.    Admitted.

60.    Admitted, but this claimed "fact" is irrelevant to Plaintiff's claims.

61.    Admitted, but this claimed "fact" is irrelevant to Plaintiff's claims.

62.    Admitted.

63.    Admitted.  Plaintiff also complained to Jerry Ellis.  (Key dep. I, p. 182).

64.    Admitted that Mr. Key has not been able to identify the individual at the managers' meeting on April 27, 2001 by the name of Lenny.

65.    Admitted that Mr. Key had not asked Dr. Gordon many questions in the past, but that since Dr. Gordon was present and available on April 27, 2001, which was unusual, Mr. Key took advantage of the opportunity and asked questions about the pre-testing he was required to do.  (Key dep. II, p. 120-22).

66.    Admitted that Ms. Nguyen so testified.

67.    Admitted that Ms. Nguyen so testified.

68.    It is not clear from the record whether Ms. Nguyen complained or whether the matter was transformed into a complaint at the behest of Dr. Gordon and/or Jerry Ellis. (Gordon dep., p. 70; Ellis dep. I, p. 79).

69.    Admitted that Ms. Nguyen so testified.

70.    Admitted.

71.    Admitted that Wal-Mart solicited a written complaint from Ms. Nguyen. (Zboray dep., pp. 98-99; Nguyen dep., p. 28, 43, 64-75[6]).

72.    Denied.  Plaintiff actually stated that he had no reason to believe that customers had in fact complained about him. (Key dep. I, 145-150, 195-96).

73.    Admitted that Plaintiff reported to work as scheduled on April 30, 2001.

74.    Admitted that Plaintiff greeted Roger Noll that day by asking "what's going on?" and "what's up?"  (Key dep. I, p. 205).

75.    Admitted.

76.    Admitted.

77.    Admitted.

78.    Admitted.

79.    Admitted.

---

[6]    Cited pages and Exhibits are attached to Plaintiff's memorandum as Exhibit 7.

80.    Denied. (Gordon dep., pp. 69-71,104, 106; Key dep. I, pp. 156, 160-62, 177-78, 180; Zboray dep., pp. 26, 30, 36-38, 42-43,106-07; Nguyen dep., p. 75 and Exhibit 1 thereto[7]).

81.    Admitted that Roger Noll did not conduct an independent examination but relied on Jerry Ellis's earlier request to terminate Plaintiff's employment and Edgar Morales's request, which was also based on Jerry Ellis's input. (Wal-Mart doc nos. 1084-89, 1130-31, 1136; Ellis dep. I, pp. 74-85; Morales dep. I, pp. 9-20[8]; Noll dep. I, pp. 19-23[9]; Noll dep. II, p. 35).

82.    Admitted that Dr. Gordon claims to have learned of Plaintiff's termination after-the-fact, despite his active role.

83.    Denied. (Key dep. I, pp. 177-79; Morales dep. I, p. 32).

84.    Admitted that Plaintiff was not included in Wal-Mart's meetings regarding his complaint about Dr. Gordon's racist remark and does not have know knowledge of what actually transpired.

85.    Admitted that Noll so testified, but Mr. Morales testified that he was the one who actually terminated Plaintiff's employment and explained Wal-Mart's claimed reasons. (Morales dep. I, pp. 19, 23-24).

86.    Admitted that Plaintiff was not included in Wal-Mart's meetings regarding his complaint about Dr. Gordon's racist remark, and was not interviewed or allowed an opportunity

---

[7]    Exhibit 1 to Nguyen's dep. is attached to Plaintiff's memorandum as Exhibit 14.
[8]    Cited pages and Exhibits are attached to Plaintiff's memorandum as Exhibit 4.
[9]    Cited pages and Exhibits are attached to Plaintiff's memorandum as Exhibit 15.

- 8 -

to discuss Ms. Nguyen's report and claims that both reasons played a role. (Noll dep. I, p. 21; Morales dep. I, pp. 19-20).

