# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ------------------------------------------------------- | X | |
| **MARVIN KEY,** | : | |
| | : | **CIVIL ACTION NO.:** |
| Plaintiff, | : | **3:03CV144(RNC)** |
| | : | |
| v. | : | |
| | : | |
| **WAL-MART, INC. AND DR. ANTHONY** | : | |
| **GORDON,** | : | |
| | : | |
| Defendants. | : | **JUNE 16, 2004** |
| ------------------------------------------------------- | X | |

## REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Wal-Mart Stores, Inc. ("Wal-Mart") and Dr. Anthony Gordon (the "Defendants"), hereby reply to Plaintiff Marvin Key's Opposition to Defendants' Motion for Summary Judgment (the "Opposition").[1]

This is a case about the termination of Key's employment. Key claims that Wal-Mart's reason for terminating his employment – poor customer service – is untrue, and that Wal-Mart's real motivation for terminating his employment was unlawful. Defendants set forth in detail in their initial summary judgment papers (the "Memorandum") Key's record of poor service to Wal-Mart's customers. Given that Key fails to refute, or even address, in his Opposition the numerous and documented episodes of poor customer service that Wal-Mart asserts led to his termination, his poor customer service is undisputed.[2] Because Key has not even disputed Wal-

---

[1] As a preliminary matter, Defendants note that in his Opposition, Key attempts to save his claims for wrongful termination and race discrimination by relying on hearsay statements from both his former and current counsel and an exhibit representing notes of a meeting his prior counsel had with one of his clients. The proffered statements and the exhibit have been stricken by the Court. See June 1, 2004 Ruling on Defendants' Motion to Preclude and/or to Strike attached hereto as Exhibit A. Accordingly, Wal-Mart does not those aspects of Key's Opposition papers. Also, Key's Opposition contains so many new arguments and assertions that it would be impossible to address them all in a single reply brief. However, the more salient points of Key's Opposition are addressed herein.

[2] See Memorandum, pp. 6-11, for a discussion of Key's numerous customer service problems. In fact, since Wal-Mart filed its Memorandum, additional deposition testimony has revealed at least six more customers who were displeased

Mart's legitimate nondiscriminatory reason for his termination, judgment can be granted in the Defendants' favor on this basis alone.

## I.   Key's Wrongful Discharge Fails As A Matter Of Law

Rather than address the points made by Defendants regarding the factual and legal deficiencies with Key's claim for wrongful termination, Key ignores the points Defendants make in the Memorandum and instead advances in his Opposition two inconsistent theories, both of which are factually and legally flawed.  First, he contends Wal-Mart terminated his employment because he actively opposed Wal-Mart's Vision Screening policy.[3]  Opposition, pp. 6-7; Affidavit of Marvin Key ("Key. Aff."), attached to his Opposition as Exhibit 8, ¶ 4.  Second, he claims Wal-Mart terminated his employment because it "feared" he would initiate a complaint or "blow the whistle" to the Department of Health regarding Wal-Mart's policy of allowing opticians to perform Vision Screenings, which he alleges violates C.G.S. § 20-128.  See Opposition, pp. 6-7. Neither theory states a cognizable claim.

### A.   Connecticut's Whistleblower Statute, C.G.S. § 31-51 et seq., Preempts Key's Public Policy Wrongful Termination Claim

Under Connecticut law, Key's only available remedy for a termination purportedly in

---

with Key's customer service, including Lorraine King, Maria Ortiz, Wilma Pelletier, Temple Dasitra, Tim Angell, and Dylan Lesnewski.  See Deposition of Jerry Ellis ("Ellis Dep."), attached as Exhibit B, pp. 252-58.  In addition, Key's co-workers testified Key had an "attitude problem," and was "shorthanded on customer service."  See Deposition of Jenilu Zboray ("Zboray Dep."), attached hereto as Exhibit C, pp. 58, 61.  Moreover, Key acknowledged in his deposition that he had received several warnings about the poor quality of his service and the need to improve.  See Memorandum, pp. 6-9.

