# EXHIBIT B

Page 1

```
 1     IN THE UNITED STATES DISTRICT COURT

 2     FOR THE DISTRICT OF CONNECTICUT

 3

 4     --------------------------x

 5     MARVIN KEY,                    :

 6          Plaintiff,               : Civil Action No.

 7              -v-                   : 3:03 CV 144 (RNC)

 8     WAL-MART, INC., AND,           :

 9     DR. ANTHONY GORDON,            :

10     Defendants.                    :

11     --------------------------x

12

13

14        Deposition of JEROME ELLIS, taken

15     pursuant to the Federal Rules of Civil Procedure,

16     at the law offices of Durant, Nichols, Houston,

17     Hodgson & Cortese-Costa, 1057 Broad Street,

18     Bridgeport, Connecticut, before James A. Martone,

19     LSR and Notary Public, in and for the State of

20     Connecticut, on October 14, 2003 at 10:10 a.m.

21

22

23

24

25
```

1          A.    Not that I recall.

2                MR. REILLY:  I object to this line.

3    What happens at the Springfield store is irrelevant

4    to what the issues are in this case.

5                MS. CORTESE-COSTA:   You've reserved

6    all your objections until trial except as to form.

7          Q.    I'm sorry, what was your answer?

8          A.    I said not that I recall.

9          Q.    Okay.  You referred before to pretesting

10   patients.  What does that involve?

11         A.    We have several, equipment that we go

12   through.  We bring the patient in and run the

13   system tests and we give all the paperwork to the

14   doctor, and the doctor does his own diagnosis on

15   them.

16         Q.    And what are the system tests that you

17   perform?

18         A.    Auto refracting.  Check for peripheral

19   vision.  Check ocular pressure.  There's an ocular

20   pressure machine.  Depth perception and color test.

21         Q.    Do you do the auto refracting test?

22         A.    They're all standard equipment.  You just

23   have the patient's head up against the unit and you

24   hit a button, and it automatically scopes into the

25   eye and reads the power.  And then it -- you slide

KEY v. WAL-MART                                          October 14, 2003

Page 24

1    the control over on the other eye.  It's like a

2    joystick, and it will -- it automatically searches

3    the eye itself.

4              So it's just a matter of just

5    pushing the button and it will read out a print of

6    what it believes the vision is.

7         Q.    What training do you have to perform that

8    test?

9              MR. REILLY:  Objection.

10        A.    Want to explain?

11        Q.    How were you trained to perform that

12   test?

13        A.    When I first was there, I'm pretty sure

14   we had -- I'm not really sure.  We had someone come

15   down and show us all at one point, a long time ago.

16        Q.    Do you know who that is?

17        A.    No.

18        Q.    And what do you do with respect to the

19   peripheral testing?

20        A.    We just put their age in, set it to the

21   correct eye.  And you hit the button and always

22   explain to the patient to look into -- look at the

23   box that's inside.  Every time they see a wave, to

24   click.

25        Q.    And then what happens with that test?

KEY v. WAL-MART                                          October 14, 2003

1       A.    Yes.

2       Q.    What do those involve?

3       A.    We have a vision screener machine.  And

4   we have a -- we have the customers look inside of

5   it, read a line for distance.  One for near.

6       Q.    And then what do you do?

7       A.    If they have problems reading it, we

8   suggest they get an eye exam.  We also tell them

9   they should get one anyway to make sure their eyes

10  are healthy.

11      Q.    And if -- you stated before they have

12  seven associates in the Springfield store.  What

13  job positions are those seven employed in?

14      A.    Their position --

15             MR. REILLY:  Objection.  Again I'll

16  just repeat, the Springfield store has nothing to

17  do with this case.  You can answer.

18      A.    Their positions you're asking?

19      Q.    Yes.  Their job titles.

20      A.    Let's see.  I have three of them that are

21  opticians.  And I have four that are apprentice.

22      Q.    Apprentice opticians?

23      A.    Right.

24      Q.    Okay.  And do all seven of them perform

25  the vision screenings?

