# EXHIBIT C

2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                      :

MARVIN KEY,
                      :

        Plaintiff,
                      : 3: 03 CV 144(RNC)

        vs.
                      :

WAL-MART, INC. and
DR. ANTHONY GORDON,
                      :

        Defendants.
                      :
- - - - - - - - - - - - - - - - - x


Deposition of JENILU ZBORAY, taken

pursuant to the Federal Rules of Civil

Procedure, at the law offices of Brown

Raysman Millstein Felder & Steiner, LLP,

CityPlace II, 185 Asylum Street, Hartford,

Connecticut, before Michelle E. Pappas,

License #00081, a Notary Public in and for

the State of Connecticut, on Monday,

September 29, 2003, at 1:56 p.m.


SCRIBES, INC.

---

2

A P P E A R A N C E S

DURANT, NICHOLS, HOUSTON, HODGSON & CORTESE-COSTA, P.C.
Attorneys for the Plaintiff
1057 Broad Street
Bridgeport, Connecticut  06604-4219
    By:  PAMELA J. COYNE, ESQ.
  Tele:  (203) 366-3438
        www.durantnic.com


BROWN RAYSMAN MILLSTEIN FELDER & STEINER, LLP,
Attorneys for the Defendants
900 Third Avenue
New York, New York  10022
    By:  GREGORY B. REILLY, III, ESQ.
  Tele:  (212) 895-2326
        greilly@brownraysman.com


A L S O   P R E S E N T

DR. ANTHONY GORDON


SCRIBES, INC.

---

3

1           J E N I L U   Z B O R A Y ,

2  called as a witness, having first been duly sworn

3  by Michelle E. Pappas, a Notary Public in and for

4  the State of Connecticut, was examined and

5  testified as follows:

6          MR. REILLY:  It's good to get the

7      transcript, because then you can read it and

8      make sure it's accurate and if there's a

9      problem you can fix it, so I recommend --

10        THE WITNESS:  Okay.

11        MR. REILLY:  -- that you do.

12        MS. COYNE:  So you want to.  Okay.

13  DIRECT-EXAMINATION

14  BY MS. COYNE:

15      Q.  Jenilu, my name is Pam Coyne, I'm an attorney

16  with Durant, Nichols, Houston, Hodgson & Cortese-Costa

17  in Bridgeport.  We've been retained by Marvin Key to

18  represent him in a lawsuit that he has filed against

19  Wal-Mart and against Dr. Gordon.  The court reporter is

20  here to record everything that you say, everything that

21  everyone says, and so therefore we ask that you answer

22  verbally, don't nod, shake, or hm-hmm or unh-unh,

23  because we have to have -- we need the record that

24  you're going to read and sign.

25      A.  Okay.


SCRIBES, INC.

---

4

1      Q.  If there's any question that I or Attorney

2  Reilly asks you that you don't understand or you want

3  to clarify it or explain it in any way, please ask and

4  we'd be happy to do so, otherwise we'll assume that you

5  understood and answered the question that was asked.

6      A.  Okay.

7      Q.  Are you represented by counsel?

8      A.  I did call my attorney this morning, he's in

9  court.

10      Q.  And what was the purpose of the call?  Was

11  it -- was it to discuss this?

12      A.  Yes.  I feel like I'm being pulled from every

13  which direction, and I'm only going to tell the truth.

14      Q.  And that's what everyone expects.  Have you

15  had any discussions with any attorneys?

16      A.  Not prior to today.  I only talked to the

17  paralegal.

18      Q.  What paralegal is that?

19      A.  John Buhrman and Russo.  Actually, it's

20  really only John Buhrman, but he wasn't in the office

21  today, because I feel like someone needs to represent

22  me.  I know I work at Wal-Mart, but I just feel like I

23  need to be represented.  I need -- that's what I think.

24  I just feel like I need to have my own attorney.

25      Q.  Have you ever spoken with me before today?


SCRIBES, INC.

