# EXHIBIT D

Page 1

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
 2
         - - - - - - - - - - - - x
 3       Case No. 303CV144                          ORIGINAL
         MARVIN KEY,
 4            Plaintiff,
         vs.
 5       WAL-MART, INC., and
         DR. ANTHONY GORDON,
 6            Defendants.
 7       - - - - - - - - - - - - x
 8       ------------------------------------------------
                DEPOSITION OF: MARVIN KEY
 9       ------------------------------------------------
10              Taken before Sue A. Terry,
         R.P.R./C.R.R., a Notary Public in and for the
11       State of Connecticut, pursuant to Notice and
         the Federal Rules of Civil Procedure, at the
12       offices of Brown Raysman Millstein Felder &
         Steiner LLP, CityPlace II, 185 Asylum Street,
13       Hartford, Connecticut, on August 13, 2003,
         commencing at 10:00 a.m.
14
                          - - -
15
16
17
18
19
20
21
22
23
                    BRANDON REPORTING SERVICE
24                       (860) 549-1850
                      11A Capitol Avenue
25                Hartford, Connecticut 06106
```

Page 6

1    impair your ability to understand my
2    questions?
3        A.   No.
4        Q.   Are there any drugs or medication
5    that you're taking that would impair your
6    ability to remember events that occurred
7    relating to your employment at Wal-Mart?
8        A.   No.
9        Q.   Is there any reason you cannot
10   testify truthfully here today?
11       A.   No.
12               MR. REILLY:  Off the record.
13               (Discussion off the record.)
14   BY MR. REILLY:
15       Q.   Mr. Key, you're familiar with
16   Dr. Gordon; correct?
17       A.   Yes.
18       Q.   And you worked with him when you
19   were employed by Wal-Mart; correct?
20       A.   He had an optometry practice there
21   next to the optical shop, and I worked in the
22   optical shop.
23       Q.   Okay.  At the time you worked at
24   Wal-Mart, if you know, who was Dr. Gordon's
25   employer?

Key vs. Wal-Mart

8/13/2003                                                     Marvin Key

Page 7

```
1     A.   I don't know of his
2  employer/employee relationship with Wal-Mart.
3     Q.   Okay.  Did Dr. Gordon have his own
4  patients?
5     A.   There again, I wasn't part of his
6  practice.
7     Q.   So do you know whether he had his
8  own patients?
9     A.   People -- people came to Dr. Gordon
10 to get examined.
11    Q.   Do you know if these people who
12 came to Dr. Gordon were his patients?
13    A.   Let's see.  I would -- I guess so.
14    Q.   Do you know if Dr. Gordon -- strike
15 that.
16         When you worked at Wal-Mart, how
17 often was Dr. Gordon present?
18    A.   I don't recall.
19    Q.   To your knowledge, did he work
20 every day of the week when you were working
21 there?
22    A.   Dr. Gordon's schedule was made by
23 him.
24    Q.   Did that schedule -- strike that.
25         To your knowledge, did Dr. Gordon
```

Key vs. Wal-Mart

8/13/2003 Marvin Key

Page 8

```
 1   change his schedule?
 2        A.   I think so.
 3        Q.   Okay.  To your knowledge, was
 4   Dr. Gordon on Wal-Mart's payroll?
 5        A.   I wasn't aware, I said previously,
 6   about his employer/employee relationship.
 7        Q.   To your knowledge, was Dr. Gordon
 8   able to set his own fees for his patients?
 9        A.   I think he yelled at me for -- did
10   he?
11             I think -- I don't know.  It was
12   his practice.
13        Q.   Let me say something that I think I
14   said before, and your attorney probably told
15   you, as well.
16             If you know the answer to the
17   question, please say the answer truthfully.
18        A.   Okay.
19        Q.   If you do not know, it's perfectly
20   fine to say, "I don't know."
21        A.   Or don't recall.
22        Q.   If you don't remember, it's
23   perfectly fine to say "I don't remember."
24             I do not, and I don't think anybody
25   in this room wants you to guess or
```

Page 9

1    speculate.
2         A.    Okay.
3         Q.    So to go back to my question:  Do
4    you know if Dr. Gordon maintained his own
5    patient records?
6         A.    That's a new question?
7         Q.    I apologize.  Do you know if
8    Dr. Gordon set his own fees?
9         A.    I don't know.
10        Q.    Do you know if Dr. Gordon
11   maintained his own files of the patients he
12   saw?
13        A.    As far as maintain, vaguely what I
14   remember is that we, the optical people --
15   see, we had different doctors, and we had --
16   sometimes the files were kept out by the
17   optical.  I don't know what was in
18   Dr. Gordon's office, but I'm trying to
19   recollect that.
20             We did have -- if -- the question
21   is -- if we had custody of the files, we had
22   access to them, we would look up things.
23             That's as far as I know as far as
24   what we did.  What Dr. Gordon had, I can't
25   recall what he had in his room.

Key vs. Wal-Mart

8/13/2003    Marvin Key

Page 10

