# EXHIBIT L

```
                                                                      Page 1

 1    IN THE UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF CONNECTICUT

 3

 4    ----------------------------x

 5    MARVIN KEY,                      :

 6        Plaintiff,                   : Civil Action No.

 7           -v-                       : 3:03 CV 144 (RNC)

 8    WAL-MART, INC., AND,             :

 9    DR. ANTHONY GORDON,              :

10    Defendants.                      :

11    ----------------------------x

12

13

14             ·         Deposition of ANTHONY GORDON, taken

15    pursuant to the Federal Rules of Civil Procedure,

16    at the law offices of Durant, Nichols, Houston,

17    Hodgson & Cortese-Costa, 1057 Broad Street,

18    Bridgeport, Connecticut, before James A. Martone,

19    LSR and Notary Public, in and for the State of

20    Connecticut, on August 19, 2003 at 10:17 a.m.

21

22

23

24

25
```

Page 106

1  standing there.
2      Q. So now it's your testimony that you made
3  that comment to Marvin as well as to Mr. Ellis?
4      A. Well --
5          MR. REILLY: Objection.
6      A. I didn't make the comment specifically
7  only to Marvin, "please don't have them staple the
8  thing upside down."
9      Q. Did Marvin make any response to that?
10     A. I don't recollect that he did.
11     Q. The questions that Mr. Key had been
12 asking you while he was conducting the pretesting,
13 do you know what tests those were in reference to?
14     A. I didn't even pay attention as to what
15 tests he was doing when he was asking those
16 questions.
17     Q. Do you have any knowledge of how the
18 patients' mother obtained this form that this
19 report is written on?
20     A. I have no idea.
21     Q. Have you ever recommended anyone to be
22 hired at the Wal-Mart Vision Center?
23     A. Never.
24     Q. Have you ever recommended that any
25 Wal-Mart employee be disciplined?

Page 107

1      A. Never.
2      Q. Have you ever recommended that any
3  Wal-Mart employee in the Vision Center be
4  discharged?
5      A. No.
6          MS. CORTESE-COSTA: Can you just
7  mark this.
8          (Plaintiff's Exhibit 3 marked
9          for identification.)
10         (Recess: 3:33-3:49 p.m.)
11     Q. So you've had about 20 minutes to look
12 through this document?
13     A. Was it that long?
14     Q. Yes.
15     A. Then you know it's punishment.
16     Q. And have you seen this document before
17 today?
18     A. Yes.
19     Q. And is that your signature that appears
20 in the top document on the 9th page?
21     A. Yes.
22     Q. And when did you sign that?
23     A. Yesterday.
24     Q. Do you see the document entitled "License
25 agreement"?

Page 108

1      A. Yes.
2      Q. Can you tell me what that is?
3      A. It's an agreement between Wal-Mart and
4  myself.
5      Q. And this is dated July 1st, 2001, this
6  agreement. Did you have any agreements with
7  Wal-Mart prior to that date?
8          MR. REILLY: Objection. Written
9  agreements?
10     Q. Yes. Did you have any license agreements
11 with Wal-Mart prior to that date?
12     A. Not that I can recall.
13     Q. I think you testified you started
14 providing services at the Wal-Mart store in
15 November of 2000?
16     A. Yes.
17     Q. So from the period of November, 2000
18 through July 1st, 2001, was there anything that
19 acknowledged in writing what the terms of your
20 provision of services to Wal-Mart were?
21     A. I don't think so.
22     Q. And do you know why this agreement was
23 entered into on July 1st, 2001?
24     A. Because there was a change from one
25 district manager to another district manager. And

Page 109

1  one was supposed to prepare it, it wasn't done and
2  the other one came in and got it prepared and it
3  took its time and it took so much time to get it to
4  me, et cetera, et cetera.
5      Q. And who was the first district manager
6  that you're referring to?
7      A. Skeet Scoville.
8      Q. Okay. After who was the second district
9  manager?
10     A. Chris Atkins.
11     Q. Was Chris Atkins the one who actually
12 prepared this document entitled "License
13 agreement"?
14     A. I don't know who prepared it but it was
15 presented to me.
16     Q. By Mr. Atkins?
17     A. Yes.
18     Q. Is there anything in this document that
19 differs from the understanding that you and
20 Wal-Mart had been operating under prior to July
21 1st, 2001?
22     A. I didn't see any difference in the
23 document.
24     Q. If you look at the second page of this
25 license agreement.

