Westlaw.

1992 WL 532115 (Conn.A.G.)      Page 1
1992 WL 532115 (Conn.A.G.)
**(Cite as: 1992 WL 532115 (Conn.A.G.))**

*1 Office of the Attorney General
State of Connecticut

Opinion No. 92-026
October 2, 1992

Hon. William J. Summa, Jr.
Chairman
Commission of Pharmacy
165 Capitol Avenue
Hartford, CT 06106

Dear Chairman Summa:

This letter is in response to your request of June 2, 1992 for our opinion concerning the licensing of pharmacies which are owned by physicians.

We understand from your letter and accompanying correspondence that in February, 1992, the Commission of Pharmacy (the "Commission") voted to approve a pharmacy license for Medical Associates of New Haven, Inc. After approving the license, the Commission learned that the corporation was owned by a group of physicians. More recently, a second corporation, Medical Associates of Fairfield, Inc., has applied for a pharmacy license. This latter corporation has the same officers as the former one and both corporations have physicians as investor-owners. In both cases, the physicians will be receiving dividends from their investments in the pharmacies.

Conn.Gen.Stat. § 20-175 specifies various grounds on which the Commission may revoke or suspend a pharmacy's license, including fee-splitting. In light of Conn.Gen.Stat. § 20-175, you have requested our opinion on the following issues:
    1. Does the Commission of Pharmacy have valid grounds to deny the license application from Medical Associates of Fairfield, Inc.?
    2. If the answer is yes, what if any action should or must be taken with regard to the license already issued to Medical Associates of New Haven, Inc.?

Addressing your questions in reverse order, we conclude that under Conn.Gen.Stat. § 20-175(7) the Commission may revoke the license of a pharmacy which engages in fee-splitting. Fee-splitting occurs when a pharmacy provides an economic incentive for a physician to refer his patients to that particular pharmacy, and the physician in fact benefits because his patients use the pharmacy. If, after analyzing the facts, the Commission determines that Medical Associates of New Haven, Inc. has engaged in fee-splitting then it would have valid grounds to revoke the pharmacy's license.

With regard to Medical Associates of Fairfield, Inc., the Commission may not deny the pharmacy a license based on the possibility that the pharmacy will engage in fee-splitting. It may, however, issue the license with a warning that the license will be revoked if the pharmacy engages in fee-splitting. If fee-splitting occurs, the Commission would have the authority to revoke the pharmacy's license.

In Connecticut, a pharmacy may not offer any drugs, medicines, poisons or chemicals used in compounding any medicine for retail sale unless the pharmacy is

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

licensed. Conn.Gen.Stat. § 20-166. The statutes governing the licensing of pharmacies are set forth in Chapter 382 of the general statutes, Conn.Gen.Stat. § 20-163 et seq.

Under Conn.Gen.Stat. § 20-168, any person, firm or corporation owning or operating a pharmacy, and employing a licensed pharmacist, may apply for a license to sell drugs and medicines at retail in the pharmacy provided the pharmacy is under the supervision of a licensed pharmacist. If the Commission is satisfied that the pharmacy will be operated in accordance with the regulations established by the Department of Consumer Protection and the requisite fees are paid, the Department of Consumer Protection may issue the pharmacy a license. Conn.Gen.Stat. § 20-168.

\*2 The general statutes are clear that anyone may own a pharmacy. Section 20-168 permits "any person, firm or corporation" owning a pharmacy to apply for a license and Conn.Gen.Stat. § 20-180 states that "[n]othing herein shall ... prevent any person from becoming a partner in or the owner of a pharmacy conducted by a licensed pharmacist." Based on the plain language of these statutes, we conclude that state law does not prohibit physicians from owning pharmacies.

Although physicians are not prohibited from owning pharmacies, pharmacies are prohibited from splitting fees with physicians. Conn.Gen.Stat. § 20-175 states that the Commission may suspend or revoke a license to conduct a pharmacy for, amongst other reasons, the "splitting of fees for professional services, including a discount or rebate, with any physician...." Conn.Gen.Stat. § 20-175(7). The question, therefore, is whether the arrangement between the physicians who own a pharmacy and the pharmacist who supervises it involves fee-splitting.

