**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARVIN KEY,

                Plaintiff,

        v.

WAL-MART STORES, INC.

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

                :   3:03CV144(RNC)

                :   MAY 2, 2005

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION IN LIMINE TO EXCLUDE EVIDENCE CONCERNING**
**PLAINTIFF BEING FIRST AFRICAN AMERICAN OPTICIAN LICENSED IN THE**
**STATE OF CONNECTICUT**

---

BROWN RAYSMAN MILLSTEIN
FELDER & STEINER LLP
Joel L. Finger (ct06114)
900 Third Avenue
New York, New York
(212) 895-2340

Mitchell L. Fishberg (ct19661)
Kristi E. Mackin (ct23394)
City Place II, 185 Asylum Street
Hartford, CT 06103
(860) 275-6400

Attorneys for Wal-Mart

## PRELIMINARY STATEMENT

Wal-Mart Stores, Inc. ("Wal-Mart") respectfully submits this Memorandum of Law in support of its motion *in limine* to exclude from trial all documentary evidence and testimony concerning the fact that Plaintiff was the first African American to become licensed as an optician in the State of Connecticut.

Plaintiff's claims that his employment as an optician with the Vision Center located in Wal-Mart's North Windham, Connecticut store was terminated on or about April 30, 2001 because of his race, African American, and in retaliation for Plaintiff's alleged report of what he described as an "abusive" statement by the independent contractor ophthalmologist, Dr. Anthony Gordon (African American), who leased space in the Vision Center to run his practice. Plaintiff grieves his termination under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et. seq.*, ("Title VII") and Connecticut's Fair Employment Practices Act, §§ 46a-60(a)(1) and 46a-60(a)(5). Plaintiff also claims that Wal-Mart negligently misrepresented to him at the time of his hire that he could ask the doctor questions regarding pre-examination procedures, but then terminated him over a year later because he asked the doctor questions. Wal-Mart asserts that neither race nor Plaintiff's alleged reporting of a comment made by Dr. Gordon had anything to do with the termination of Plaintiff's employment. Likewise, Plaintiff was not terminated because he asked questions. Plaintiff was terminated for and only for non-discriminatory reasons, including poor customer service.

During the course of discovery, Plaintiff submitted documentation relating to the fact that he was the first African American individual to be licensed in the State of Connecticut. See newspaper article attached hereto as Exhibit A. To the extent that Plaintiff intends to submit evidence or make references to this fact, it should be excluded from trial.

## STATEMENT OF FACTS

Plaintiff, an optician licensed in the State of Connecticut, accepted employment with the North Windham Wal-Mart (the "Store") on February 9, 2000 as an optician working in the Store's Vision Center. The Vision Center was managed by Mr. Ellis. *See* Ruling on the Parties' Motions for Summary Judgment, filed by this Court on September 30, 2004 (the "Summary Judgment Ruling"), p. 1. Dr. Gordon, also an African American, leased space from Wal-Mart to operate his optometry practice in the Vision Center. Soon after Plaintiff was hired, he received training in the Vision Center's operations. This training included how Wal-Mart wanted Plaintiff to perform "vision screenings" and "pre-testing."[1]

Wal-Mart has a progressive discipline policy, which it uses to handle employee discipline and performance issues. When necessary, Wal-Mart progressively disciplines its employees first through a verbal coaching,[2] which, if necessary, is followed by a written coaching, a "Decision-making Day"[3] and finally, termination. Plaintiff does not dispute that he received verbal coachings, a written coaching, and a Decision-making Day prior to his termination.

---

[1] A vision screening is a test for "visual acuity," *i.e.* how well a person sees without glasses. To perform vision screenings, Plaintiff and the other Vision Center employees were trained in the use of a machine called an auto refractor that tests visual acuity. *Id.* The auto refractor machine requires the patient to place his or her head on a chin rest. Thereafter, the machine automatically measures the patient's visual acuity and prints a paper receipt with the test results. Plaintiff also was trained in how to perform "pre testing." The pre-tests (which required the use of automated machines to test peripheral vision, ocular pressure and visual acuity) likewise relied on automated machines in which the patients rested their chins on a head rest, the machine conducted a measurement, and printed the test results. Opticians do not read the results, but are referred to the resident optometrist for an eye examination. The screening results are then provided to an optometrist, in this case Dr. Gordon, who interprets the test results, conducts the patient's eye exam, and, in some cases, issues a prescription for the patient to obtain eye glasses or contact lenses.