87.    Admitted that Plaintiff filed a charge of discrimination with the CHRO, and denied that such charge was the first time he raised the issue of discrimination. (Key dep. I, pp. 177-86; Morales dep. I, p. 32).

88.    Admitted.

89.    Admitted.

90.    Denied. (Zboray dep., pp. 18, 79, 82, 91-92, 97; Wal-Mart doc. nos. 974, 1089; Key aff.,[10] ¶ 4).

91.    Admitted that Plaintiff did not voice his concerns regarding Opticians performing vision screenings and pre-testing, but denied as to his suspicions regarding such para-optometric services. (Zboray dep., pp. 18, 79, 82, 91-92, 97; Wal-Mart doc. nos. 974, 1089; Key aff., ¶ 4).

92.    Denied that Roger Noll was the decisionmaker. (Wal-Mart doc. nos. 1084-89, 1130-31, 1136; Ellis dep. I, pp. 74-85; Morales dep. I, pp. 9-20; Noll dep. I, pp. 19-23; Noll dep. II, p. 35). Also denied that Wal-Mart lacked knowledge of complaints by Plaintiff and other Vision Center associates regarding Opticians performing para-optometric services for the resident Optometrist's patients. (Zboray dep., 15, 18, 56-57 79, 82, 92-93, 97, 136; Ellis dep., I,

---

[10]    Key's Affidavit is attached to Plaintiff's memorandum as Exhibit 8.

pp. 82-82; Morales dep. I, p. 39; Wal-Mart doc nos. 974, 1089; Ceneviva aff.,[11] ¶¶ 7-11); Adkins Dec., ¶ 5).

93.    Admitted that Jeff Krol raised an issue with Wal-Mart in connection with performing para-optometric services and was later terminated. (Adkins Dec., ¶ 5; Fabricant aff.,[12] ¶ 4 and Exhibit thereto).

94.    Admitted that Adkins claims to have called the State of Connecticut Department of Public Health ("DPH"), but denied that a claimed telephone call to an unidentified representative of DPH is an investigation.

95.    Admitted that Adkins so claims, but this claimed "fact" is inadmissible and therefore irrelevant to either party's motion for summary judgment.

96.    Admitted that Adkins so claims, but this claimed "fact" is inadmissible and therefore irrelevant to either party's motion for summary judgment.

97.    Denied. (Key aff., ¶¶ 12-13).

98.    Denied. (Key aff., ¶ 13; Letter from Gary J. Griffin attached as Exhibit 13 to Plaintiff's Memorandum of Law).

99.    Denied. (Key dep. II, pp. 97-98). By Wal-Mart's admission, Plaintiff was discharged in connection with his performance of such duties.

---

[11]    Ceneviva Affidavit is attached to Plaintiff's memorandum as Exhibit 10.
[12]    Fabricant Affidavit and Exhibit thereto is attached to Plaintiff's memorandum as Exhibit 9.

100.    Admitted that Plaintiff lacked knowledge of his former co-workers' disciplinary records at the time of his deposition, but has since learned that several co-workers, who are White and never complained about performing para-optometric services, had several customer services issues, and were not disciplined or discharged. (*See* Response to ¶ 30, *supra*). Plaintiff has also learned that the only Wal-Mart employees who objected to performing para-optometric services because they believed that the licensing laws prohibited them from doing so, were eventually terminated. (Adkins Dec., ¶ 5; Fabricant aff., ¶ 4 and Exhibit thereto; Ceneviva aff., ¶¶ 7-11.

101.    Admitted that Plaintiff was not aware of his former co-workers' disciplinary records at the time of his deposition, but denied that this is the only example of disparate treatment. (*See* Response to ¶ 100, *supra*).

102.    Admitted that Plaintiff was not aware of his former co-workers' disciplinary records at the time of his deposition, but denied that this is the only example of disparate treatment. (*See* Response to ¶ 100, *supra*).