[3] Key asserts this theory even though he testified in deposition that he never (1) considered whether it was unlawful for opticians to perform Vision Screenings or suspected this practice was unlawful, (2) complained to Wal-Mart management about performing Vision Screenings, or (3) opposed performing Vision Screenings during his employment with Wal-Mart.  See Deposition Testimony of Marvin Key, August 8, 2003 ("Key II"), pp. 63-64, 67-68, attached as Exhibit D.  Evidently, after Wal-Mart filed its Memorandum, Key apparently realized the ridiculousness of his wrongful discharge claim in light of his testimony.  Thus, in conjunction with the filing of his Opposition, Key submitted an affidavit in which he directly contradicts his earlier testimony by claiming that he did realize that C.G.S. § 20-128 prohibited opticians from performing Vision Screenings, and that he complained about this practice to his co-workers. See Key's Opposition, p. 9 (admitting Key never knew of a so-called violation but thereafter claiming he actively opposed the same alleged violation he did not know about); Ex. 8, ¶ 4.

retaliation for opposing Wal-Mart's Vision Screenings policies or, alternatively, Wal-Mart's

alleged fear that Key would "blow the whistle" on the company's practice, would be a

whistleblower claim pursuant to C.G.S. § 31-51m. See, e.g., Burnham v. Karl & Gelb, P.C., 252

Conn. 153, 158-59 (2000) (employee's common law wrongful termination claim precluded by

§ 31-51m); Campbell v. Town of Plymouth, 79 Conn. App. 67, 75-76 (court precluded wrongful

discharge claim brought by town employee who alleged he was fired for refusing to submit a

fraudulent report because C.G.S. § 31-51m provided exclusive remedy); Atkins v. Bridgeport

Hydraulic Co., 5 Conn. App. 643, 648 (1985) (plaintiff can bring wrongful discharge claim only

when he or she is "otherwise without remedy" (internal quotations omitted)).[4]

The fact that Key cannot plead a viable claim under C.G.S. § 31-51m because he never

reported a suspected illegal practice to a public body as required by the statute does not make his

common law wrongful termination theory actionable.  Connecticut's courts have clearly rejected

the notion that a plaintiff may rely on a common law wrongful discharge claim merely because

his claim under the whistleblower statute fails. See Burnham, 252 Conn. at 162; Campbell, 79

Conn. App. at 74-76.  In Burnham, Campbell and Atkins, for example, none of the plaintiffs

qualified for protection under C.G.S. § 31-51m because none of them reported a violation or a

suspected violation to a public agency. In fact, the plaintiff in Campbell never even made a

complaint or report to his employer, to a public agency or otherwise, but merely refused to

submit a report he claimed was fraudulent.  Campbell, 79 Conn. App. at 70.  Nonetheless, the

Connecticut Court of Appeals concluded Campbell's wrongful discharge claim was preempted

by C.G.S. § 31-51m. Campbell, 79 Conn. App. at 74-76  (plaintiff's claim preempted by C.G.S.

---

[4] C.G.S. § 31-51 prohibits employers from retaliating against employees who report "a violation or a suspected violation of any state or federal law ... to a public body ... ." C.G.S. § 31-51m(b).  The term "public body" is defined by the statute as "any public agency, as defined in subsection (a) of [C.G.S.] Section 1-18a." Section 1-18a, in turn, defines a

§ 31-51m, despite plaintiff's inability to qualify for that statute's protection); see also Burnham, 252 Conn. at 158; Atkins, 5 Conn. App. at 648.[5] Thus, Key's wrongful termination claim is preempted by Connecticut's whistleblower statute, even though Key fails to state a claim pursuant to that statute.

> **B.    Even If Not Preempted By The Whistleblower Statute, Key's Wrongful Termination Claim Fails As A Matter Of Law**

Even if the Court finds that Key's wrongful discharge claim is not preempted by the whistleblower statute, Key's claim still fails for the reasons detailed below.

> **1.    Key did not Oppose Wal-Mart's Policy Regarding Vision Screenings**

Although Key now says he complained about performing Vision Screenings to his co-workers, during his employment Key never made a complaint, filed a report or otherwise raised the issue of whether opticians were prohibited from performing Vision Screenings. See Key II, pp. 63-64, 67-68; Declaration of Roger Noll ("Noll Dec."), attached hereto as Exhibit E, ¶ 4; see also fn 3, supra. In fact, during his deposition Key acknowledged that while employed at Wal-Mart he neither believed nor suspected that Wal-Mart had engaged in the alleged improper practice on which he now relies as the foundation of his wrongful discharge claim. Key II, pp. 63-64, 67-68.

Indeed, the only "evidence" Key offers to support his claim that he complained or questioned the propriety of opticians performing Vision Screenings is a self-serving affidavit in

---

public agency as "any executive, administrative, or legislative office of the state of any political subdivision of the state . . . ."