October 14, 2003

1          A.   I -- I don't want to speculate.  So I

2     don't know.  I don't recall.

3          Q.   But do you have any idea what position

4     they held?

5          A.   I think it was district manager but I do

6     not want to speculate.

7          Q.   Can you tell me who the person was?

8          A.   Skeet Scoville.

9          Q.   And how about the -- did you testify that

10    you also received training when you went to the

11    Springfield store, or was this the one training

12    that you received at Wal-Mart?

13         A.   In pretesting?

14         Q.   Pretesting and vision screening?

15         A.   When I came to the Wal-Mart store, yeah.

16         Q.   So it was just the one training session

17    with Skeet Scoville, you haven't had any subsequent

18    training?

19         A.   No.  I had -- Phyllis had already been

20    doing pretesting.  Pretesting, it's not really a

21    complicated task.  It's a matter of pushing

22    buttons.  There's no expertise, with the exception

23    of making sure that someone's head is in the right

24    spot and so forth.

25              We don't do any diagnostics on it.

KEY v. WAL-MART                                                    October 14, 2003

Page 48

1    We don't diagnose what's going on.  We just collect

2    the data and give it to the doctor.

3        Q.   So Ms. Parmeter was already doing the

4    pretesting when you started at the North Windham

5    store?

6        A.   Yes.

7        Q.   How about Marvin, had he already been

8    doing it?

9        A.   Yes.

10       Q.   I think the question I actually asked you

11   was whether subsequent to the training that you had

12   with Skeet Scoville that you've described, did you

13   have any further training at Wal-Mart in pretesting

14   or vision screening?

15       A.   Not that I recall.

16       Q.   Did you receive any written materials in

17   connection with your training for pretesting and

18   vision screening?

19       A.   Well, every unit has a description on

20   what to -- how to perform each task, right on the

21   unit itself.  We also had all the -- every single

22   instrument has data on how to go ahead and do it.

23   It's really simple.  All the directions are right

24   there.

25       Q.   So they're kept near the machine?

Page 50

1          Q.    And with respect to the vision

2     screenings, are customers charged a fee for those?

3          A.    Vision screenings?

4          Q.    Yes.

5          A.    No.

6          Q.    So what purpose do they serve in terms of

7     profitability for Wal-Mart?

8                    MR. REILLY:   Objection.

9          A.    Well, vision screenings, it's just a

10    service that we give to the customers.   Doesn't --

11    vision screening is not an eye examination or

12    anything.   It's not a diagnosis of anything.

13    Doesn't really tell you much except for whether

14    someone, you know, whether they don't have any

15    prescription or they do have something, it's just a

16    service to the customer.

17                    It's not that -- it's not an eye

18    examination.   So we tell people that they still

19    should have an eye exam to see what they need for a

20    prescription or any eye diseases or anything.   They

21    should go to a doctor, whether it's ours or theirs.

22         Q.    So is it your testimony then that you do

23    the vision screenings purely as a service to the

24    customer, with no profitability motive at all?

25                    MR. REILLY:   Objection.   This

Page 56

```
 1        Q.    And what would you say?

 2        A.    That this is not an eye examination, that

 3   they should see a doctor, to have their eyes

 4   checked, to make sure that they don't need

 5   correction.  Also to make sure they don't have any

 6   eye diseases.

 7        Q.    And when were the customers told that?

 8        A.    When we did the vision screenings.

 9        Q.    Before or after?

10        A.    After.

11        Q.    How long were these in use at the North

12   Windham store?

13        A.    Not too long.  I'd make like 500 copies

14   at a time.

15        Q.    Well, when you say not too long, any idea

16   how long?

17        A.    How ever long it took to handout 500

18   copies.

19        Q.    So you'd only use this once?

20        A.    I believe so.

21        Q.    Did you have other flyers that you

22   designed, other than this one?

23        A.    Yeah.

24        Q.    Did you maintain copies of those?

25        A.    No.
```

KEY v. WAL-MART                                                    October 14, 2003

Page 81

1       A.    Because that's the only papers that we

2    have.