57

```
1    wasn't pushed for us to pursue it.
2         Q.   Is that the only basis for your statement?
3         A.   Yes.
4         Q.   When you say the issue wasn't pushed, what
5    are you talking about?
6         A.   To continue the prescreenings, to do the
7    maximum that was required.
8         Q.   Who didn't push, as you -- to use your own
9    words?
10        A.   Jane.
11        Q.   Are vision screenings still being done at the
12   Willimantic Vision Center?
13        A.   No.
14        Q.   When did that stop?
15        A.   About when Luke started.
16        Q.   When did Luke start?
17        A.   Two, three months ago.  Two months ago.
18        Q.   Other than what you've testified to, do you
19   have any other basis for your belief that vision
20   screenings are not legal?
21        A.   No.
22        Q.   Did you enjoy working with Mr. Key?
23        A.   Yes.
24        Q.   Why?
25        A.   He was a co-worker.  I like them all.
```

SCRIBES, INC.

58

```
1         Q.   Mr. Key, to your knowledge prior to this
2    incident at the end of April 2001, did he have any
3    performance problems at work?
4         A.   Yes.
5         Q.   What performance problems of Mr. Key are you
6    aware of?
7         A.   I feel he could have had his attitude
8    adjusted a little bit.  I remember --
9                   MS. COYNE:  Okay.  We can strike that.
10                  MR. REILLY:  I asked her opinions of his
11             performance.
12                  MS. COYNE:  You're asking about the
13             specific performance problems.
14        Q.   Is it your testimony that Mr. Key had an
15   attitude problem?
16        A.   That would be fair to say.
17        Q.   Could you please describe his attitude
18   problem?
19        A.   I didn't feel he had respect for Jerry.  When
20   a patient would go in, Marvin would say what do you
21   need, go ahead, sit down.  It was kind of minimum.  He
22   didn't really go out of his way.
23        Q.   When you say Mr. Key had "no respect for
24   Jerry," could you please give me some examples?
25        A.   I can tell you that Jerry would say, Marvin,
```

SCRIBES, INC.

59

```
1    what are you doing.  Well, what do you think I'm doing,
2    I've got a frame in my hand and it's going on the frame
3    board, okay, it's going on the frame board, that's what
4    I'm doing.  Things like that.
5         Q.   Could you give me some more examples, please?
6         A.   Jerry would go on his break, him and the
7    Doctor at the snack bar, and he would say, what does he
8    think I'm doing, I've got a frame in my hand, I'm
9    putting the frame away.  I mean, he sees the frame in
10   my hand.  He'll come back to the office and say,
11   Marvin, what are you doing, and I would say, I'm
12   getting ready to take out the trash.  Sometimes I think
13   he's picking on me because he can see clearly what I'm
14   doing.
15        Q.   Who said sometimes I think he's picking on
16   me?
17        A.   Marvin's saying that to me, he referring to
18   Jerry.
19        Q.   I understand.  Can you give me any other
20   examples of what you considered Mr. Key "no respect for
21   Jerry"?
22        A.   I can't think of anything right now.
23        Q.   Now, you say that Mr. Key allegedly said
24   sometimes it seems like Jerry's picking on me or words
25   to that effect; is that correct?
```

SCRIBES, INC.

60

```
1         A.   That would be Marvin saying that about Jerry.
2         Q.   Understood.
3         A.   Right.
4         Q.   Okay.  What was your observation, was
5    Mr. Ellis allegedly picking on Mr. Key?
6         A.   I kind of thought the same way too.  He'd tap
7    me on the shoulder, say can you get the phone, he'd be
8    closer, I'd wonder why can't he answer the phone.
9         Q.   Who?
10        A.   Jerry, the manager.
11        Q.   So you thought Jerry was picking on you as
12   well; is that correct?
13        A.   Or irritating me.
14        Q.   Okay.  And would you say that Jerry was an
15   equal opportunity picker, that he picked on you just as
16   much, if not more, than Mr. Key?
17        A.   I tried not to take it personally because I
18   knew he was my manager and I had to respect him.
19        Q.   Understood.  But that doesn't answer my
20   question.  Would you say that Jerry picked on you just
21   as much, if not more, than Mr. Key?
22        A.   I think he picked on Marvin more.
23        Q.   Okay.  What's the basis for that statement?
24        A.   They didn't see eye to eye probably.
25        Q.   Do you have any other basis for that
```

SCRIBES, INC.