```
1       Q.   Okay.  Now, to your knowledge, did
2  Dr. Gordon have authority to hire Wal-Mart
3  employees?
4       A.   I don't know.
5            MS. CORTESE-COSTA:  I'm going
6  to object to the form.
7            You mean hire employees for
8  Wal-Mart?
9            MR. REILLY:  Right.
10 BY MR. REILLY:
11      Q.   Do you understand?
12      A.   Yes.
13      Q.   Could he hire new employees to work
14 for Wal-Mart?
15      A.   I'm not -- I'm not familiar with
16 that.
17      Q.   Do you know if Dr. Gordon could
18 fire Wal-Mart employees who worked at the
19 store?
20      A.   There again, I don't -- I'm not
21 aware of any employer/employee relationship
22 with Wal-Mart -- any powers they gave him.
23      Q.   Do you know if Dr. Gordon had the
24 power to discipline Wal-Mart employees?
25      A.   There again, I don't know the
```

Page 11

1   authority that -- the relationship between
2   the doctor and Wal-Mart and delegating duties
3   to optical shop personnel, I'm not aware of
4   any of that information.
5       Q.   To your knowledge, did Dr. Gordon
6   conduct performance evaluations of Wal-Mart
7   employees?
8       A.   I'm not aware of that.
9       Q.   Did he ever conduct a performance
10  evaluation of your work?
11      A.   I don't know.
12              MS. CORTESE-COSTA:  I think he
13  means those annual evaluations.
14              THE WITNESS:  That is what you
15  mean?
16  BY MR. REILLY:
17      Q.   Let me ask it this way:  Did
18  Dr. Gordon ever provide you with or have any
19  input on, as far as you know, your annual
20  performance evaluation?
21      A.   I don't know.
22      Q.   Do you know if Dr. Gordon had the
23  power to coach Wal-Mart employees?
24      A.   I don't know.
25      Q.   Do you know -- well, put it this

Key vs. Wal-Mart

8/13/2003　　　　　　　　　　　　　　　　　　　　Marvin Key

Page 12

```
 1   way:  Did Dr. Gordon ever coach you under the
 2   Wal-Mart disciplinary system?
 3        A.   We worked -- we worked in the same
 4   area.  We talked, but as far as him having
 5   the power to actually say that he coached me,
 6   I don't know of that.
 7        Q.   Now, when you worked at Wal-Mart, I
 8   think we had testimony the last time that you
 9   had received two written coachings.
10             Do you remember that?  I'm happy to
11   show them to you.
12        A.   If you've got them, that would be
13   good.
14             MR. REILLY:  Let the record
15   reflect I'm showing the witness Key Exhibits
16   6 and 7.
17             THE WITNESS:  Yes.
18   BY MR. REILLY:
19        Q.   To your knowledge, was Dr. Gordon a
20   contributor or did he play any role in the
21   coachings that are reflected in Exhibits 6
22   and 7?
23        A.   I don't know.
24        Q.   When you received the coachings
25   referred to in Exhibits 6 and 7, was
```

```
 1    Dr. Gordon present?
 2         A.    No.
 3         Q.    And I refer you -- and I'm going to
 4    give you this to look at -- Key Exhibit 8.
 5         A.    Yes.
 6         Q.    Was Dr. Gordon present when you had
 7    your exit interview?
 8         A.    In the room?
 9         Q.    Yes.  Was he at your exit interview?
10         A.    No.
11         Q.    To your knowledge, what role, if
12    any, did Dr. Gordon play in your -- in
13    Wal-Mart's decision to terminate your
14    employment?
15         A.    I'm still trying to find out more
16    information.
17         Q.    Well, to your knowledge sitting
18    here today, what role, if any, did Dr. Gordon
19    play in your termination from Wal-Mart?
20         A.    Well, I just got a -- some type of
21    letter.
22               I don't know.
23         Q.    To your knowledge, did Dr. Gordon
24    have access to your personnel file?
25         A.    I don't know.
```

1    perceive you weren't licensed to perform in
2    the Vision Center?
3        A.   I didn't think it was proper for me
4    to make medical record entries.
5        Q.   And when you say "medical record
6    entries," what are you referring to?
7        A.   Well, the customer's files --
8    optometry files.
9        Q.   Okay.  Let's go back a little bit.
10            By the way, anything else other
11   than the medical records entries now?
12       A.   I can't recall right now.
13       Q.   Okay.
14       A.   Oh, I told you about depth
15   perception, right, that means stereo --
16   stereopsis, I think.
17       Q.   Okay.  Here is what I would ask:
18   With respect to these four tests -- the
19   Glaucoma, visual fields, color
20   discrimination, depth perception -- isn't it
21   the case you were asked to record the results
22   of the patient's tests?
23       A.   Yeah, I think so.
24       Q.   Okay.  And who asked you to do that?
25       A.   I guess -- I'm trying to remember.

Page 64