Page 30

```
 1   Q.  And what was said in that regard?
 2   A.  "When could you start."
 3   Q.  And what did you say?
 4   A.  I don't remember exactly to his response
 5  what I said on small little details. But the
 6  general was that we agreed to start working
 7  together. Or not working together, but to work out
 8  a date as to when I could start working at
 9  Wal-Mart.
10   Q.  Was there any discussion as to how you'd
11  be compensated for your services?
12   A.  I would charge my own fees. Set my own
13  time.
14   Q.  Was there any discussion of the services
15  that you would be providing?
16   A.  Optometric services.
17   Q.  Was there any discussion of what
18  Wal-Mart's expectations would be as to those
19  services?
20   A.  No.
21   Q.  Was there any discussion of any
22  conditions you'd have to satisfy in order to start
23  providing those services?
24   A.  Not that I can recall.
25   Q.  Was there any discussions of what your
```

Page 31

```
 1  expectations would be with regard to anything
 2  Wal-Mart would have to provide to enable you to
 3  provide those services?
 4         MR. REILLY: Objection. You can
 5  answer.
 6   A.  If she can repeat it.
 7   Q.  Could you read it back.
 8         (Question read.)
 9   A.  Wal-Mart would provide trained staff to
10  do any initial vision screening or any pretesting.
11   Q.  Anything else?
12   A.  Apart from the things I've mentioned, I
13  can't recall anything.
14   Q.  Was there any discussion of office space,
15  where that would be located?
16   A.  North Windham.
17   Q.  And would that be provided by Wal-Mart?
18   A.  Correct.
19   Q.  Was there any discussion regarding
20  reimbursement for expenses that you might incur in
21  providing services to Wal-Mart?
22   A.  No.
23   Q.  Okay. Was there any discussion of what
24  Wal-Mart would get in exchange for allowing you to
25  practice in the North Windham store?
```

Page 32

```
 1   A.  I would be charged a fee of 20 percent.
 2   Q.  20 percent of what?
 3   A.  Whatever fee that I earned for that day.
 4   Q.  Anything else in your discussion with
 5  Mr. Scoville that you can remember?
 6   A.  Not that I can recall right now.
 7   Q.  Is there anything that would help you to
 8  recall that?
 9   A.  I think I said that I just can't recall
10  anything else that was discussed right now so --
11   Q.  My question is, if there's anything that
12  would assist you in making that recollection. Did
13  you take any notes of the meeting?
14   A.  No.
15   Q.  Or anything like that?
16   A.  No.
17   Q.  And after you met with Mr. Scoville, can
18  you tell me what happened next with respect to your
19  starting to provide services at the North Windham
20  store?
21   A.  A date was agreed on to start eye exams
22  in the North Windham store.
23   Q.  And what was the date that was agreed on?
24   A.  It was in early November. I don't have
25  the exact day.
```

Page 33

```
 1   Q.  Did you have to sign any type of
 2  agreement with Wal-Mart before you started?
 3   A.  It was a lease that I had with them.
 4   Q.  Anything else?
 5   A.  That's it.
 6   Q.  Did anyone from Wal-Mart provide you with
 7  copies of any of their policies or procedures prior
 8  to your providing services there?
 9   A.  No.
10   Q.  Did anyone from Wal-Mart discuss with you
11  expectations as to your interactions with Wal-Mart
12  employees?
13         MR. REILLY: Objection; vague.
14   Q.  Do you understand the question?
15   A.  It was vague.
16   Q.  Was there any discussion with you
17  regarding what, if any, responsibilities you'd have
18  with respect to Wal-Mart employees that would be
19  provided to perform the vision screenings and
20  pretestings?
21         MR. REILLY: Objection. I think
22  vision screenings, you can ask him, I think that's
23  part of the pretesting. Not a separate thing.
24         MS. CORTESE-COSTA: I'm just
25  quoting his own testimony.
```