In construing Conn.Gen.Stat. § 20-175, we are guided by fundamental rules of statutory construction. A statute must be construed so as to give effect to the apparent intent of the legislature. Nationwide Mutual Insurance Co. v. Pasion, 219 Conn. 764, 594 A.2d 468 (1991). To discern the legislature's intent, a court looks first to the words of a statute and resolves any ambiguity in the statutory language by turning to the statute's legislative history and the purpose the statute is to serve. In re Sheldon G., 216 Conn. 563, 568-569, 583 A.2d 112 (1990).

The term "splitting of fees" is not defined in Conn.Gen.Stat. § 20-175 other than the statement that it includes discounts or rebates given to physicians. The legislative history of 1961 Conn.Pub.Acts No. 61-149, which amended Conn.Gen.Stat. § 20-175 to include the prohibition on fee-splitting, also fails to define, or even mention, the term. The legislative history indicates, however, that the intent behind the many restrictions enacted in Public Act 61-149 [FN1], which included the prohibition on fee-splitting, was to provide a pharmacy code of ethics "to better protect and benefit the public". 40 Conn.S.Proc. pt. 4, 1961 Sess. 1151 (May 2, 1961) (remarks of Senator Hickey).

Although the language and legislative history of Conn.Gen.Stat. § 20-175 do not define the term "splitting of fees," the Connecticut Supreme Court has discussed the term in connection with the practice of optometry. In Lieberman v. Board of Examiners in Optometry, 130 Conn. 344, 34 A.2d 213 (1943), the court stated that the "[s]plitting of fees as defined in the statutes of several states occurs where a member of a profession divides the compensation he receives from a patient with another member of the same profession or any person who has sent the patient to him or called him into consultation." Id. at 351. Under this definition, a pharmacist who shares his receipts from the sale of a drug with the physician who prescribed the drug would be guilty of fee-splitting. In many cases, however, a fee-splitting arrangement may be less direct than this. For example, as in the current case, a

physician might receive a dividend from the corporation which owns the pharmacy, rather than splitting a fee directly with the pharmacist. Whether the legislature intended to prohibit all forms of fee-splitting between physicians and pharmacists, including indirect fee-splitting such as the payment of dividends, depends on the purpose of the ban on fee-splitting and the harms which the legislature intended to prevent.

*3 The purpose of the ban on fee-splitting, as stated in the legislative history of Public Act 61-149, is to protect and benefit the public. Presumably, a ban on direct fee-splitting protects and benefits the public because it insures that physicians will refer patients to pharmacies based on the patients' needs, not on the physician's desire for a referral fee. A physician who receives a percentage of all the payments which his patients make to a particular pharmacist may be inclined to refer his patients to that pharmacist, rather than to the pharmacy which is most convenient for the patient, provides the best service, has the lowest prices, or employs the most highly regarded pharmacist. The economic incentive for the physician to recommend a particular pharmacy thus undermines the patient's right to be properly advised and to select the most suitable pharmacy for his needs. The physician may also be tempted to prescribe particularly expensive or even unnecessary drugs in order to increase his referral fee from the pharmacist. In such a case, the patient's right to reasonable and appropriate therapy is clearly jeopardized. Thus fee-splitting between pharmacies and physicians, in its most direct form, poses multiple possible harms to the public.

The potential harm to the public is no less, however, from less direct forms of fee-splitting. A physician who receives a corporate dividend based either on the number of his patients who use a particular pharmacy or the total dollar amount spent by his patients at the pharmacy is just as likely to be influenced by the payment as a physician who is paid directly by the pharmacist. Likewise, a physician whose dividend is not tied to his referrals, but whose ownership interest is sufficiently large that he can increase his dividends by increasing the pharmacy's sales, is likely to be influenced in the same way that he would be if the pharmacist paid him directly. In each of these situations, the payment to the physician does not come directly from the pharmacist, but the potential harm to the public is the same as if it did.