[2] A "coaching" is a combination of constructive criticism and discipline designed to correct an associates problematic behaviors or performance.

[3] The Decision-making Day is a day off, with pay, in which employees are asked to consider their commitment to Wal-Mart employment and to prepare a plan of action for correcting their employment problems.

3

Plaintiff received verbal coachings for missing department meetings, how he greets customers and his manner when he talks with them, and not wearing his lab coat. Thereafter, on July 13, 2000 Ellis issued his first written warning to Plaintiff, which noted that Wal-Mart had received "complaints from two separate customers concerning the way Marvin handled them." Plaintiff acknowledges that he received the written coaching. On November 4, 2000, Ellis issued Plaintiff a Decision-making Day. The Decision-making Day form noted, among other things, that Plaintiff had told a customer with a brain injury to "go home and bring her husband in" because the woman was "a little slow at learning." Ellis, however, spent a few minutes with the woman and answered all of her questions. The same form also noted that another customer had complained that "when she came into store, Marvin wouldn't take care of her when asked, [and] told other associate to get someone else."

On April 27, 2001 Wal-Mart customer Huong Nguyen ("Nguyen") brought in her twin children, her daughter Kimi and her son Harrison, for eye examinations by Dr. Gordon. Plaintiff conducted the pre-testing for Kimi in the presence of her mother while Dr. Gordon was nearby.

At some point during the pre-testing, Plaintiff claims that Dr. Gordon yelled at him and accused him of stapling one of the children's files incorrectly.[4] Plaintiff claims that Dr. Gordon also stated "words to the affect that he's [Dr. Gordon] tired of black people messing up," which Plaintiff considered to be an "abusive" statement. Plaintiff claims that he complained about Dr. Gordon's "abusive" statement to a group of managers in a room in the back of the Store,

---

[4] The machines used by the Vision Center to conduct pre-testing create printed records of the test results that resembles an itemized customer receipt from a grocery store. Ellis had instructed the employees about how the pre-testing "receipts" should be stapled to the patients' files prior to Dr. Gordon's review, and Ellis even posted a model in the Vision Center for reference.

4

although Plaintiff cannot identify any of the managers to whom he allegedly complained.[5]

As a result of the Nguyen complaint, Assistant Manager Edgar Morales reviewed Plaintiff's history of customer service complaints and spoke to Mr. Noll. As a result of Plaintiff's continued poor service to customers and in accordance with Wal-Mart's progressive discipline policy, Plaintiff's employment was terminated. When Plaintiff arrived at work on April 30, 2001, Plaintiff was asked to attend a meeting with Noll and Morales. At that time, Plaintiff was notified that his employment was terminated. Ruling, p. 3.

## THE SPECIFIC EVIDENCE TO BE EXCLUDED

During discovery, the Plaintiff submitted several items, including newspaper articles, noting that the Plaintiff was the first African American optician licensed in the State of Connecticut. It is likely that the Plaintiff will submit or refer to this fact or these articles in the course of the trial. Defendants object to the introduction of this category of evidence or any derivation thereof, on the grounds that it (1) lacks relevance, Fed. R. Evid. 401; (2) is of only marginal relevance which substantially outweighed by other concerns such as undue prejudice or juror confusion, Fed. R. Evid. 403.

Defendants expressly reserve the right to seek to exclude other items from evidence as preparation for trial continues.

## ARGUMENT

### ANY TESTIMONY OR REFERENCES TO PLAINTIFF'S STATUS AS THE FIRST AFRICAN AMERICAN OPTICIAN LICENSED IN THE STATE OF CONNECTICUT IS IRRELEVANT AND UNDULY PREJUDICIAL.

Plaintiff has made repeated references to his status as the first African American licensed by the State of Connecticut. In discovery, he submitted a newspaper article relating to this claim

---

[5] Plaintiff thought that one of the managers was named "Lenny," but the Store does not have any managers by that name.