103.    Admitted that Jerry Ellis claims to have verbally coached Dave Peterson.

104.    Admitted that Dr. Gordon did not hire, train, supervise or participate in formal performance evaluations. Denied that Dr. Gordon played no role in Plaintiff's discharge. (*See* Response to ¶ 80, *supra*).

## DISPUTED ISSUES OF MATERIAL FACT

1.    Whether Wal-Mart feared that Plaintiff would report to the Connecticut Department of Public Health issues pertaining to Wal-Mart's Vision Center practices.  The record is replete with evidence from which a factfinder could determine that such was the case. For example, Plaintiff's co-worker, Jenilu Zboray testified at deposition that Plaintiff did in fact object to performing pre-testing for the resident optometrist while employed by Wal-Mart, and expressed concern about losing his license because of Wal-Mart requiring him to do so.[13] (Zboray dep., pp. 18, 79, 82, 91-92, 97).  Both, the Vision Center Manager, Jerry Ellis, and North Windham Store Co-Manager, Edgar Morales, believed that Plaintiff asked Dr. Gordon questions in front of the customer whose report Wal-Mart relied upon to discharge him (Exhibit 1 to Nguyen dep.) because he did not want to perform the pre-testing.  (Ellis dep. I, pp. 81-82; Morales dep. I, p. 39).

2.    Wal-Mart's awareness of Plaintiff's objection to performing vision screenings and pre-testing patients, as evidenced by Jerry Ellis' notes in his Day Planner/diary expressing his suspicion that Plaintiff had reported a potential violation to the Department of Public Health as early as February 14, 2001,[14] and documenting his conversation with Vision Center District Manager, Chris Adkins, on April 6, 2001 writing that "We need to make sure all CT stores are at

---

[13]    Ms. Zboray further testified that she similarly believes that it is "not legal" for Opticians and Optician Apprentices to conduct vision screenings, and that the current Vision Center Manager at the North Windham Wal-Mart, Jane Consoli, has directed Vision Center staff to stop conducting screenings because they are prohibited by law from doing so. (Deposition Transcript for Jenilu Zboray, pp. 15, 56-67, 136).
[14]    This entry was approximately one month after Mr. Ellis gave Plaintiff a favorable performance evaluation. (Exhibit 4 to Morales dep. I).

state standards for when Marvin gets terminated he doesn't cause any trouble."[15]  (Wal-Mart's

doc. nos. 974, 1089).  Further, Edgar Morales, who completed Plaintiff's Exit Interview checked

off "insubordination," as a reason for Plaintiff's discharge.  (Exhibit 6 to Morales dep. I).  At his

deposition, Mr. Morales claimed that he checked off "insubordination" because Jerry Ellis told

him that Plaintiff left work early on April 27, 2001 -- the day of the altercation between Dr.

Anthony Gordon and Plaintiff, following which Wal-Mart managers solicited the customer

complaint against Plaintiff,[16] and terminated Plaintiff's employment.  (Morales dep. I, pp. 36-

36).  Mr. Ellis testified that he believed Mr. Key had permission to leave early.  (Ellis dep. I, p.

89).  Ms. Zboray testified at her deposition that Plaintiff requested and received permission to

leave early that day from Mr. Ellis himself.  (Zboray dep., pp. 102-03).

    3.    If the Court determines that knowledge prior to discharge is material, whether

Wal-Mart knew there was an issue with Opticians providing optometric services and had

concerns prior to Plaintiff's discharge.  The declaration of Christopher Adkins (hereinafter

"Adkins Dec."), a District Manager for Wal-Mart's Vision Centers, submitted by Wal-Mart in

support of its motion, states that the issue had been raised by another Optician in "early 2001

prior to Plaintiff's termination."[17]  (Adkins Dec. ¶ 5).  That employee, Jeffrey Krol,[18] was

---

[15]     This entry is exactly three (3) weeks before the "customer complaint," which Wal-Mart claims as the reason for Plaintiff's termination (Wal-Mart doc. nos.1088-89).

[16]     See Zboray dep., pp. 98-99; Nguyen dep., pp. 28, 64, 75.