[5] See also Armstead v. The Stop & Shop Companies, Inc., 3:01cv1489(JBA), 2003 U.S. Dist. LEXIS 4107, at * 9 (D. Conn. March 17, 2003) (The statutory remedy bars the wrongful termination action whether or not the remedies provided by the statute are lesser or narrower than the remedies potentially available in the tort or contract action) citing Burnham, 252 Conn. at 159-62; Tyszkiewicz v. Aaron Manor, Inc., CV 970081800S, 1998 Conn. Super. LEXIS 1650 (Conn. Super. June 9, 1998)(court rejected plaintiff's common law wrongful termination claim, holding "[i]t seems reasonable to conclude that in defining the whistleblower protection as it did, the legislature chose to fetter employer discretion only where an employee had actually engaged in reporting and not to extend it to the less verifiable circumstance in which an employee claimed to be planning to do so").

which Key completely contradicts his own deposition testimony, claiming for the first time that

he did complain about performing Vision Screenings.  Key claims, under oath, in this affidavit:

> During the term of my employment, I suspected that Wal-Mart's practice
> of requiring Licensed Opticians and Optician Apprentices to perform
> vision screenings and pre-testing for the resident Optometrists was
> contrary to law and discussed my suspicion and concerns with my co-
> workers.

Opposition, Ex. 8, ¶ 4.  Yet at his deposition, Key stated the following, also under

oath:

| | |
|---|---|
| Q: | Did you ever complain to anyone at Wal-Mart that you should not be conducting these tests because your license didn't provide for you to conduct them? |
| A: | I didn't know that.  I had no reason to suspect Wal-Mart at the time, so I did not complain. |
| Q: | … Prior to your termination, did you ever tell anybody at Wal-Mart that it was your belief that you were not licensed to perform the glaucoma tests, the visual field tests, the color discrimination tests, the depth perception tests or to make what you call medical record entries? |

*********************

| | |
|---|---|
| A: | I didn't suspect, so no. |
| Q: | Prior to your termination at Wal-Mart did you ever refuse to engage in any of these activities? |
| A: | No. |

Key II, pp. 63-64.

Key's contradictory affidavit should be disregarded.[6]  Mack v. United States, 814 F.2d

120, 124 (2d Cir. 1987)("It is well settled in this circuit that a party's affidavit which contradicts

his own prior deposition testimony should be disregarded on a motion for summary judgment.");

Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997) ("We follow the rule that 'a party may not

create an issue of fact by submitting an affidavit in opposition to a summary judgment motion

that, by omission or addition, contradicts the affiant's previous deposition testimony'"); EEOC v. Johnson & Higgins, Inc., 93 Civ. 5481 (LBS)(AJP), 1998 U.S. Dist. LEXIS 17612 at *22 (S.D.N.Y. Nov. 6, 1998)("It is black letter law that affidavits that contradict prior deposition testimony are disregarded on summary judgment motions.").

No reasonable jury could conclude that Wal-Mart terminated Key's employment either because he complained or questioned whether opticians should be performing Vision Screenings or that the company feared he would inform the Department of Health *because he not only admits that he never opposed, complained or raised this issue until after his employment ended but that he had no knowledge of the allegedly improper practice in question until after Wal-Mart terminated his employment.*[7]  See Key II, pp. 67-68.  Accordingly, Key's wrongful termination claim should be summarily dismissed.

### 2.    No Precedent Exists for the Recognition of a Wrongful Termination Claim Premised on a Company's "Fear" that an Employee may Blow the Whistle

Recognizing that the undisputed facts establish Key never complained about or opposed performing Vision Screenings, Key attempts to create a new type of wrongful discharge claim on the basis that Wal-Mart *feared* Key would someday "blow the whistle."  Opposition, pp. 5-8. There is no legal precedent for the creation of such a broad at-will carve-out.[8]  To allow such a carve-out would fly in the face of the rationale underpinning the basis for recognizing wrongful

---

[6] Key's affidavit also refers to conversations he had with another Wal-Mart employee, Dale Ceneviva.  These statements constitute hearsay and should be disregarded.  Similar hearsay statements have been stricken by this Court in its June 1, 2004 Order on Defendants' Motion to Preclude and/or Strike, attached hereto as Exhibit A.

[7] Key's affidavit does not state Key complained to or otherwise notified any management personnel or that Wal-Mart's management had any knowledge of his complaints.  Key's affidavit also fails even to suggest that Wal-Mart management knew of Key's newly-created complaints.  In any event, the affidavit certainly does not nullify the undisputed evidence of Key's poor customer service.