3       Q.    Did she say anything more specific about

4    what was not right about them?

5       A.    Her most concern was that she didn't feel

6    that Marvin knew what he was doing and that he

7    seemed not to know her kids -- that her boy -- the

8    boy's name was Harrison and the daughter's name was

9    Kimmy and they were both teenagers, and you could

10   really tell them apart, and he kept asking her what

11   her name was, and that seemed kind of strange.

12      Q.    I think you mentioned earlier that you

13   felt that maybe Mr. Key was doing it on purpose?

14      A.    Yeah.

15      Q.    What makes you think that?

16      A.    Because he's done it many a times and

17   never had any issues with -- just one time before

18   with the paperwork.  But I've watched them do

19   pretesting and they've never had any issues with

20   it.

21      Q.    So when you say he did it many times

22   before, you mean he's done the pretesting many

23   times before?

24      A.    Yes.  Without issues.

25                (Pause in the Proceedings).

KEY v. WAL-MART                    February 10, 2004

Page 247

1      A.    No, this goes across with, up to the

2   top, "Review all coachings and decide if it's

3   possible to terminate."

4      Q.    Is that what Chris Atkins told you?

5      A.    Yeah.  I'm not sure if he told me,

6   though.  I wrote that down there, but I'm not

7   sure if that's what he told me.  I don't want to

8   say he did.

9      Q.    And then below that, "Saw Roger, he

10  said he'd sit down with me Saturday and during

11  the week to discuss Marvin."

12     A.    Yep.

13     Q.    Was anything else said at that time?

14     A.    Just the note on the bottom when I

15  spoke with Chris.  After I spoke with Chris about

16  terminating Marvin, he said that we should make

17  sure, you know, all our stuff is in order, cross

18  our t's and dot our i's, in case Marvin would

19  cause any trouble because it is possible he'd

20  start some trouble with the licensing, because

21  there's a policy, we always have to make sure

22  that everything is -- you know, we keep -- our

23  store is licensed, that every store has people --

24  every store has a licensed optician while the

25  store is open.  So he just said to make sure

1   everybody was following suit, if it was something

2   he was going to follow through with.

3        Q.   And what makes you think Marvin was

4   going to cause trouble?

5        A.   Because I felt, you know, he'd be one

6   to start trouble like that.

7        Q.   Trouble with respect to licensing?

8        A.   Yeah, try to start trouble.  There

9   really wasn't anything to be concerned over.

10        Q.   Well, what did you expect that he might

11   do?

12        A.   Just call the state and complain, you

13   know, say, oh, they don't have coverage or

14   something, or we don't have licenses on the wall

15   or something.

16        Q.   And what made you think that Marvin

17   would do that?

18        A.   Because he was -- because if we were

19   terminating him, I knew he'd be starting some

20   kind of trouble.  It's an assumption, if you want

21   to say.

22        Q.   Do you expect everyone who is

23   terminated is going to go to the state?

24        A.   When you're licensed, they might.  You

25   don't know.  I'm not saying he did, just when

KEY v. WAL-MART                                    February 10, 2004

Page 249

1    someone's sour, you know, things happen, that's

2    all.

3         Q.   And this was according to Chris Atkins?

4         A.   That was, yeah.

5         Q.   To make sure that all state standards

6    and --

7         A.   Yeah, just make sure everything is in

8    order so we don't get in any trouble, which we

9    usually are anyways.

10        Q.   Would you go to 1109A?  And I just want

11   to know when this was typed?

12        A.   Monday on April 16th, 2001.

13        Q.   Okay.  Would you turn to 1111, please?

14   And take a moment and read that.

15        A.   Okay.

16        Q.   Okay.  And did Chris Atkins bring this

17   customer Kim Nicholson's (phonetic) complaint to

18   your attention?