1  statement?
2      A.   No, it's just my feelings.
3      Q.   Mr. Key, to your knowledge, did he have any
4  other performance problems?
5      A.   Might have been shorthanded on customer
6  service performances.  He would talk short and not
7  sweet, but more like sassy, kind of, like, cocky to
8  them.
9      Q.   So it's your testimony, and correct me if I'm
10  wrong, that Mr. Key was sometimes sassy and cocky to
11  the customers?
12      A.   Not all the time, but sometimes I saw that.
13      Q.   And you heard it; is that correct?
14      A.   [No verbal response.]
15      Q.   Is that correct?  You have to answer
16  verbally.
17      A.   Yes.
18      Q.   Can you give me some examples?
19      A.   I can't remember everything, but I remember
20  one day there was a patient that was kind of slow, and
21  he had told them to come back with their husband or
22  brother or somebody with their prescription.  I felt
23  that he could have helped them then.  The customer,
24  that girl then.
25      Q.   I want to make sure your testimony's clear.

SCRIBES, INC.

---

62

1  Is it your testimony that Mr. Key could have helped
2  this customer better and that she had some type of
3  injury or she had some type of brain injury?
4      A.   Hm-hmm.  Yes.
5           MS. COYNE:  You're putting -- objection
6      He's putting words in her mouth.
7      Q.   To your knowledge did the customer have a
8  brain injury?
9      A.   Well, she had problems, she was slow.  She --
10  she had told us that she had problems, you know.
11      Q.   Hm-hmm.  Okay.  Do you know what the problems
12  were?
13      A.   She had an injury.  It was a brain injury.
14      Q.   It was or wasn't?
15      A.   It was.
16      Q.   Okay.  And what -- and -- strike that.
17      It was your opinion that Mr. Key could have
18  treated this customer better?
19      A.   Right.
20      Q.   Okay.  And what's the basis for your opinion
21  or your belief?
22      A.   He could have taken care of her and in a
23  timely manner instead of telling her to come back with
24  someone else.  I believe that particular day Jerry went
25  in the lobby to get her, if this is the same day.

SCRIBES, INC.

---

63

1           MS. COYNE:  If you don't know --
2      A.   Then I don't know.
3      Q.   Can you give me any other examples of Mr. Key
4  treating customers inappropriately?
5      A.   No.
6           MS. COYNE:  Objection.
7      Q.   Did you ever witness Mr. Key telling a
8  customer that they should return to the store where
9  they purchased their glasses because the Willimantic
10  store would not service that customer?
11      A.   No.
12      Q.   Did you ever observe Mr. Key spending an
13  inordinate amount of time on the phone?
14      A.   No.
15      Q.   Did you ever observe Mr. Key spending an
16  inordinate or too much time with a patient?
17      A.   Well, I didn't notice if Marvin did.  I know
18  I certainly do, because when you fill a prescription
19  you can't do it in seven minutes.  I mean, they have
20  questions, you have to answer their questions, you have
21  to focus on the patient.  So I can't answer that
22  question.
23      Q.   So you just don't know; is that fair?
24      A.   I don't think you can do a prescription fast.
25  I don't think you can --

SCRIBES, INC.

---

64

1      Q.   That wasn't my question.  I understand these
2  things take time.  But did you ever observe Mr. Key
3  taking too much time, in your opinion, assisting a
4  customer?
5      A.   I didn't notice.  I don't know.
6      Q.   Now, other than what you've described as his
7  bad attitude and being cocky and sassy with customers,
8  are you aware of any other performance problem that
9  Mr. Key may have had?
10      A.   No.
11      Q.   Is it the case that periodically, like once a
12  week, there was a department meeting at the store?
13      A.   Yes.
14      Q.   Was it on a weekly basis?
15      A.   The managers meet on Mondays around nine
16  o'clock, eight o'clock, in the back with all the
17  managers, including specialty divisions, and the store
18  has a meeting usually on Friday or every day of the
19  week, but most often everybody goes to the Friday one
20  in the snack bar for the free doughnut and coffee.
21      Q.   Was there any meetings of just the Vision
22  Center associates and managers?
23      A.   Yes.
24      Q.   And how frequently did they occur?
25      A.   Jerry would have -- he would have them, I

SCRIBES, INC.