```
 1        Q.   Isn't it true Mr. Ellis asked you
 2   to do this?
 3        A.   Well, the doctor wanted it done.
 4        Q.   Who asked you to perform these
 5   tests?
 6        A.   Well, I remember I was in the room
 7   with the doctor one time, and he was telling
 8   me how to do it.
 9        Q.   Let me go backwards a little bit.
10             Who was your supervisor in the
11   Vision Center?
12        A.   Jerry Ellis.
13        Q.   And as your supervisor, wasn't he
14   responsible for directing your work
15   activities?
16        A.   Basically.
17        Q.   Okay.  Now, after you conducted the
18   tests, isn't it the case that you recorded
19   the results of the tests?
20        A.   Should have, yeah.
21        Q.   Isn't it also the case that you
22   were not responsible for interpreting the
23   results of the tests?
24        A.   We would have to -- what do you
25   mean by "interpret"?
```

Page 67

1  A. No, I was not an optometrist. I
2  did not evaluate.
3  BY MR. REILLY:
4  Q. Right. That's all I wanted to know.
5  With respect to -- you started
6  working, I think, at this Wal-Mart in the
7  spring of 2000. I'll not state that as a
8  fact on the record, but assume it for
9  purposes of my question.
10 When you started work, isn't it the
11 case that -- isn't it the case that you were
12 assigned to conduct these glaucoma tests,
13 visual field tests, color discrimination and
14 depth perception tests when you started
15 working there?
16 A. I think I said that since we first
17 started, they made us do that.
18 Q. Did you ever complain to anyone at
19 Wal-Mart that you should not be conducting
20 these tests because your license didn't
21 provide for you to conduct them?
22 A. I didn't know that. I had no
23 reason to suspect Wal-Mart at the time, so I
24 did not complain.
25 Q. Let me ask the question a little

Key vs. Wal-Mart

8/13/2003                                                     Marvin Key

Page 68

1    differently.
2              Prior to your termination, did you
3    ever tell anybody at Wal-Mart that it was
4    your belief that you were not licensed to
5    perform the glaucoma tests, the visual field
6    tests, the color discrimination tests, the
7    depth perception tests or to make what you
8    call medical record entries?
9         A.   What was the first part of the
10   question -- the first part?
11             MR. REILLY:  It's a long
12   question.
13             Can you read it back to him.
14             (Record read.)
15        A.   I didn't suspect, so no.
16   BY MR. REILLY:
17        Q.   Prior to your termination at
18   Wal-Mart, did you ever refuse to engage in
19   any of these activities?
20        A.   No.
21        Q.   Did anybody ever tell you from any
22   government agency or from any source that
23   these activities which you claim you're not
24   licensed for were, in fact, activities that
25   you should not be engaging in?

1    harmed by that?
2         A.    Excuse me?
3         Q.    How were you harmed by that alleged
4    misrepresentation in paragraph fifteen of the
5    Complaint, if you were harmed at all?
6         A.    Well, the -- when I'm doing things
7    I shouldn't be doing to the public, it puts
8    the public at risk, and I don't want to be
9    held liable to putting harm to the public.
10        Q.    Is there any other way in which you
11   were allegedly harmed by the alleged
12   misrepresentation in paragraph fifteen of the
13   Complaint?
14        A.    Well, you could say that I was put
15   in jeopardy.
16        Q.    And what do you mean when you say
17   "put in jeopardy"?
18        A.    There again, I'm not sure, but if
19   something was done incorrectly, and later on,
20   they had a problem; who would they go after?
21        Q.    Other than what you call being put
22   in jeopardy and what you've testified to, is
23   there any other way that Wal-Mart's alleged
24   misrepresentations in paragraph fifteen of
25   the Complaint harmed you?

Page 98

```
 1      A.   Well, they could use that as an
 2  excuse to say that I did something that
 3  wasn't in my duties and use it against me.
 4      Q.   Anything else?
 5      A.   I can't recall right now.
 6           MR. REILLY:  I need a
 7  five-minute break.
 8           (Whereupon, a recess was taken
 9  from 1:01 p.m. until 1:04 p.m.)
10  BY MR. REILLY:
11      Q.   What race are you, Mr. Key?
12      A.   Negro.
13      Q.   And your claims in this case --
14  part of them anyway -- is that you were
15  terminated because of your race and color; is
16  that correct?
17      A.   I believe I said that.
18      Q.   Okay.  Other than being terminated,
19  did you suffer -- do you claim you suffer any
20  other alleged detriment because of race
21  discrimination at Wal-Mart?
22      A.   Could you clarify that?  I don't
23  know what you mean.
24      Q.   Well, you say you were terminated,
25  in part, based on your race.
```