Page 34

1   A. I agree with him, with what Attorney
2   Reilly said.
3   Q. That's fine. Can you answer my question?
4       MR. REILLY: I'm sorry, he probably
5   forgot it. Make you can read it back.
6       (Question read.)
7   A. I had no responsibilities for any of the
8   Wal-Mart employees.
9   Q. Well, is the answer no, it wasn't
10  discussed or "no, I have no responsibilities?"
11  A. They would do pretesting. So that was --
12  that's all that was said to me.
13  Q. And you didn't have any questions as to
14  how that would be accomplished?
15  A. No.
16  Q. Did you have any questions as to what you
17  would do if you felt that the Wal-Mart employees
18  were not providing the services satisfactorily?
19  A. Could you just repeat the first part.
20      (Question read.)
21  A. No questions.
22  Q. Now when you used the terms "vision
23  screenings" and/or "pretesting," what do you mean
24  by that?
25  A. Well, you would have to look at

Page 35

1   Wal-Mart's guidelines for that.
2   Q. Well, I believe you just testified that
3   you didn't look at any, so why don't you tell me
4   what you mean when you use the words.
5   A. Whatever pretesting Wal-Mart provided, I
6   accepted it.
7   Q. And what did that include?
8   A. That included the stereopsis tests.
9   Included color vision tests. It included a visual
10  field test. And a test that gives the number
11  pertaining to the inter-ocular pressure. And a
12  printout, a printout from any of the machines that
13  they had.
14  Q. And what is the test that gives the
15  number pertaining to inter-ocular pressure?
16  A. The patient sits -- say that question
17  again. What is the --
18  Q. What is the test that gives the number
19  pertaining to inter-ocular pressure?
20  A. What is the test or how is it?
21  Q. Does the test have a name?
22  A. Just to get the number that pertains to
23  the inter-ocular pressure.
24  Q. And how is that conducted?
25  A. Patient sits behind the machine. Patient

Page 36

1   looks into the machine. Asked to keep your eyes
2   steady. The operator pushes the button on the
3   joystick, and the number prints out.
4   Q. Okay. And I think you also mentioned you
5   would receive a printout from machines. Were there
6   other printouts other than the one you just
7   described?
8   A. The visual field.
9   Q. And how was that conducted?
10  A. Patient sits in front of the machine.
11  Asked to look at a target. And to push buttons
12  whenever they see the light flashing inside of the
13  machine.
14  Q. Any other machines that give you
15  printouts at Wal-Mart?
16      MR. REILLY: Objection. You mean in
17  the Vision Center?
18      MS. CORTESE-COSTA: Yes.
19  A. Oh, keratometry.
20  Q. And how is that test conducted?
21  A. Patient looks into the machine, asked to
22  look at a target. The operator aligns the eye,
23  push the button, the machine prints out the
24  information.
25  Q. What is that test for?

Page 37

1   A. To determine the curvature of the cornea.
2   Q. Any other machines that give a printout
3   in the Vision Center?
4   A. Lensometer.
5   Q. And how does that work?
6   A. The lens is put into the machine. You
7   move the lens to automatically align with the
8   center, and it gives a printout.
9   Q. And what does the printout tell you?
10  A. The power of the lens.
11  Q. Any other machines?
12  A. No.
13      MR. REILLY: Can we take a short
14  break?
15      MS. CORTESE-COSTA: Sure.
16  (Recess Taken: 11:25-11:35 a.m.)
17  Q. So with respect to the machines that
18  you've just described, do you perform any of that
19  testing yourself?
20  A. Yes.
21  Q. Okay, and when would you perform it
22  yourself?
23  A. If, for example, the number did not
24  coincide with the condition of the eye.
25  Q. And can you give me a specific example of