Given the legislative intent of Conn.Gen.Stat. § 20-175 to protect the public and to provide a broad code of ethics for the operation of pharmacies, we conclude that the legislature intended Conn.Gen.Stat. § 20-175(7) to prohibit not only direct fee-splitting, but also less direct forms of the offense which nonetheless result in the same potential harm to the public. Thus if a pharmacy provides an economic incentive for a physician to refer his patients to that particular pharmacy, and the physician benefits because his patients in fact use the pharmacy, the pharmacy is engaged in fee-splitting. In such a case, the Commission may revoke the pharmacy's license under Conn.Gen.Stat. § 20-175. [FN2]

Exactly how a patient actually selects a pharmacy in a given case is irrelevant. The statute is aimed at pharmacies and pharmacists. If a pharmacy pays a doctor because his patient has used the pharmacy to fill a prescription, the payment is an attempt to solicit customers. It is an attempt to induce the physician to refer his patients to the pharmacy in the future. It is not necessary that the physician actually have recommended the pharmacy to the patient because as long as he is rewarded for his patients' use of the pharmacy, there is the danger that he will refer his patients to the pharmacy in the future. In addition, knowing that his patient happens to use, or is likely to use, a given pharmacy, the physician may be tempted to overprescribe medications for his own financial benefit. Only if a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1992 WL 532115 (Conn.A.G.)                                                     Page 4
1992 WL 532115 (Conn.A.G.)
**(Cite as: 1992 WL 532115 (Conn.A.G.))**

physician has no economic interest in which pharmacy fills his prescriptions will the public be protected from the danger that a physician's judgment may be influenced by his desire to make a profit.

   **\*4** Although there is little Connecticut case law on fee-splitting, the Connecticut Supreme Court's decision in Lieberman v. Board of Examiners in Optometry, 130 Conn. 344, 34 A.2d 213 (1943), lends support to the conclusion that a physician should have no economic interest in which pharmacy fills his prescriptions. In Lieberman, an optometrist contracted with a department store to provide eye examinations within the store. In exchange for the service, the optometrist received a salary and a commission on all optical goods sold by the store on the optometrist's prescription. In concluding that the Board properly revoked the optometrist's license for unprofessional conduct, the court stated that a patient who seeks the help and advice of an optometrist is entitled to the same undivided loyalty that he should receive from a physician. Although the court noted that the optometrist might not be splitting fees in the usual understanding of the offense, it nonetheless found that the optometrist's arrangement "might well impair the personal responsibility of the optometrist to his patient which is one of the safeguards of the proper rendition of services by a member of a profession." Id. at 352. Quoting from another case, the court stressed that "[p]rofessionally, an optometrist should have no interest in any way in who fills his prescriptions. It is manifestly apparent that the situation here prevailing cannot permit the freedom in the optometrists which should exist in purely professional men." Id. at 350, quoting Rowe v. Burt's Inc., (Ohio App.) 31 N.E.2d 725, 727 (1939).

   A California court cited similar concerns in Magan Medical Clinic v. California Board of Medical Examiners, 249 Cal.App.2d 124, 57 Cal.Rptr. 256 (1967). The case involved a group of physicians who challenged the constitutionality of a state law prohibiting physicians from owning pharmacies. The court upheld the law. After noting the danger that physicians who owned pharmacies would overprescribe or prescribe inappropriately, the court concluded that "[c]ertainly a sick patient deserves to be free of any reasonable suspicion that his doctor's judgment is influenced by a profit motive." Id. at 132.