(Exhibit A), and is likely to refer to this claim during trial. This claim is irrelevant to the issue that the jury must decide and serves only to create an improper and prejudicial inference that Plaintiff should be afforded special treatment or deference based on this status.

Evidence is "relevant" when it has the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. That Plaintiff was the first African American optician licensed in the State does not in any way relate to whether Plaintiff's employment was terminated was based on unlawful prejudice, in retaliation for reporting a comment by Dr. Gordon, or, as Plaintiff claims as part of his negligent misrepresentation claim, because he asked Dr. Gordon questions. In this case, whether Plaintiff was the first, third, or hundredth optician licensed by the State does nothing to show that his termination was or was not unlawful.

Even if this "evidence" made Plaintiff's claims more or less probable, the evidence also should be precluded based on its potential for prejudice. In this case, Plaintiff is expected to submit evidence and/or commentary relating to several improper grounds. These areas, enumerated above, are of no relevance to Plaintiff's claim and serve only to prejudice Defendant. In fact, the only reason to invoke this fact is to create some type of prejudicial inference unrelated to the actual facts of this case.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court issue an order granting Defendant's motion *in limine* in its entirety and precluding Plaintiff from introducing the testimony and evidence set forth herein.

DEFENDANT WAL-MART STORES, INC.,

By:_____

Mitchell L. Fishberg (ct19661)
Kristi E. Mackin (ct23394)
Brown Raysman Millstein Felder & Steiner LLP
185 Asylum Street, 10th Floor
Hartford, CT 06103
(860) 275-6400

Joel L. Finger (ct06114)
Brown Raysman Millstein Felder & Steiner LLP
900 3rd Avenue
New York, NY 10022
(212) 895-2000

7

## CERTIFICATE OF SERVICE

This is to certify that on this 2nd day of May 2005, a true copy of the foregoing

Memorandum of Law in Support of Defendant's Motion in Limine was sent via facsimile and

first-class mail, postage prepaid, to:

Loraine M. Cortese-Costa, Esq.
Pamela Coyne, Esq.
Durant, Nichols, Houston,
    Hodgson & Cortese-Costa, P.A.
1057 Broad Street
Bridgeport, CT  06804

Mitchell L. Fishberg

8

# EXHIBIT A

*12/2/90*

*NORWICH*
*BULLETIN*

SECTION

**B**

*B-1*

*FILE*
*COPY*

# For local resident, the eyes have it

■ Norwich man gets license and becomes one of the few black opticians in the state.

### By CARA MATTHEWS
*Norwich Bulletin*

**NORWICH** — While waiting for a delayed plane's arrival at a New York City airport, Marvin Key, then a chauffeur, meandered into an optical store that caught his eye.

"I walked in and kind of looked around and I said to myself, 'I could do that,'" he said.

A former electronic mechanic, Key, 46, was looking for a stable second career.

"I wanted to do something that you would always be employed no matter where you went in the world."

Key, who received his license in Norwich Thursday, said he learned through unofficial accounts he is the only black optician in the state.

"They told me that in school," he said of professors at Middlesex Community Technical College in Middletown. "There's a lack of African-Americans in the field.


Key

"There's very few role models or anybody making minorities aware that this industry is wide open to them."

Debra Tomassone, chief of licensing for the state Department of Public Health, said the agency does not record licensee's race or ethnicity. A likely assumption would be there are not many minorities who are opticians, she said.

Key, of Norwich, said he had a lot of help getting licensed.

About five years ago, when he first started looking into the field, he learned of a new program in Connecticut. Two years of study at Middlesex Community-Technical College could substitute for four years of apprenticeship under an optician.

Flexible work hours as a chauffeur for New London businessman John C. Ellis and his associates allowed Key to earn the money he needed for school and provide for his family. Key and his wife, Darlene, have four children.

When Key had some difficulty with the licensing exam and state bureaucracy, Michael Doyle of the governor's eastern office helped him navigate. In part due to Key's input, the state changed the licensing requirements to more accurately reflect what is required of an optician, Key and Doyle said.

Only 40 percent of licensing candidates for opticians passed the test last year. Key was one of them.

"Marvin's a living example of that motivation to be the best you can be," Ellis said.

000002