[17]     The very fact that Mr. Adkins claims he responded to this legal issue by calling the State of Connecticut Department of Public Health, without noting with whom he spoke or requesting confirmation in writing is questionable at best, especially in light of Mr. Ellis' testimony that all legal questions are to be directed to the Legal Department at Wal-Mart's home office. (Ellis dep. I, pp. 123-24).

discharged shortly thereafter. (Exhibit A to Fabricant aff.; Wal-Mart doc. no. 1800). In addition to Plaintiff and Mr. Krol, the only other Wal-Mart employee known to Plaintiff who has questioned Wal-Mart's practice of requiring opticians and optician apprentices to perform pre-testing and vision screenings, Dale Ceneviva, (Ceneviva aff., ¶¶ 7-11), was also terminated.[19] (Key aff., ¶¶ 9-10; Affidavit of Pamela J. Coyne,[20] ¶¶ 9-11).

    4.      If material, whether Wal-Mart managers questioned or should have questioned the practice. As an Optician since 1983 in a wide variety of practices and retail establishments, Mr. Ellis had never been asked by any employer other than Wal-Mart (who has employed him since April 2000) to perform pre-testing or vision screenings. (Ellis dep. I, pp. 6-16). Lenscrafters and National Vision carefully maintain the separateness of the optometric practices located in their stores (Key aff., ¶¶ 5-8). Importantly, the National Vision store Plaintiff worked for prior to taking the position with Wal-Mart was located inside a Wal-Mart store (although not affiliated with Wal-Mart), but unlike Wal-Mart's visions centers, kept its Opticians completely independent from the optometrists and their para-optometric employees. (Key dep. II, pp. 90-91). Plaintiff's current employer, Lenscrafters, similarly maintains the requisite separateness of its optometric and optical services, the former being performed by an Optometrist and his/her staff, and the latter being performed by Opticians. (Key aff., ¶¶ 6-7).

---

[18]      Mr. Krol is now deceased. (Fabricant aff., ¶ 4).

[19]      It is also interesting to note that on Saturday, March 6, 2004, Ms. Ceneviva received a telephone call from Wal-Mart's "home office" advising her that she was to be reinstated effectively immediately with full back pay -- just two (2) days after Attorney Coyne argued to Attorney Mackin that Ms. Ceneviva was a comparator to Plaintiff because of her prior objection to performing para-optometric services and termination.

[20]      Coyne affidavit is attached to Plaintiff's memorandum as Exhibit 1.

5.    Whether Dr. Gordon supervised or was available to supervise the Wal-Mart Vision Center Employees. Dr. Gordon testified that he had no responsibility or control over the employees Wal-Mart provided to perform pre-testing and vision screenings. (Gordon dep., pp. 33-34). Nor has he provided those employees with any type of training. (*Id.*, p. 42). Dr. Gordon was not involved in pre-testing in any way, and he has no idea who supervised those employees assigned to perform pre-testing of his patients. (*Id.*, pp. 51-52). Dr. Gordon had no idea what the Wal-Mart employees' job responsibilities entailed. (*Id.*, pp. 55-56). Dr. Gordon had no idea what licenses the Wal-Mart employees had or what they were, or were not, qualified to do. (*Id.*, p. 58-59). In fact, when presented with questions about pre-testing, Dr. Gordon simply refused to answer the Wal-Mart employees performing the tests.[21] (*Id.*, p. 103-06). Dr. Gordon testified:

> I had no responsibilities for any of the Wal-Mart employees. (*Id.*, p. 34).

> Q:    Okay. During the time that you've provided services at the North Windham store, have you provided any of the Wal-Mart employees with training on any of these machines?
> A:    That's not my duty to do that.
> Q:    Have you taken any steps to see whether the testing on these machines is being done properly by the Wal-Mart employees?
> A:    It's not my responsibility to do that. (*Id.*, p. 42).