[8] Key provides nothing in support of his position except one superior court decision, which, within a half of page, summarily and without analysis denies a motion to strike four unidentified counts.  The decision does not recite or address the facts.  See Taylor v. Hall Neighborhood House, Inc., CV98356027S, 1999 Conn. Super. LEXIS 765 (Conn. Sup. March 17, 1999).  This superior court case is neither binding nor persuasive precedent.

termination claims,[9] and, if recognized, would substantially compromise Connecticut's recently reconfirmed commitment to at-will employment.  See Iosa v. Gentiva Health Services, Inc., 299 F. Supp. 2d 29, 35 (D. Conn. 2004), citing Burnham v. Gelb, 252 Conn. at 153, 159 (2000) ("In interpreting [the public policy] exception, we note our adherence to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a narrow one"); Parsons v. United Technologies Corp., 243 Conn. 66, 79 ("courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation").

### 3.    The Undisputed Evidence Establishes that Key had no Knowledge of an Alleged Violation of Law, and that Wal-Mart did not Fear Key Would Report an Alleged Violation.

Even if the Court entertains Key's attempt to radically expand the doctrine of public policy wrongful discharge, the undisputed facts in this case demonstrate that Wal-Mart had no reason to fear Key would report a purported unlawful practice with the Department of Health or any other public agency.  The only admissible "evidence" Key cites in support of his claim is a single entry in Jerry Ellis' day planner stating that that he needed to make sure "stores were at state standard" so Key would "not cause any trouble."[10]  However, the undisputed evidence proves that this notation had nothing to do with any fear Key would complain about the legality

---

[9] Since the Supreme Court of Connecticut first recognized a cause of action for public policy wrongful termination in Sheets v. Teddy's Frosted Foods, 179 Conn. 471 (1980), Connecticut courts have been careful to restrict the scope of such claims so as not to stray from its intended purpose - to protect the bold individual who, at his own peril, speaks out against his employer's alleged violation of an important public policy for the good of society.  In this case, Key did not speak out.  In fact, according to his own deposition, he was not aware of anything to speak out about, nor are there any facts to suggest that Wal-Mart had any reason to fear he would speak out.

[10] See D001089, attached to Key's Opposition as part of Exhibit 5.  Key also notes in his Opposition that Ms. Zboray, an optician's apprentice, recalled that Key complained about performing Vision Screenings.  However, Key does not claim he opposed or raised the issue with Wal-Mart that performance of Vision Screenings by opticians may be in violation of the law.  See Opposition, p. 7.  Moreover, Key has admitted that he never complained or raised this issue during his employment because he did not even realize that he had something to complain about.  See Key II, pp. 63-64, 67-68. Key likewise states in conclusory fashion that since the term "insubordination" was listed on his termination form, this must mean that he was terminated for refusing to perform Vision Screenings.  Opposition, p. 7.  As Key himself points

of opticians performing Vision Screenings.  Ellis Dep. p. 247; Affidavit of Jerry Ellis ("Ellis

Aff."), ¶ 6, attached as Exhibit F.   Rather, this notation only evidences that *it was important to*

*Wal-Mart to make sure that it was complying with the law.*[11]  The note was merely a reflection of

Christopher Adkin's reminder to Ellis to keep his department in order, as employees who are

terminated may be "sour" and attempt to retaliate against their former employer.[12] Ellis Dep., pp.

248-49.  Ellis' notation was not related to Vision Screenings.  Ellis Aff., ¶¶ 5-6.

Indeed, there would be no reason for Ellis to make a notation in his day planner relating

to concern over opticians performing Vision Screenings because he did not believe that opticians

performing the Vision Screenings were problematic.  Id. at  ¶¶ 4-6.  The undisputed facts, as set

forth below, establish that Wal-Mart did not suspect Key would make a complaint and had no

reason to fear a complaint being made:

- Another employee, Jeff Krol, had previously reported to the Department of Health
  that opticians were performing Vision Screenings at Wal-Mart, but nothing had come
  of the allegations.[13] Declaration of Christopher Adkins ("Adkins Dec."), ¶ 5, attached
  as Exhibit G.

- After Krol submitted a complaint in 2001 to the Department of Health, Adkins, then
  District Manager, telephoned the Department of Health to question whether it was
  unlawful for Wal-Mart's opticians to perform Vision Screenings. Adkins Dec., ¶¶ 5-
  6.  The information Adkins was given by the Department of Health led him to
  conclude that Wal-Mart's practice was in fact lawful.  Id. at ¶ 5-6.[14]

---

out, however, Assistant Manager Edgar Morales listed "insubordination" based on his belief that Key had left early
without obtaining management's permission.  Id.