19        A.   Yes.

20        Q.   And did you ever speak with Kim

21   Nicholson?

22        A.   I must have because I gave her a 50

23   dollar gift card.

24        Q.   Did Kim Nicholson ever express her

25   complaint or dissatisfaction in writing?

KEY v. WAL-MART                                    February 10, 2004

Page 252

 1                    MS. COYNE:  Oh, wait can I back

 2   up?

 3                    MR. REILLY:  Of course.

 4                    MS. COYNE:  I'm sorry.

 5   BY MS. COYNE:

 6        Q.    When you purchased this Day Planner,

 7   did you request reimbursement from Wal-Mart?

 8        A.    I think I had asked for it, yeah.

 9        Q.    Did they pay you for it?

10        A.    No, it's mine, I own it.

11        Q.    All right.

12                    MS. COYNE:  Then I'm finished.

13   CROSS-EXAMINATION

14   BY MR. REILLY:

15        Q.    I'm just going to ask you some

16   questions from the Day Planner.  Can you turn to

17   page 1568?

18                    MS. COYNE:  This is beyond the

19   scope of direct.

20                    MR. REILLY:  What do you mean, I

21   haven't even asked the question yet?

22                    MS. COYNE:  I didn't ask anything

23   about this page.

24                    MR. REILLY:  Well, first of all,

25   we're not in trial so there's no issue of scope

KEY v. WAL-MART                                February 10, 2004

Page 253

1    on cross-examination.

2                MS. COYNE:  I know.  I can object,

3    but it's supposed to follow the same as trial.

4         Q.   Can you turn to 1568?

5         A.   I got it.

6         Q.   Okay.  If you read that entry to

7    yourself and it goes on to -- actually, if you

8    look at 1569, start up there.

9         A.   Okay.

10        Q.   There's a reference to -- it looks like

11   a Loraine King?

12        A.   Yep.

13        Q.   Do you see that?

14        A.   Yes.

15        Q.   Was Loraine King a customer of

16   Wal-Mart?

17        A.   Yes.

18        Q.   Did Ms. King -- strike that.

19                Can you turn to page 1545?

20                MS. COYNE:  Again, I object.  Your

21   cross is nowhere near my direct.

22                MR. REILLY:  Okay.  Your objection

23   is noted.

24        Q.   You see there's a reference to a Maria

25   Ortiz?

Page 254

1      A.    Yes.

2      Q.    Was Ms. Ortiz a customer at Wal-Mart?

3      A.    Yes.

4      Q.    I'd ask you to turn to page 941.

5            MS. COYNE:   I object again.

6      Q.    There's a reference to Mr. Pelletier

7   and a Wilma Pelletier.  Were the Pelletiers, or

8   at least Wilma Pelletier, a customer at Wal-Mart?

9      A.    Yes.

10           MS. COYNE:   This is also beyond

11  the scope of the judge's order because this was

12  already discussed at the first deposition.

13     Q.    Can you turn to 961, please?

14           MS. COYNE:   I object to the mere

15  asking everything beyond what I asked.  I asked

16  about this person, that's been answered.  That's

17  the only one that's anywhere near what I asked,

18  everything else is completely beyond my direct.

19  That is not the way a deposition is conducted,

20  it's narrowed, it's supposed to be within the

21  scope of my direct.  The first questions you

22  asked, three or four questions, were not.  This

23  one I already established who this person is.

24           MR. REILLY:   You made reference to

25  the person, I'm just going to ask whether the

KEY v. WAL-MART                                    February 10, 2004

Page 255

1    person is a customer.

2                    MS. COYNE:  I know what you're

3    going to ask.

4                    MR. REILLY:  Okay.

5                    MS. COYNE:  And I --

6                    MR. REILLY:  Your objection is

7    noted.

8                    MS. COYNE:  This is just -- it's

9    inappropriate.

10                    MR. REILLY:  Okay, your objection

11    is noted.  These are supposed to be form

12    objections, I think that was the stipulation.