   Despite our conclusion that a physician must not benefit financially when his patients use a particular pharmacy, and therefore that fee-splitting, whether direct or indirect, is cause to revoke a pharmacy's license, it is important to note that a physician may still own a pharmacy. [FN3] For example, a physician might invest in a pharmacy located outside the community in which he or she practices. Assuming that none of the physician's patients use the pharmacy, it is unlikely there would be any harm to the public as a result of the physician's ownership. Or, conceivably, a physician might practice a specialty in which he does not prescribe drugs and thus has no occasion to refer a patient to a pharmacy. In either case, the physician's receipt of dividends or profits from a pharmacy which is not used by his patients would not constitute fee-splitting.

   **\*5** Finally, a physician's percentage of ownership in a pharmacy may be so minimal that he receives no measurable financial benefit from referring patients to the pharmacy. For example, a physician might own stock in a major corporation which operates a nationwide chain of pharmacies. The physician's referrals to a pharmacy in the chain would have no measurable effect on the size of the corporation's dividends. In such a case, there would be little, if any, concern that the physician's ownership interest would influence his judgment to the detriment of his patients. Thus any dividends paid to the physician would not constitute fee-splitting.

            Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Turning to the current situation, the Commission must make a factual determination as to whether the physicians who own Medical Associates of New Haven, Inc. benefit financially when their patients use the pharmacy and whether, in fact, their patients are using the pharmacy. If so, there is the potential danger that the physicians are acting in their own best interest when advising patients and writing prescriptions, rather than in the best interest of their patients. Based on our analysis of Conn.Gen.Stat. § 20-175(7), we conclude that the Commission in such a case would have valid grounds to revoke the license of Medical Associates of New Haven, Inc. to operate a pharmacy.

Similarly, the Commission should analyze whether the arrangement proposed by Medical Associates of Fairfield, Inc. provides an economic incentive for the physicians who own the pharmacy to refer their patients to the pharmacy. Although there is no statutory basis for the Commission to deny a license to a pharmacy on the grounds that it is likely to engage in fee-splitting, the Commission may revoke the license of such a pharmacy once fee-splitting has occurred. Thus if the Commission determines that the arrangement provides an economic benefit to the physicians who own Medical Associates of Fairfield, Inc. if their patients use the pharmacy and, in fact, their patients begin using the pharmacy, then the Commission could revoke the pharmacy's license on the grounds that it is engaged in fee-splitting.

Very truly yours,

Richard Blumenthal

Attorney General

Jane R. Rosenberg

Assistant Attorney General

[FN1] 1961 Conn.Pub.Acts No. 61-149, which was entitled "An Act Concerning a Pharmacy Code of Ethics", amended Conn.Gen.Stat. § 20-175 to include sixteen specific grounds for revocation or suspension of a pharmacy license. Most of the grounds, including the provision on fee-splitting, are still grounds for revocation of a license under the current version of Conn.Gen.Stat. § 20- 175.

[FN2] Our conclusion is not affected by the provisions of Conn.Gen.Stat. § 20-7a, as amended by 1992 Conn.Pub.Acts No. 92-24. Section 20-7a implies that a physician may have an ownership or investment interest in, or may receive referral fees from, an entity which provides diagnostic or therapeutic services. The physician must, however, disclose his financial interest in the entity to his patients whom he refers. The physician must also disclose his charges and reimbursement for certain laboratory tests. Section 20-7a does not mention pharmacies, however, and thus is not applicable to the current situation.

[FN3] The legislative history of 1961 Conn.Pub.Acts No. 61-149, which amended Conn.Gen.Stat. § 20-175 to include fee-splitting as grounds for revocation of a license, makes clear that the public act was not intended to affect existing laws concerning pharmacy ownership. 54 Conn.H.Proc. pt. 3, 1961 Sess. 1154 (April 25, 1961) (remarks of Mr. Stoeffler). Because the provision in Conn.Gen.Stat. § 20-180 that "[n]othing herein shall ... prevent any person from becoming a partner in or the owner of a pharmacy conducted by a licensed pharmacist" has been in the general statutes in its current form since 1918, Conn.Gen.Stat. Revision of 1918, § 2930, it is not affected by Conn.Gen.Stat. § 20-175(7).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1992 WL 532115 (Conn.A.G.)                                                                    Page 6
1992 WL 532115 (Conn.A.G.)
**(Cite as: 1992 WL 532115 (Conn.A.G.))**