* * *

> Q:    Are you ever involved in that pretesting in any way?
> A:    No. Not that I recall.
> Q:    Is there anyone who oversees the Wal-Mart employees in performing that pretesting, if you know?

---

[21]    Jenilu Zboray testified that she directed questions about vision screenings and pre-testing to "[t]he licensed optician," not Dr. Gordon. (Zboray dep., p. 15).

A:    That's Wal-Mart's responsibility.

Q:    Well, based on your experience working there, have you observed anyone who oversees their work in that regard?

A:    Again, that would be Wal-Mart's responsibility.

Q:    Okay, but I'm asking about your own observation of what goes on in the Vision Center.

A:    I don't know who supervises who. In the sense that who trained who, and there's a supervisor there who is a manger. (*Id.*, pp. 51-52).

6.    Whether Plaintiff's implied contract of hiring was limited to the performance of duties consistent with those of a Licensed Optician or whether it also included, as Wal-Mart claims, hiring him as an "optometric assistant trainee."

7.    Whether Plaintiff would have acted differently had he known that the higher pay at Wal-Mart was tied to the performance of duties inconsistent with those of a Licensed Optician. Mr. Key was not performing any such duties in his Licensed Optician position with National Vision. (Key aff., ¶¶ 5-6).

8.    Whether Plaintiff was treated differently from his White co-workers. The evidence is as follows:

-    the statement of Plaintiff's direct supervisor that he had wanted Plaintiff "fired because he was a '350 lb black fucking asshole.'" (Exhibit A to Fabricant aff.);

-    Jerry Ellis documented several instances of customer service issues, insubordination and attendance issues for other Vision Center employees doing the same job Plaintiff did who are White and were not disciplined or terminated as was Plaintiff, as follows:

Phyllis Parmenter:

- four (4) separate customer service issues, including a prescription that was not in the file, turning customers away who sought exams. (Wal-Mart doc. nos. 963, 989, 1185, 1374, attached as Exhibit 5 to Plaintiff's memorandum);

- eight (8) separate instances of insubordination, including refusing to check in orders, telling Mr. Ellis that "she was taking back her life, she wasn't taking shit from anyone any more," refusing to wait on customers and telling Mr. Ellis to do it himself, yelling at Mr. Ellis in the front of the store, and exhibiting hostile behavior in general (Wal-Mart doc nos. 923, 963, 964, 1012, 1021, 1035, 1046-47, 1719, attached as Exhibit 5 to Plaintiff's memorandum); and

- twenty-one (21) separate instances of being late or calling out, one such occasion forcing the Vision Center to remain closed (Wal-Mart doc. nos. 921, 1020, 1050, 1066, 1078, 1080, 1082, 1084, 1116, 1120, 1122, 1124, 1126, 1128, 1325-26, 1329, 1439, 1518, 1520, 1689, attached as Exhibit 5 to Plaintiff's memorandum);

Jenilu Zboray:

- seven (7) separate customer service issues, including turning away customers who wanted exams, dispensing eyewear when not authorized and forcing a customer to make an unnecessary second trip to the Vision Center (Wal-Mart doc nos. 922, 949, 1008, 1054-55, 1374, 1460, 1521, attached as Exhibit 5 to Plaintiff's memorandum);

- a "hotline" complaint by a customer against Ms. Zboray (Wal-Mart doc. no. 1730, attached as Exhibit 5 to Plaintiff's memorandum);

- four (4) performance issues, including the need for re-training and "correction on several issues that she should know by now" (Wal-Mart doc nos. 992, 1010, 1064, 1483, attached as Exhibit 5 to Plaintiff's memorandum); and

- five (5) separate instances of insubordination, including lying, forging Plaintiff's signature and obtaining an unauthorized loan (Wal-Mart doc

nos. 925, 947, 1022-23, 1436, 1446, attached as Exhibit 5 to Plaintiff's memorandum);

Dave Peterson:

- five (5) separate customer service issues, including banging things in the lab, swearing, using F word (Wal-Mart doc. nos. 966, 1122, 1510, 1614-15, attached as Exhibit 5 to Plaintiff's memorandum);