[11] If any specific concern was identified, it was a need to ensure that the Vision Centers were only opened with a
licensed optician on duty.  Ellis Aff.,  ¶ 6.

[12]  It is significant that Key, who went so far as to seek an order from this Court to allow him to re-depose Ellis about his
day planner, completely failed to elicit any testimony or provide anything other than mere speculation that Ellis was
worried about Key learning about problems associated with Vision Screenings.  By re-deposing him Key succeeded only
in eliciting additional evidence that the notation had nothing to do with any of Key's claims.  See, e.g., Ellis Dep., p. 247.

[13] Key misconstrues Wal-Mart's argument on this point. Although it is helpful to Wal-Mart's position that there has been
no violation, it is fundamentally irrelevant whether it is unlawful for opticians to perform Vision Screenings or if an
investigation on this issue is still pending.  The only material issue related to Key's theory of wrongful discharge is
whether Wal-Mart feared Key was about to question the legality of opticians performing Vision Screening and report
them.  The undisputed facts demonstrate it did not.

[14] Key claims Adkins' affidavit is comprised of hearsay and should be disregarded.  Opposition, pp 12-13.  However, the
statements relied upon – that the Department of Health told Adkins that what Wal-Mart was doing is not a violation of

- Key testified under oath that he never even thought of the issue prior to the termination of his employment, Key II, pp. 67-68, and never expressed any concern about performing Vision Screenings to any member of Wal-Mart management. Adkins Dec, ¶¶ 5-6; Noll Dec., ¶ 4; Ellis Aff., ¶¶ 4-5; Key II, pp. 67-68.

- Roger Noll, the Store Manager who made the final decision to terminate Key's employment, was not aware of any legal issue concerning the Vision Screenings. Noll Dec., ¶ 4.

- To the extent Key claims Ellis was a decision-maker with respect to the termination of his employment, Ellis did not believe it was unlawful for opticians to perform Vision Screenings. Ellis Aff., ¶ 6. Regardless of who Key claims was the decision-maker, then, no one had any reason to believe that Key was either opposed to conducting Vision Screenings, as a legal matter or otherwise, or on the cusp of blowing the whistle.[15]

The only way Key claims he put Wal-Mart's management, including Ellis, on notice that he opposed Vision Screenings was his failure, after over a year of performing them, to do them well. See Opposition, p. 7. It is impossible to comprehend how Key's failure to perform Vision Screenings in a satisfactory manner would serve to notify Wal-Mart's management that Key questioned whether opticians were prohibited from conducting Vision Screenings under C.G.S. § 20-138a or some other law or regulation. Moreover, Key's documented shortcomings in performing the Vision Screenings, including improperly stapling documents, Deposition of Plaintiff Marvin Key dated June 24, 2003 ("Key Dep."), at pp. 179-80, attached as Exhibit H, and being unable to determine which of two pre-teen customers was female, Ellis Dep. at p. 81, had absolutely no connection to the issue of whether opticians may lawfully conduct Vision Screenings.

---

the statute – need not be offered for their truth but rather as evidence that Adkins did not believe Wal-Mart was in violation of state law, and therefore, that he did not "fear" any such complaint by Key or any other individual. Such statements are not hearsay. Fed. R. Evid. 801(c); Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 66 (2d Cir. 2003) (statements used not to prove the truth of the matter asserted, but to establish state of mind are not hearsay).

[15] In addition, Key requested and received an "Open Door" meeting for purposes of grieving his termination. During this meeting, Key was allowed to provide any and all reasons why his termination should be overturned. Not once did Key claim or even imply that Wal-Mart's policies were improper or that he believed Ellis or others wanted him terminated because of so-called complaints. Of course, this makes perfect sense because Key never questioned the legality of performing Vision Screenings or refused to perform certain optician duties. Key II, pp. 62-63, 67-68.