13    That's what you told me in the beginning.

14                    MS. COYNE:  And have you followed

15    that?

16                    MR. REILLY:  Yeah, for the most

17    part, I think I do a pretty good job of following

18    my stipulations.

19                    MS. COYNE:  Oh, we go off the

20    record for the rest.

21        Q.    Looking at page 961, is this person

22    that's referenced, Temple Dasitra, was that a

23    customer at Wal-Mart?

24        A.    Yes.

25        Q.    Can you turn to 964, please?

SANDERS, GALE & RUSSELL                    (203) 624-4157

KEY v. WAL-MART                                      February 10, 2004

Page 256

1                    MS. COYNE:  Objection.

2                    MR. REILLY:  If you want, you can

3    make a continuing objection.

4                    MS. COYNE:  It is a continuing

5    objection.

6                    MR. REILLY:  Okay.

7        Q.   There's a reference to a person named

8    Jean, and I can't say the name.  Who's that, Jean

9    Libernisky (phonetic)?  Was that a customer at

10   Wal-Mart?

11       A.   Yes.

12       Q.   If you could refer to page 1057.

13                   MS. COYNE:  Objection.

14                   Before you ask that question, I

15   need to take a two-minute break.

16                   (Recess:  2:13 to 2:18 p.m.)

17   BY MR. REILLY:

18       Q.   Mr. Ellis, looking at 1057, there's a

19   reference to Tim Angell.  Do you see that?

20       A.   Yes.

21       Q.   Was Mr. Angell a customer at Wal-Mart?

22       A.   Yes.

23                   MS. COYNE:  Note my continuing

24   objection.

25                   MR. REILLY:  Understood.

KEY v. WAL-MART                                February 10, 2004

Page 257

1         Q.   I'd ask you to refer to page 1350,

2    going on to 1351.  On page 1350, there's a

3    reference to Kathy Shaw; do you see that?

4         A.   Yes.

5         Q.   All right.  Was Miss Shaw a customer at

6    Wal-Mart?

7         A.   Yes.

8         Q.   I ask you to refer to page 1628.  On

9    that page there's a reference to Dylan Lesnewski;

10   do you see that?

11        A.   Yes.

12        Q.   Was Dylan Lesnewski a Wal-Mart

13   customer?

14        A.   Yes.

15        Q.   I ask you to refer to page 1666,

16   there's a reference there to a Mr. -- and correct

17   me if I'm wrong, looks like Mr. Saline.  Is that

18   how you say it?

19        A.   Yes.

20        Q.   Okay.  Was Mr. Saline a customer at

21   Wal-Mart?

22        A.   Yes.

23        Q.   Okay.  Ask you to refer to page 1696.

24   On that page there appears to be a reference to

25   Mrs. Gostin or Gostin?

SANDERS, GALE & RUSSELL                    (203) 624-4157

KEY v. WAL-MART                                    February 10, 2004

Page 258

1        A.    Gostin.

2        Q.    Gostin; is that correct?

3        A.    Gostin.

4        Q.    And her husband.  Are either

5    Miss Gostin and her husband Wal-Mart customers?

6        A.    Her husband.

7        Q.    I see.  And I'd ask you to refer to

8    page 1009.  Will you look at the bottom?  You

9    know, the bottom of that page there's a reference

10   to a Richard Gagnon; is that correct?

11       A.    Gagnon.

12       Q.    Gagnon.  Was Mr. Gagnon a customer at

13   Wal-Mart?

14       A.    Yes.

15       Q.    With respect to all these individuals

16   that we've just went through and were customers

17   at Wal-Mart, were these individuals that had --

18   that there were customer issues with Marvin

19   about?

20       A.    Yes.

21               MR. REILLY:  That's all I have.

22   REDIRECT EXAMINATION

23   BY MS. COYNE:

24       Q.    Okay.  Just looking at this last one,

25   Richard Gagnon, it said that you wanted to chat

SANDERS, GALE & RUSSELL                    (203) 624-4157