 1992 WL 532115 (Conn.A.G.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1987 Conn. Op. Atty. Gen.                                                      Page 1
1987 Conn. Op. Atty. Gen. 387, 1987 WL 341285 (Conn.A.G.)
**(Cite as: 1987 WL 341285 (Conn.A.G.))**


Office of the Attorney General
State of Connecticut

*1 Opinion No. 87-55
October 28, 1987


E. Craig Fritz, L.O.
Chairman
Board of Examiners for Opticians
Department of Health Services
150 Washington Street
Hartford, Connecticut 06106

Dear Chairman Fritz:

   This is in response to your request for advice regarding the legality of optometrists employing the use of unlicensed ancillary personnel to perform all or some of the functions licensed opticians perform--under the aegis of the employer/optometrist's license. You state in your letter that the Board believes the above described conduct to be in violation of Chapter 381 of the Connecticut General Statutes and ask for our opinion.

   We previously touched on this question and set forth some of the necessary statutory background in a July 7, 1986 opinion to this Board. For the sake of clarity, we will repeat part of that material here.

   Optometrists are regulated pursuant to Chapter 380 of the Connecticut General Statutes. The practice of optometry is defined in Conn.Gen.Stat. § 20-127 as
     [t]he measurement and evaluation of vision and the refraction and examination of the human eye and related structures to determine and interpret visual deficiencies, optical defects, disfunction of seeing and perceiving and muscular anomalies of the visual system in order to recognize for appropriate referral diseased or injured eyes for definitive medical diagnosis or treatment, or both, and to prevent, correct and modify, guide and suggest, prescribe, adapt and dispense ophthalmic materials, to compensate and program for visual defects, and the maintenance, normalization and rehabilitation of visual functions and performance by any means.

   A licensed optician is defined pursuant to Conn.Gen.Stat. § 20-145 as "[o]ne having a knowledge of optics and skilled in the technique of producing and reproducing ophthalmic lenses and kindred products and mounting the same to supporting materials and the fitting of the same to the eyes."

   Section 20-162 provides, in pertinent part, that the provisions of Chapter 381 (which regulate opticians), "shall not be construed to apply to certified optometrists licensed to practice under the provisions of chapter 380...." The Commissioner of Health Services promulgated a regulation which further defines this exemption for licensed optometrists: "[t]he exemption for optometrists is personal only to such certified optometrists as individuals, and such exemption does not extend to any other person, firm, corporation or any other kind of an establishment with which such certified optometrists may be associated." 6 Reg.Conn. Agencies,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1987 Conn. Op. Atty. Gen.                                                                Page 2
1987 Conn. Op. Atty. Gen. 387, 1987 WL 341285 (Conn.A.G.)
**(Cite as: 1987 WL 341285 (Conn.A.G.))**

Department of Health Services, § 20-141- 31 (1982).

In the opinion of July 7, 1986, we pointed out that § 20-162 clearly stated that licensed optometrists are not required to obtain optical permits and are otherwise exempt from the provisions of Chapter 381. However, we also stated that § 20-162 would not exempt all employees of licensed optometrists from the statutes governing opticians. In particular, we pointed out that individuals who own or manage an optical shop or who supervise an optical department must obtain an optical permit.

*2 This office had also addressed a similar issue on two earlier occasions. In a 1968 opinion, the Attorney General stated as follows:
It is quite clear that the foregoing provision [§ 20-162] applies to the licensed individuals themselves. It would not apply to nurses or assistants employed by the aforementioned specialists and it likewise does not apply to opticians who may be employed by them. Exempting statutes are strictly construed and exempt only what is strictly within their terms. Waterbury Savings Bank v. Danaher, 128 Conn. 78, 83; Klein v. Bridgeport, 125 Conn. 129, 131.
68 Conn.Op.Atty.Gen. (5/3/68). See also, 69 Conn.Op.Atty.Gen. (12/22/69).