- one (1) incidence of insubordination when he called Jerry Ellis a "fucking liar" (Wal-Mart doc. no. 1616, attached as Exhibit 5 to Plaintiff's memorandum);

- Dave Peterson was not disciplined for any of these instances, but was later terminated for a reason that has not been fully explained, although he was given a full investigation, including interviews. Even Dave Peterson himself was interviewed and allowed to offer an explanation prior to being terminated. Plaintiff was not given the same opportunity, nor was anyone who might have supported Plaintiff allowed the opportunity to explain what really happened with Dr. Gordon and Jerry Ellis on April 27, 2002[22] (Ellis dep. I, pp. 40-42; Zboray dep., p. 34).

- Further, Wal-Mart received two (2) separate hotline complaints by customers about Mr. Ellis (Wal-Mart doc nos. 1730-31, attached as Exhibit 5 to Plaintiff's memorandum), one of which stated that Mr. Ellis was "very abrupt and rude" and the other stated that he was of "no help" and "rude" to the point that the customer said that she had been warned about him by other customers, but decided to take her chances at the Vision Center anyway. Wal-Mart took no action against Jerry Ellis, a White manager;

- Dr. Gordon's statement that he was "sick of Black people messing up."

---

[22]    Mr. Morales also testified about investigating incidents regarding other Vision Center employees at the North Windham Wal-Mart, all of whom were White (Wal-Mart doc nos. 1799-1800), one of whom he discharged only after a full investigation. (Morales dep. I, pp. 25-29).

- the fact that no one spoke with Plaintiff and no one spoke with the only eyewitness, Jenilu Zboray, although every other incident involving a White Vision Center associate was investigated and the employee was allowed to explain him/herself.

9.     Whether Plaintiff complained to Ellis about Dr. Gordon's race-related comments. (Key dep. I, pp. 182, 186-88)

10.     Whether Ellis and Dr. Gordon understood Plaintiff was going to make a complaint to other Wal-Mart managers about Dr. Gordon's behavior (Key dep. I, pp. 183-84; Ellis dep. I, p. 89; Zboray dep., pp. 101-02), which he did (Key dep. I, pp. 183-86).

11.     Whether Ellis and Dr. Gordon orchestrated the customer report which led to Plaintiff's discharge after that became clear. (Zboray dep., pp. 30, 106; Gordon dep., 69-71, 104, 106; Key dep. I, pp. 156, 160-162, 177-78, 180; Nguyen's report.)

12.     Whether Morales and Noll had knowledge of the Complaint (Ellis dep., p. 83; Morales dep. I, pp. 9-10; 14-15).

13.     All of the issues raised in Plaintiff's Rule 56(a)(1) statement to his motion for summary judgment to the extent the Court finds that there is record evidence in dispute of any or all of them.

Done at Bridgeport, Connecticut, this *15th* day of March, 2004.

 

*Pamela Coyne*
Pamela J. Coyne
Federal Bar No. ct22941
DURANT, NICHOLS, HOUSTON,
HODGSON & CORTESE-COSTA, P.C.
1057 Broad Street
Bridgeport, CT  06604
(203) 366-3438
ATTORNEYS FOR PLAINTIFF

**CERTIFICATION**

I hereby certify that I have caused to be served this _15th_ day of March, 2004, the above

and foregoing by United States mail, postage paid, return receipt requested, on the following

counsel and pro se parties of record:

Joel Finger, Esq.
Brown Raysman Millstein Felder & Steiner LLP
900 Third Avenue
New York, NY 10022

Kristi Mackin, Esq.
Mitchell L. Fishberg, Esq.
Brown Raysman Millstein Felder & Steiner, LLP
CityPlace II
10th Floor
185 Asylum Street
Hartford, CT  06103


_Pamela Coyne_
Pamela J. Coyne

P:\lit\pjc\523818\001\00038830.DOC

- 21 -