Finally, Key claims, in summary fashion, that two other opticians (Dale Ceneviva and Jeff Krol) complained about the proprietary of opticians conducting Vision Screenings and thereafter were terminated by Wal-Mart. Aside from Key's self-contradicting affidavit, this is Key's most blatant attempt to re-create the evidentiary record. In fact, Key's Opposition makes it clear that he knows nothing about the reasons why either of these employees were terminated. He fails to point to any evidence linking their terminations to complaints they may or may not have made regarding Vision Screenings. Moreover, since Key himself admits he did not complain about conducting Vision Screenings, even assuming for purposes of this motion that Mr. Krol and/or Ms. Ceneviva did make such complaints, it is completely disconnected from Key's claims against Defendants. Key's attempt to distract the Court by attempting to litigate the employment terminations of Mr. Krol and Ms. Ceneviva does not help him.[16]

### C.    The Public Policy Violation Cited By Key Is Not Important And Clearly Articulated For Purposes Of Supporting A Claim For Wrongful Termination

Assuming, arguendo, that Key could overcome the above hurdles, his wrongful termination must still fail because Key has, as a matter of law, failed to meet his "heavy burden of proving a violation of 'an important public policy." Iosa, 299 F. Supp. at 35, citing Cimochowski v. Hartford Public Schools, 261 Conn. 287, 306 (2002).[17]  Courts in this state have

---

[16] Key attempted to interject a host of improper "evidence" about Krol and Ceneviva into his Opposition in a last-ditch attempt to create an issue of material fact with regard to his wrongful termination and race discrimination claims. Opposition, p. 10. This Court struck these blatant attempts by Key to introduce inadmissible hearsay. See Exhibit A. To the extent Key attempts to call Krol's and/or Cenivava's terminations into question, it is important to note that neither of their terminations had anything to do with Vision Screenings. Krol was terminated after several Wal-Mart employees submitted statements complaining about Krol's unprofessional and abusive manner. See Exhibit I. Wal-Mart terminated Dale Ceneviva's employment for walking off of the job. The decisions regarding these employment terminations were made by different Wal-Mart managers, at different stores. Key's only alleged link to Ceneviva is the fact that he worked with her at a different store before either of them was employed by Wal-Mart. Wal-Mart reinstated after grieving her termination through Wal-Mart's employee grievance policy. See Exhibit J. Despite Key's attempt to create an inference that undersigned counsel acted improperly in some way by suggesting to its client that Ceneviva be re-hired because it would help in this case, the decision to re-hire her was made before counsel even knew of the issue and, thus, has nothing to do with this case.

[17] As stated by the Court in Iosa, 299 F. Supp. 2d at 36:

10

repeatedly emphasized that a plaintiff must establish a violation of an <u>important</u> and <u>clearly</u> <u>articulated</u> public policy to sustain a wrongful termination claim. <u>Thibodeau</u>, 260 Conn. at 701 (public policy relied upon for wrongful termination claim must be important and clearly articulated); <u>Iosa</u>, 299 F. Supp. at 35-36. This does not mean, as Key claims, that Wal-Mart does not believe that the optician statute at issue is not important. Rather, Wal-Mart contends that the alleged violation of the statute does not rise to the level of an important policy sufficient to carve out a wrongful termination claim to protect his employment, as, as described below, the public at large has not been harmed and there is no social justice that needs to be vindicated. If any provision of Connecticut's optician statutes were violated, the violation was of a technical nature and inflicted no harm or manifest injustice upon anyone.[18] Key provides no evidence that by allowing opticians to perform Vision Screenings, he or a member of the public was put at any type of risk or that the public policy of protecting eye health has been compromised. Wal-Mart's policy in no way impedes the protections contemplated by this statute. Wal-Mart emphasizes that individuals should regularly see an ophthalmologist in order to evaluate their eye health. <u>See</u> Wal-Mart Academy of Vision Handbook, attached as Exhibit K, pp. 160-162; Ellis Dep. at pp.

---

Indeed, in cases far more compelling than this one, the Connecticut courts have refused to expand the "public policy exception" to the employment at-will doctrine. <u>See</u>, <u>e.g.</u>, <u>Thibodeau</u>, 260 Conn. at 694 (holding that a common-law claim for wrongful discharge will not lie against employers with less than three employees, thus not covered by Connecticut's Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60, who discharge their employees on the basis of pregnancy); <u>Daley v. Aetna Life & Casualty Co.</u>, 249 Conn. 766, 734 A.2d 112 (1999) (refusing to extend the public policy embodied in the state and federal Family and Medical Leave Acts to require an employer to accommodate a parent's work-at-home requests and, thus, dismissing plaintiff's wrongful discharge claim based on a violation of this alleged public policy); <u>Burnham</u>, 252 Conn. at 160 (refusing to extend the protections of the state whistleblower statute, Conn. Gen. Stat. § 31-51m, to an employee who was terminated for reporting defendants' unsafe dental practices to a dental association, because the dental association was not a "public body" under § 31-51m(b) and, therefore, dismissing plaintiff's wrongful discharge claim based on this public policy); <u>Morris v. Hartford Courant</u>, 200 Conn. 676 at 680, 513 A.2d 66 (holding that a false but negligently made accusation of criminal conduct as a basis for dismissal was not a "demonstrably improper reason" when the employer was not statutorily obligated to investigate the veracity of the allegation); <u>Jarrett</u>, 2003 Conn. Super. LEXIS 1021, 2003 WL 1962835 (refusing to extend the public policies of the state Family and Medical Leave Act to cover a discharge that was not a prohibited act enumerated under Conn. Gen. Stat. § 31-51pp, nor a violation of the leave policy under Conn. Gen. Stat. § 31-51ll).