It is well established that, absent special provision, no unlicensed person or entity may engage in the practice of a health profession through licensed employees or employers. State ex rel. State, etc. v. Kuhwald, 389 A.2d 1277 (Del.1978); State ex inf. Danforth v. Dale Curteman, Inc., 480 S.W.2d 848 (Mo.1972); Worlton v. Davis, 73 Idaho 217, 249 P.2d 810 (1952). Similarly, provisions exempting one regulated health profession from the requirements of another regulated health profession are personal to the licensed individuals and do not exempt any employees who may work under their supervision. State ex rel. State, etc. v. Kuhwald, 389 A.2d 1277 (Del.1978); State ex inf. Danforth v. Dale Curteman, Inc., 480 S.W.2d 848 (Mo.1972).

Section 20-139 states that the purpose of Chapter 381 is generally to protect the public health, welfare and safety and specifies
that persons filling prescriptions having to do with optical glasses from given formulas, and kindred products, and others engaged in the practice of optical dispensing, shall possess the education, special knowledge, skill, technique and ability to apply such knowledge in order to properly fill any such formulas correcting visual or ocular anomalies of the human eye and shall be licensed....
(Emphasis added.)

Section 20-146 similarly provides that with the exception of inmates employed in certain optical shops maintained by the Commissioner of Correction, "no person shall produce or reproduce ophthalmic lenses and similar products or mount the same to supporting materials or fit the same by mechanical manipulation, molding techniques or other related functions unless such person is licensed by the department of health services." [FN1]

The statutes governing the practice of optometry do not provide for the delegation of any professional function to unlicensed employees. Section 20- 138a states that "[n]o person shall engage in the practice of optometry in this state unless such person has first obtained a license from the department of health services."

The language and intent of the opticianry and optometry statutes lead us to conclude that the practice of opticianry by unlicensed subordinates of optometrists is in violation of both Chapter 380 and Chapter 381 of the Connecticut General Statutes. We caution that, in each case of a possible violation, the board must

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00144-RNC   Document 146-2   Filed 11/29/2004   Page 10 of 12

1987 Conn. Op. Atty. Gen.                                                         Page 3
1987 Conn. Op. Atty. Gen. 387, 1987 WL 341285 (Conn.A.G.)
**(Cite as: 1987 WL 341285 (Conn.A.G.))**

examine the facts and make its own determination whether or not the individual was improperly engaged in opticianry.

**\*3** We trust this answers your question.

Very truly yours,

Joseph I. Lieberman

Attorney General

Maite Barainca

Assistant Attorney General

[FN1]. The only provisions for the practice of opticianry by unlicensed individuals are in Conn.Gen.Stat. § § 20-159 and 20-146. Section 20- 159 provides for the registration of apprentices who work at optical establishments under the supervision of a licensed optician to obtain practical experience and skill in opticianry. Section 20-146(a) indicates that one of the qualifications for a license as an optician is that the person serve as a registered apprentice for at least four years and acquire experience in the various functions, e.g., producing and reproducing opthalmic lenses, mounting, etc.

ATTACHMENT

January 15, 1987

The Honorable Joseph I. Lieberman

Attorney General

State of Connecticut

30 Trinity Street

Hartford, Connecticut 06106

Dear Attorney General Lieberman:

In review of Chapter 381, General Statutes, Section 20-139 through 20- 162 inclusive; questions have arisen regarding the compliance of others of these statutes.

It has been brought to the attention of the Board of Examiners for Opticians that certain optometrists licensed under Chapter 380 are allegedly employing the use of unlicensed ancillary personnel for the design and delivery of eyeglasses and kindred products to the ultimate wearer. This is occurring under the guise of the optometrists's personal license which accepts the responsibility for the products dispensed. It is the opinion of the Board that the use of non-licensed persons as a delivery provider in the eyecare system is a violation of Chapter 381.