[18] Key's post-termination concern for the letter of the law is hard to swallow given Key's own frequent attempts to ignore it. For example, Key asked Ellis to fill a prescription out for a customer so Key did not have to wait for the

23-24, 28, 47-48, 50, 56, Ellis Dec., ¶6. Opticians were specifically instructed not to provide information to customers about results of a Vision Screening, interpret the results or opine on an individual's eye health. Id. [19] These fundamental principles are not altered or in any way compromised merely because Dr. Gordon is an "independent contractor," not an "employer." See Opposition, p. 14. C.G.S. § 20-138a allows opticians to perform certain optical duties under an "employing" ophthalmologist. Its purpose is to protect the public from individuals providing optical services when they are not qualified or not able to consult with a trained doctor. Given that Wal-Mart only allows an optometrist to perform eye examinations, write prescriptions, and dispense eye health care advice, whether the optometrist an independent contractor or an employee of Wal-Mart makes no difference with respect to protecting the safeguards set out in the statute. Opticians are still barred from performing such duties. See, e.g., Exhibit K.

## II.    Key Provides No Evidence For His Claim of Racial Discrimination And, As Such, Judgment Should Be Entered in Defendants' Favor

In order to avoid summary judgment on his claim of race discrimination, Key must show that (1) Wal-Mart's articulated legitimate, non-discriminatory reasons for terminating his employment are false, and (2) more likely than not discrimination was the real reason for the adverse employment action. Weinstock v. Columbia Univ., 224 F.3d 33, 42, 50 (2d Cir. N.Y. 2000). Key has completely failed to produce even a scintilla of evidence that Wal-Mart's articulated reason for terminating his employment (i.e., his poor record of customer service) is at all fabricated or

---

doctor. Ellis refused Key's request, noting that Key knows opticians cannot fill out prescriptions. See Ellis' calendar entry, D00947, attached to the Opposition as Exhibit 5.

[19] The Vision Center Handbook provides "a vision screening is a screening test and is not meant to be a replacement for a thorough eye exam … Your doctor will spend a great deal of their chair time looking at the overall health of the patient's eyes." The manual also makes clear that opticians are not to opine on or discuss diagnoses or vision screening results with customers. "**It is very important that during the preliminary examination that you not make comments regarding the Customer's eye health or vision** … The doctor will then evaluate your findings and make a case presentation to the Customer. The Customer may very well ask you for the results of the pre-tests. You should always tell them, 'Mrs. Jones, Dr. Smith will discuss the results of these tests during the examination.' **It cannot be stressed enough that we do not relay the actual test results to the Customer.**" Exhibit K.

pretextual. For this reason, Key cannot sustain a claim of racial discrimination. Indeed, as Key notes in his Opposition, two Wal-Mart Vision Center opticians who were terminated during the relevant time period were white. Ellis Aff.. ¶ 7.

Key's race claim is based entirely on a single comment Key alleges was made by Dr. Gordon (i.e., that Dr. Gordon was "tired of black people messing up.") Such a statement, if it was uttered, was at best a single stray remark by a non-decision maker.[20] See Memorandum, pp. 27-28; Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998) (stray remark by non-decision makers are not probative).

In addition, Key has provided no evidence that Dr. Gordon was involved in the decision to terminate his employment. There is no dispute that Dr. Gordon neither had any hiring or firing authority over Key or any of the other opticians, nor even knew that Key had been fired. Key II at pp. 6-13; Deposition of Dr. Anthony Gordon, ("Gordon Dep."), pp. 33-34, 106-07, attached as Exhibit L. Key acknowledges that Dr. Gordon was not his supervisor or manager. See Opposition, pp. 15-16. Dr. Gordon did not hire, fire, discipline, evaluate, supervise or manage, promote, set schedules or determine benefits with respect to the Vision Center employees. Store Manager Noll, who made the decision to terminate Key's employment, did not consult with Dr. Gordon before making his decision.[21] Deposition of Philip Roger Noll, (Noll Dep) at pp.19-21.