The Board is aware that a licensed optometrist or surgeon is exempt from Chapter 381:
    Section 20-162. Exceptions for certified optometrists and physicians and surgeons. The provisions of this chapter shall not be construed to apply to certified optometrists licensed to practice under the provisions of Chapter 380 nor

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1987 Conn. Op. Atty. Gen.                                                    Page 4
1987 Conn. Op. Atty. Gen. 387, 1987 WL 341285 (Conn.A.G.)
**(Cite as: 1987 WL 341285 (Conn.A.G.))**

to deny to physicians and surgeons particularly trained and specializing in diseases of the eye and licensed under the provisions of Chapter 370 from the same right to fit, apply and dispense contact lenses or other ophthalmic materials to their patients in the course of their practice as is accorded licensed optometrists.  The provisions of this chapter shall not be construed to permit such physicians or surgeons to engage in the business of either grinding lenses or filling prescriptions for optical glasses, lenses or ophthalmic materials unless they are licensed or certified under the provisions of this Chapter or Chapter 380.

   The exemption for the licensed optometrist is further defined by Regulation:
     Section 20-141-31.  Exemption of certified optometrists.  The exemption for optometrists is personal only to such certified optometrist as individuals and such exemption does not extend to any other person, firm, corporation or any kind of establishment with which such certified optometrist may be associated.

   *4 The intent of not allowing non-licensed personnel to dispense eyewear and kindred products to the general public is defined by 20-139 which provides in pertinent part that:
     It is declared that regulation is required of all optical appliances, eyeglasses, lenses, optical instruments.... and that persons filling prescriptions having to do with optical glasses from given formulas, and kindred products, and others engaged in the practice of optical dispensing, shall possess the education, special knowledge, skill, technique and ability to apply such knowledge in order to properly fill any such formulas correcting visual or ocular anomalies of the human eye and shall be licensed, and that all optical establishments.... shall be registered pursuant to the provisions of the statutes governing opticians ... Without the control of standards and quality of optical goods, appliances, instruments or other aids to vision, the sale, dispensing and distribution to the public would be such as to constitute a menace to the public health, welfare and safety.... that there should be legislation pertaining.... also to persons engaged in the optical industry.

   Section 20-146's mandate that "no person shall produce or reproduce ophthalmic lenses and similar products.... or fit the same by mechanical manipulation.... unless such person is licensed by the department of health services ..." clearly defines a violation of statute when a non-licensed optical dispenser provides an optical service in an optometric practice under the "direct supervision" of the licensed or certified optometrist.

   Although Chapter 381 provides for "on the job" training to obtain the knowledges and skills necessary to achieve the status of optician, and further allows such training to take place under the direct supervision of a licensed optician nowhere is it stated that a licensed or certified optometrist may delegate his responsibilities or train an optical apprentice or "optometric aid" either under this chapter or Chapter 380 of the Connecticut General Statutes.

   We, the Connecticut Board of Examiners for Opticians, declare that the only persons allowed by law to practice opticianry are licensed opticians and registered optical apprentices, and licensed optometrists only.  We also feel that when a licensed optician is hired by an optometric practice to dispense or fabricate eyewear, it is assumed that such individual is a manager or supervisor and therefore is required to obtain an optical permit as required by C.G.S. 20-150 and 20-151.  Such action would also provide for inspection and registration of apprentices as provided in C.G.S. 20-143 and 20-159, respectively.

   Now, therefore, the Board of Examiners for Opticians respectfully requests that

              Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

1987 Conn. Op. Atty. Gen.                                                                Page 5
1987 Conn. Op. Atty. Gen. 387, 1987 WL 341285 (Conn.A.G.)
**(Cite as: 1987 WL 341285 (Conn.A.G.))**

your office investigate this alleged misconduct and inform the Board with your opinion.  We look forward to meeting with you or representatives of your office to discuss this issue.

 Sincerely,

 ***5** E. Craig Fritz

L.O., Chairman

 1987 Conn. Op. Atty. Gen. 387, 1987 WL 341285 (Conn.A.G.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.