## III. Wal-Mart Did Not Make A Negligent Misrepresentation To Key

Key seeks damages under a theory of negligent misrepresentation, claiming that Wal-

---

[20] In order to bolster his race discrimination claim, Key attempted to introduce a statement allegedly made by Ellis to Jeffrey Krol. See Opposition, p. 28. In response to Defendants' motion to strike and/or preclude the statement, this Court struck the alleged statement as inadmissible hearsay. See Exhibit A.

[21] To the extent that Key claims Chris Adkins and Assistant Manger Edgar Morales participated in the decision to terminate Key, there is not a scintilla of evidence that either one of these individuals maintained any racial animus against Key.

Mart failed to inform him that he would be expected to perform certain Vision Screening functions as an optician which Key now purportedly believes are unlawful. This claim is unsupported and fails. Key admits he did not sustain any damages by virtue of being required to perform the Visions Screenings, which he did for well over a year. Key II at 97-98. (Key's acknowledgment that he suffered no tangible damages as a result of Wal-Mart's failure to advise him that he would be responsible for conducting vision screenings and pre-testing.) If Key was so misled about the job description that he was purportedly given, or, in this case, not given, Key offers no factual evidence to explain why he remained in the position for over a year without objecting to the tests he now claims he found so offensive. Moreover, Key misrepresents the case law in his Opposition. In his opposition, Key states "[t]hat the failure to fully disclose pertinent information when providing guidance to others in connection with employment constitutes a misrepresentation under Connecticut law is one of the key holdings of D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206 (1987)." Opposition, p. 28. This statement is disingenuous and turns D'Ulisse-Cupo on its head. Nowhere in the holding, or even in dicta, did the Court in D'Ulisse-Cupo indicate that the failure to disclose pertinent information constitutes a misrepresentation. Rather, D'Ulisse-Cupo held that a *specific misrepresentation*, if negligently made, could be actionable. Key's position would require employers to create exhaustive lists of any and all tasks an employee is expected to perform, in order to avoid a negligent misrepresentation claim.[22]

## IV.    Key Fails To Prove He Had A Contract With Wal-Mart, or That Such A Contract was Breached.

Key has failed to set forth a contract on which he can sustain a breach of contract claim. He has likewise failed to establish that, as an at-will employee, he had any contractual right to

---

[22] For example, Wal-Mart may not have explicitly told Key that he was expected to clean off dirty eyeglass samples.

employment. Because Key has set forth no facts on which to base on actionable breach of contract claim, Defendants respectfully refer this Court to their Memorandum, pp. 20.

## V.    Key's Claims Against Dr. Gordon Have No Merit.

Key has provided mere speculation that Dr. Gordon was involved in the decision making process, and fails to provide any supported facts on which a fact finder could base a conclusion that Dr. Gordon was even involved in the decision to terminate Key's employment for sustained poor customer service, let alone "aided and abetted" such a decision. Indeed, a large portion of Key's argument centers on the fact that Dr. Gordon did not have any authority over Wal-Mart's opticians. See Opposition, pp. 14-16. He certainly did not aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so. Conn. Gen. Stat. § 46a-60(1)(5). Because the undisputed evidence demonstrates that Dr. Gordon in no way aided and abetted in discrimination against Key – indeed there was no discrimination against Key – the Counts against him should be summarily dismissed.

## VI.    Conclusion

For all the reasons set forth above, Defendants respectfully request that this Court grant their Motion for Summary Judgment in its entirety.

DEFENDANTS WAL-MART STORES INC. and
DR. ANTHONY GORDON

By:    _____

Joel L. Finger (ct06114)
Mitchell L. Fishberg (ct19661)
Kristi E. Mackin (ct23394)
Brown Raysman Millstein Felder & Steiner LLP
185 Asylum Street, 10th Floor
Hartford, CT  06103
(860) 275-6400

---

That does not mean that Wal-Mart, in asking Key to do so, negligently misrepresented elements of the job.

## **CERTIFICATE OF SERVICE**

This is to certify that on this 16th day of June 2004, a true copy of the foregoing was sent

via facsimile and first-class mail, postage prepaid, to:

Loraine M. Cortese-Costa, Esq.
Pamela Coyne, Esq.
Durant, Nichols, Houston,
    Hodgson & Cortese-Costa, P.A.
1057 Broad Street
Bridgeport, CT  06804

Kristi E. Mackin