# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                     :

MARVIN KEY,

           Plaintiff,  :

vs.            : 3: 03 CV 144 (RNC)

WAL-MART, INC. and  :
DR. ANTHONY GORDON,

          Defendants.  :

- - - - - - - - - - - - - - - - x

Deposition of JENILU ZBORAY, taken

pursuant to the Federal Rules of Civil

Procedure, at the law offices of Brown

Raysman Millstein Felder & Steiner, LLP,

CityPlace II, 185 Asylum Street, Hartford,

Connecticut, before Michelle E. Pappas,

License #00081, a Notary Public in and for

the State of Connecticut, on Monday,

September 29, 2003, at 1:56 p.m.

SCRIBES, INC.

---

A P P E A R A N C E S

DURANT, NICHOLS, HOUSTON, HODGSON & CORTESE-COSTA, P.C.
Attorneys for the Plaintiff
1057 Broad Street
Bridgeport, Connecticut  06604-4219
  By:  PAMELA J. COYNE, ESQ.
  Tele:  (203) 366-3438
     www.durantnic.com


BROWN RAYSMAN MILLSTEIN FELDER & STEINER, LLP,
Attorneys for the Defendants
900 Third Avenue
New York, New York  10022
  By:  GREGORY B. REILLY, III, ESQ.
  Tele:  (212) 895-2326
     greilly@brownraysman.com


A L S O   P R E S E N T

DR. ANTHONY GORDON

SCRIBES, INC.

---

**Page 3**

J E N I L U   Z B O R A Y ,

called as a witness, having first been duly sworn

by Michelle E. Pappas, a Notary Public in and for

the State of Connecticut, was examined and

testified as follows:

    MR. REILLY:  It's good to get the

transcript, because then you can read it and

make sure it's accurate and if there's a

problem you can fix it, so I recommend --

    THE WITNESS:  Okay.

    MR. REILLY:  -- that you do.

    MS. COYNE:  So you want to.  Okay.

DIRECT-EXAMINATION

BY MS. COYNE:

    Q.  Jenilu, my name is Pam Coyne, I'm an attorney

with Durant, Nichols, Houston, Hodgson & Cortese-Costa

in Bridgeport.  We've been retained by Marvin Key to

represent him in a lawsuit that he has filed against

Wal-Mart and against Dr. Gordon.  The court reporter is

here to record everything that you say, everything that

everyone says, and so therefore we ask that you answer

verbally, don't nod, shake, or hm-hmm or unh-unh,

because we have to have -- we need the record that

you're going to read and sign.

    A.  Okay.

SCRIBES, INC.

---

**Page 4**

    Q.  If there's any question that I or Attorney

Reilly asks you that you don't understand or you want

to clarify it or explain it in any way, please ask and

we'd be happy to do so, otherwise we'll assume that you

understood and answered the question that was asked.

    A.  Okay.

    Q.  Are you represented by counsel?

    A.  I did call my attorney this morning, he's in

court.

    Q.  And what was the purpose of the call?  Was

it -- was it to discuss this?

    A.  Yes.  I feel like I'm being pulled from every

which direction, and I'm only going to tell the truth.

    Q.  And that's what everyone expects.  Have you

had any discussions with any attorneys?

    A.  Not prior to today.  I only talked to the

paralegal.

    Q.  What paralegal is that?

    A.  John Buhrman and Russo.  Actually, it's

really only John Buhrman, but he wasn't in the office

today, because I feel like someone needs to represent

me.  I know I work at Wal-Mart, but I just feel like I

need to be represented.  I need -- that's what I think.

I just feel like I need to have my own attorney.

    Q.  Have you ever spoken with me before today?

SCRIBES, INC.

61

```
1    statement?
2        A.   No, it's just my feelings.
3        Q.   Mr. Key, to your knowledge, did he have any
4    other performance problems?
5        A.   Might have been shorthanded on customer
6    service performances.  He would talk short and not
7    sweet, but more like sassy, kind of, like, cocky to
8    them.
9        Q.   So it's your testimony, and correct me if I'm
10   wrong, that Mr. Key was sometimes sassy and cocky to
11   the customers?
12       A.   Not all the time, but sometimes I saw that.
13       Q.   And you heard it; is that correct?
14       A.   [No verbal response.]
15       Q.   Is that correct?  You have to answer
16   verbally.
17       A.   Yes.
18       Q.   Can you give me some examples?
19       A.   I can't remember everything, but I remember
20   one day there was a patient that was kind of slow, and
21   he had told them to come back with their husband or
22   brother or somebody with their prescription.  I felt
23   that he could have helped them then.  The customer,
24   that girl then.
25       Q.   I want to make sure your testimony's clear.
```

SCRIBES, INC.

62

```
1        Is it your testimony that Mr. Key could have helped
2    this customer better and that she had some type of
3    injury or she had some type of brain injury?
4        A.   Hm-hmm.  Yes.
5             MS. COYNE:  You're putting -- objection
6        He's putting words in her mouth.
7        Q.   To your knowledge did the customer have a
8    brain injury?
9        A.   Well, she had problems, she was slow.  She --
10   she had told us that she had problems, you know.
11       Q.   Hm-hmm.  Okay.  Do you know what the problems
12   were?
13       A.   She had an injury.  It was a brain injury.
14       Q.   It was or wasn't?
15       A.   It was.
16       Q.   Okay.  And what -- and -- strike that.
17            It was your opinion that Mr. Key could have
18   treated this customer better?
19       A.   Right.
20       Q.   Okay.  And what's the basis for your opinion
21   or your belief?
22       A.   He could have taken care of her and in a
23   timely manner instead of telling her to come back with
24   someone else.  I believe that particular day Jerry went
25   in the lobby to get her, if this is the same day.
```



SCRIBES, INC.

63

```
1             MS. COYNE:  If you don't know --
2        A.   Then I don't know.
3        Q.   Can you give me any other examples of Mr. Key
4    treating customers inappropriately?
5        A.   No.
6             MS. COYNE:  Objection.
7        Q.   Did you ever witness Mr. Key telling a
8    customer that they should return to the store where
9    they purchased their glasses because the Willimantic
10   store would not service that customer?
11       A.   No.
12       Q.   Did you ever observe Mr. Key spending an
13   inordinate amount of time on the phone?
14       A.   No.
15       Q.   Did you ever observe Mr. Key spending an
16   inordinate or too much time with a patient?
17       A.   Well, I didn't notice if Marvin did.  I know
18   I certainly do, because when you fill a prescription
19   you can't do it in seven minutes.  I mean, they have
20   questions, you have to answer their questions, you have
21   to focus on the patient.  So I can't answer that
22   question.
23       Q.   So you just don't know; is that fair?
24       A.   I don't think you can do a prescription fast.
25   I don't think you can --
```

SCRIBES, INC.

64

```
1        Q.   That wasn't my question.  I understand these
2    things take time.  But did you ever observe Mr. Key
3    taking too much time, in your opinion, assisting a
4    customer?
5        A.   I didn't notice.  I don't know.
6        Q.   Now, other than what you've described as his
7    bad attitude and being cocky and sassy with customers,
8    are you aware of any other performance problem that
9    Mr. Key may have had?
10       A.   No.
11       Q.   Is it the case that periodically, like once a
12   week, there was a department meeting at the store?
13       A.   Yes.
14       Q.   Was it on a weekly basis?
15       A.   The managers meet on Mondays around nine
16   o'clock, eight o'clock, in the back with all the
17   managers, including specialty divisions, and the store
18   has a meeting usually on Friday or every day of the
19   week, but most often everybody goes to the Friday one
20   in the snack bar for the free doughnut and coffee.
21       Q.   Was there any meetings of just the Vision
22   Center associates and managers?
23       A.   Yes.
24       Q.   And how frequently did they occur?
25       A.   Jerry would have -- he would have them, I
```

SCRIBES, INC.

# Exhibit B

Key vs Wal-Mart

9/29/2003                                                        Huong Nguyen

Page 1

1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT

2

3

4       ------------------------------------X

        MARVIN KEY,                    |    3:03CV144 (RNC)

5             Plaintiff,               |

                                       |

6       VS.                            |

                                       |

7       WAL-MART, INC., and            |    ORIGINAL
        DR. ANTHONY GORDON,            |

8             Defendants.              |

        ------------------------------------X

9

10

11

12          Deposition of HUONG NGUYEN, taken before Francine
        Rossini, LSR 00206, a Stenographer and Notary Public in

13      and for the State of Connecticut, at  the law firm of
        Brown, Raysman, Millstein, Felder & Steiner, LLP,

14      CityPlace II, Hartford, Connecticut, on September 29,
        2003 at approximately 11:41 a.m.

15

16

17

18

19

20

21

22

23              Francine Rossini, LSR 00206
             Brandon-Smith Reporting Service
24                  44 Capitol Avenue
             Hartford, Connecticut 06106
25                   (860) 549-1850

5b4aca1c-f2ea-4ad4-97ca-052964837568

Key vs Wal-Mart

Page 10

1              A.   No.

2              Q.   So which Wal-Mart do your children get their

3        glasses from?

4              A.   I am sorry.  I don't understand.

5              Q.   As you know, there is different Wal-Mart

6        stores, so I was wondering at which store you get them.

7              A.   The one in Willimantic.

8              Q.   Is that the same store where Dr. Gordon was

9        working?

10             A.   Yes.

11             Q.   And when is the first time you met Dr. Gordon?

12             A.   I would say two years ago.  I don't remember.

13   I like Dr. Gordon, very nice and friendly.

14             Q.   The first time you met Dr. Gordon, would that

15       be about the same time Kimi got glasses?

16             A.   Yes.

17             Q.   Or would that have been the same time like

18       Tina got a renewal of her glasses?

19             A.   You see, Tina, I think -- you see, I don't

20       keep track of the time, so I don't remember when we

21       started.

22             Q.   Okay.  Have you gotten glasses at any other

23       Wal-Mart store?

24             A.   No.

25             Q.   So you met Dr. Gordon you think about two

5b4aca1c-f2ea-4ad4-97ca-052964837568

Key vs Wal-Mart

1    years ago?

2         A.  Yes.  Earlier like.

3         Q.  You are not sure?

4         A.  Right.  I am not sure.

5         Q.  Okay.  That is fine.  If you are not sure or

6    you don't know the answer, it is perfectly fine to say

7    "I don't know" or "I don't remember."

8              Do you understand?

9         A.  Yes, yes.

10        Q.  In any event, how about Mr. Key, the gentleman

11   down the table?  When is the first time you met him?

12        A.  Few years ago when I brought Harrison and Kimi

13   in for an eye exam.

14        Q.  Was that in 2001?

15        A.  Yes.

16        Q.  Do you know if that was in March or April of

17   2001?

18        A.  I don't remember.

19        Q.  Well, do you remember anything about that

20   first time that you met Mr. Key?

21        A.  Yes.

22        Q.  Well, if you don't mind, tell us what you

23   know.

24        A.  I remember when he brought the files out, and

25   he came up to my children and kept asking my daughter

5b4aca1c-f2ea-4ad4-97ca-052964837568

9/29/2003

Huong Nguyen

1   Q. Was anybody else around, other than Jenilu,

2 who may have heard him asking Kimi's name?

3   A. No.  I don't know.  I don't remember.

4   Q. So what happened next?

5   A. After, you know, he took Kimi in for an eye

6 testing, and I am -- I watched him, and he seemed like

7 he didn't know what he doing, and I don't remember,

8 what you know, was going on, but I do remember I didn't

9 like it and I was getting like frustrated.

10   And I interrupt Dr. Gordon and ask him that --

11 I told Dr. Gordon that I am not comfortable for Mr. Key

12 to do the testing for my children, because to me, when

13 I see what he, you know, question my kids and he didn't

14 know what he is doing at all.  I keep saying, "I don't

15 feel comfortable for him to," you know --

16   Q. By the way, do you know if he knew what he was

17 doing?

18   A. No.  Do I know?

19   Q. Yes.

20   A. At that time?  I don't think he know what he

21 doing.

22   Q. But you don't know one way or another?

23   A. No.

24   Q. Was there anything that he was doing, if you

25 can recall, that made you think he didn't understand

Key vs Wal-Mart

Page 18

1          what he was supposed to do?

2               A.  My daughter like, you know, like look at me

3          and she said like, you know, she kind -- how you say?

4          You know, like she mouthed to me that says, "He doesn't

5          know what he is doing."  She looked at me and she say

6          that, because we --

7               Q.  This is Kimi?

8               A.  Yes, this is Kimi.

9               Q.  This testing that Mr. Key was doing, was that

10         in a separate room?

11              A.  Yes, it is in a separate room.

12              Q.  Did you ever get tested in that room?

13              A.  I remember now I have tested for my eyeglasses

14         once there.

15              Q.  Did you ever get eyeglasses?

16              A.  Yes, I did.

17              Q.  Because earlier, I thought you said that --

18              A.  Right.  I remember that now.  Now I remember.

19         I am sorry.

20              Q.  That is okay.

21              A.  I didn't wear the glasses because I haven't

22         come to be comfortable with the bifocal and focal.  I

23         don't know what they call -- and you know, you look

24         down, you read, and then you look straight for fast

25         like.

5b4aca1c-f2ea-4ad4-97ca-052964837568

Key vs Wal-Mart

9/29/2003

Huong Nguyen

Page 19

1       Q.  Do you wear your glasses?

2       A.  No.

3       Q.  No?

4       A.  No.

5       Q.  That is okay.  You can see okay without them,

6  I guess.

7       A.  Right.

8       Q.  So other than with what Kimi was mouthing to

9  you, was there any other reason that you thought

10  Mr. Key may not have understood what he was supposed to

11  be doing?

12       A.  Yes.  And then when Harrison came in also, you

13  know, when Mr. Key done with Harrison and Kimi and

14  Harrison came out and said, "We shouldn't go to

15  Wal-Mart."

16       Q.  Harrison said that?

17       A.  Yes.  Because you know, Mr. Key didn't know

18  what he was doing, and he said, you know -- and Kimi

19  said what does she know about the test, and she asked

20  him the question that she have no idea.  She just be

21  there for testing.

22       Q.  Other than what Kimi said and Harrison said,

23  was there any other reason why you thought Mr. Key may

24  not understand what he was supposed to be doing?

25       A.  No.  Just his performance -- job wasn't

5b4aca1c-f2ea-4ad4-97ca-052964837568

Key vs Wal-Mart

9/29/2003                                                                     Huong Nguyen

Page 20

1      qualified for it to me when he asked the question, and

2      even my children -- when the children say that with

3      that age, then you know you got to think twice, is it

4      worth to go back here or not.

5              Q.  Now, do you know if Mr. Key worked at this

6      Vision Center before you came in?

7              A.  No.  That is the first time I met Mr. Key.

8              Q.  Do you know how many times he has done these

9      testings?

10             A.  I have no idea.

11             Q.  Did you make any comments to Mr. Key?

12             A.  No.  Because to me, is like if I have problem,

13     I go directly to the doctor.  Not to, you know --

14     either that or to go to the manager.

15             Q.  Did your children make any comments to

16     Mr. Key?

17             A.  No.

18             Q.  Were you there the whole time?

19             A.  Yes.  When the children have their eye exam, I

20     always tried standing there.

21             Q.  Other than you and your children and Mr. Key,

22     was anybody else in the testing room?

23             A.  No.

24             Q.  Could anybody else hear or see what was going

25     on in there, as far as you know?

5b4aca1c-f2ea-4ad4-97ca-052964837568

Key vs Wal-Mart

9/29/2003                                                        Huong Nguyen

Page 30

1       doing."

2               Did I read that correctly?

3       A.  Yes.

4       Q.  I am going to -- that is -- you wrote this?

5       A.  Yes.

6       Q.  By the way, did anybody tell you what to

7       write?

8       A.  No.  That is why -- I read now, it is like I

9       should have read.  It wasn't very good.

10      Q.  Well, but no one told you what to write, true?

11      A.  No, no.

12      Q.  It goes further, "First he asked me who is

13      Kimi? and who is Harrison?  (My twins are boy and

14      girl)"; is that correct?

15      A.  Yes.

16      Q.  And how many times, if you can recall, did he

17      ask which twin was which?

18      A.  Two, three times, then after that, then -- you

19      know, Kimi, he repeated again even after that.  She

20      said, you know, "My name is Kimi, yes.  I am Kimi," but

21      he keep asking like, so it was like here are both of

22      them, now he ask her again.  That is why I don't feel

23      comfortable.

24      Q.  In your opinion, could you tell that your

25      children, one was a boy and one was a girl?

Brandon Smith Reporting Service

5b4aca1c-f2ea-4ad4-97ca-052964837568

Key vs Wal-Mart

9/29/2003                                                                    Huong Nguyen

Page 31

1          A.   Right.   Also the name also, you know.

2    Harrison is, you know, to me, that is an American name.

3          Q.   Boy's name?

4          A.   Right.

5          Q.   And would you say Kimi is a girl's name?

6          A.   Right.

7          Q.   So how did you feel about him asking which one

8    was Kimi and which one was Harrison?

9          A.   Right.   I didn't feel comfortable.   My

10   children look at me like, you know, and then my

11   Harrison came and whisper by my ear and said, "He

12   didn't even know our name," you know.

13          Like, here you ask, that is why he get me

14   nervous, and you know, like is he going to know what he

15   is doing?  But I didn't say anything until he took Kimi

16   into like, you know, the testing room, then that make

17   me more worried.

18          Q.   I am going to read some more.   It says,

19   "Second, he started to examine Kimi or Kimi's eyes, but

20   he ask Dr. Gordon all the questions even before he

21   started with Kimi."

22          Did I read that correctly?

23          A.   Yes.

24          Q.   So it sounds a little different than what you

25   said earlier.

5b4aca1c-f2ea-4ad4-97ca-052964837568

# Exhibit C

# WAL*MART

## *Vision Centers Personnel*

Teri Johannesen RPM Div A
702 SW 8th Street
Bentonville, AR 72716
(479) 273-6255 PH
(479) 277-0918 FX
E-Mail: tmjohan@walmart.com

To: Whom It May Concern:

Subject: Reinstatement of Dale Ceneviva

I have recently reviewed a termination, which resulted in an open door opportunity. After investigating the issues, I have overturned the termination and would like to request this associate's reinstatement. We would like to have her start on March 06, 2004.

The associate is Dale Ceneviva from store 2897 on 2/6/04 she was terminated for walking off the job. She had no previous coaching on file. Upon detailed investigation, the decision has been made by the Regional Manager, Tina Frank and Divisional Manager, Matt Herlevic, to turn over her termination. Therefore, we should reinstate her with her original benefits, vacation and tenure, and pay her back pay from 2/6/04 to present. She will be placed in store 2896 Derby Ct.

Thank you for your immediate attention in this matter.

Teri Johannesen

D001923

# BROWN RAYSMAN

BROWN RAYSMAN MILLSTEIN FELDER & STEINER LLP

Kristi E. Mackin
860-275-6417
kmackin@brownraysman.com

June 4, 2004

Loraine M. Cortese-Costa, Esq.
Durant, Nichols, Houston,
 Hodgson & Cortese-Costa, P.A.
1057 Broad Street
Bridgeport, CT  06804

      Re:   Marvin Key v. Wal-Mart, Inc. and Dr. Anthony Gordon
          Civil Action No.:  3:03CV144(RNC)

Dear Lorraine:

      Pursuant to the Court's Order dated May 20, 2004, attached are all of the personnel file documents for Dale Ceneviva that we have been able to locate.  To the extent that additional documents are discovered, we will supplement this production in accordance with Fed. R. Civ. P. 26(e).

      Very truly yours,

      Kristi E. Mackin

Enclosure

KEM:nst

BROWN RAYSMAN MILLSTEIN FELDER & STEINER LLP CITYPLACE II 185 ASYLUM STREET HARTFORD CT 06103 T 860-275-6400 F 860-275-6410 brownraysman.com

# Exhibit D

Mart's legitimate nondiscriminatory reason for his termination, judgment can be granted in the Defendants' favor on this basis alone.

## I.    Key's Wrongful Discharge Fails As A Matter Of Law

Rather than address the points made by Defendants regarding the factual and legal deficiencies with Key's claim for wrongful termination, Key ignores the points Defendants make in the Memorandum and instead advances in his Opposition two inconsistent theories, both of which are factually and legally flawed. First, he contends Wal-Mart terminated his employment because he actively opposed Wal-Mart's Vision Screening policy.[3] Opposition, pp. 6-7; Affidavit of Marvin Key ("Key. Aff."), attached to his Opposition as Exhibit 8, ¶ 4. Second, he claims Wal-Mart terminated his employment because it "feared" he would initiate a complaint or "blow the whistle" to the Department of Health regarding Wal-Mart's policy of allowing opticians to perform Vision Screenings, which he alleges violates C.G.S. § 20-128. See Opposition, pp. 6-7. Neither theory states a cognizable claim.

### A.    Connecticut's Whistleblower Statute, C.G.S. § 31-51 et seq., Preempts Key's Public Policy Wrongful Termination Claim

Under Connecticut law, Key's only available remedy for a termination purportedly in

---

with Key's customer service, including Lorraine King, Maria Ortiz, Wilma Pelletier, Temple Dasitra, Tim Angell, and Dylan Lesnewski. See Deposition of Jerry Ellis ("Ellis Dep."), attached as Exhibit B, pp. 252-58. In addition, Key's co-workers testified Key had an "attitude problem," and was "shorthanded on customer service." See Deposition of Jenilu Zboray ("Zboray Dep."), attached hereto as Exhibit C, pp. 58, 61. Moreover, Key acknowledged in his deposition that he had received several warnings about the poor quality of his service and the need to improve. See Memorandum, pp. 6-9.

[3] Key asserts this theory even though he testified in deposition that he never (1) considered whether it was unlawful for opticians to perform Vision Screenings or suspected this practice was unlawful, (2) complained to Wal-Mart management about performing Vision Screenings, or (3) opposed performing Vision Screenings during his employment with Wal-Mart. See Deposition Testimony of Marvin Key, August 8, 2003 ("Key II"), pp. 63-64, 67-68, attached as Exhibit D. Evidently, after Wal-Mart filed its Memorandum, Key apparently realized the ridiculousness of his wrongful discharge claim in light of his testimony. Thus, in conjunction with the filing of his Opposition, Key submitted an affidavit in which he directly contradicts his earlier testimony by claiming that he did realize that C.G.S. § 20-128 prohibited opticians from performing Vision Screenings, and that he complained about this practice to his co-workers. See Key's Opposition, p. 9 (admitting Key never knew of a so-called violation but thereafter claiming he actively opposed the same alleged violation he did not know about); Ex. 8, ¶ 4.

# Exhibit E

Page 139

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF CONNECTICUT

3    ---------------------------x

                                  :

4                                 :

     MARVIN KEY,                  :

5                                 :

          Plaintiff,              :

6                                 :    Civil Action No.

     -versus-                     :    3:03 CV 144 (RNC)

7                                 :

     WAL-MART, INC. and           :

8    DR. ANTHONY GORDON,          :

                                  :

9         Defendants.             :

                                  :

10   ---------------------------x

11

12                   VOLUME II

13

14         Continued deposition of JEROME ELLIS,

15   SR., taken pursuant to the Federal Rules of Civil

16   Procedure, at the law offices of Durant, Nichols,

17   Houston, Hodgson & Cortese-Costa, P.C.,

18   1057 Broad Street, Bridgeport, Connecticut,

19   before Lea M. Palombo, LSR #00184, RPR, a Notary

20   Public in and for the State of Connecticut, on

21   Tuesday, February 10, 2004, at 10:07 a.m.

22

23

24

25

KEY v. WAL-MART                                    February 10, 2004

Page 252

1                  MS. COYNE:  Oh, wait can I back

2     up?

3                  MR. REILLY:  Of course.

4                  MS. COYNE:  I'm sorry.

5     BY MS. COYNE:

6          Q.    When you purchased this Day Planner,

7     did you request reimbursement from Wal-Mart?

8          A.    I think I had asked for it, yeah.

9          Q.    Did they pay you for it?

10         A.    No, it's mine, I own it.

11         Q.    All right.

12                 MS. COYNE:  Then I'm finished.

13    CROSS-EXAMINATION

14    BY MR. REILLY:

15         Q.    I'm just going to ask you some

16    questions from the Day Planner.  Can you turn to

17    page 1568?

18                 MS. COYNE:  This is beyond the

19    scope of direct.

20                 MR. REILLY:  What do you mean, I

21    haven't even asked the question yet?

22                 MS. COYNE:  I didn't ask anything

23    about this page.

24                 MR. REILLY:  Well, first of all,

25    we're not in trial so there's no issue of scope

KEY v. WAL-MART                              February 10, 2004

Page 253

1    on cross-examination.

2                 MS. COYNE:  I know.  I can object,

3    but it's supposed to follow the same as trial.

4        Q.    Can you turn to 1568?

5        A.    I got it.

6        Q.    Okay.  If you read that entry to

7    yourself and it goes on to -- actually, if you

8    look at 1569, start up there.

9        A.    Okay.

10       Q.    There's a reference to -- it looks like

11   a Loraine King?

12       A.    Yep.

13       Q.    Do you see that?

14       A.    Yes.

15       Q.    Was Loraine King a customer of

16   Wal-Mart?

17       A.    Yes.

18       Q.    Did Ms. King -- strike that.

19                 Can you turn to page 1545?

20                 MS. COYNE:  Again, I object.  Your

21   cross is nowhere near my direct.

22                 MR. REILLY:  Okay.  Your objection

23   is noted.

24       Q.    You see there's a reference to a Maria

25   Ortiz?

KEY v. WAL-MART                                    February 10, 2004

Page 254

1       A.    Yes.

2       Q.    Was Ms. Ortiz a customer at Wal-Mart?

3       A.    Yes.

4       Q.    I'd ask you to turn to page 941.

5             MS. COYNE:  I object again.

6       Q.    There's a reference to Mr. Pelletier

7   and a Wilma Pelletier.  Were the Pelletiers, or

8   at least Wilma Pelletier, a customer at Wal-Mart?

9       A.    Yes.

10            MS. COYNE:  This is also beyond

11  the scope of the judge's order because this was

12  already discussed at the first deposition.

13      Q.    Can you turn to 961, please?

14            MS. COYNE:  I object to the mere

15  asking everything beyond what I asked.  I asked

16  about this person, that's been answered.  That's

17  the only one that's anywhere near what I asked,

18  everything else is completely beyond my direct.

19  That is not the way a deposition is conducted,

20  it's narrowed, it's supposed to be within the

21  scope of my direct.  The first questions you

22  asked, three or four questions, were not.  This

23  one I already established who this person is.

24            MR. REILLY:  You made reference to

25  the person, I'm just going to ask whether the

KEY v. WAL-MART                                    February 10, 2004

Page 255

1   person is a customer.

2                    MS. COYNE:  I know what you're

3   going to ask.

4                    MR. REILLY:  Okay.

5                    MS. COYNE:  And I --

6                    MR. REILLY:  Your objection is

7   noted.

8                    MS. COYNE:  This is just -- it's

9   inappropriate.

10                    MR. REILLY:  Okay, your objection

11   is noted.  These are supposed to be form

12   objections, I think that was the stipulation.

13   That's what you told me in the beginning.

14                    MS. COYNE:  And have you followed

15   that?

16                    MR. REILLY:  Yeah, for the most

17   part, I think I do a pretty good job of following

18   my stipulations.

19                    MS. COYNE:  Oh, we go off the

20   record for the rest.

21       Q.   Looking at page 961, is this person

22   that's referenced, Temple Dasitra, was that a

23   customer at Wal-Mart?

24       A.   Yes.

25       Q.   Can you turn to 964, please?

KEY v. WAL-MART                                    February 10, 2004

Page 256

1              MS. COYNE:  Objection.

2              MR. REILLY:  If you want, you can

3    make a continuing objection.

4              MS. COYNE:  It is a continuing

5    objection.

6              MR. REILLY:  Okay.

7       Q.    There's a reference to a person named

8    Jean, and I can't say the name.  Who's that, Jean

9    Libernisky (phonetic)?  Was that a customer at

10   Wal-Mart?

11      A.    Yes.

12      Q.    If you could refer to page 1057.

13              MS. COYNE:  Objection.

14              Before you ask that question, I

15   need to take a two-minute break.

16              (Recess:  2:13 to 2:18 p.m.)

17   BY MR. REILLY:

18      Q.    Mr. Ellis, looking at 1057, there's a

19   reference to Tim Angell.  Do you see that?

20      A.    Yes.

21      Q.    Was Mr. Angell a customer at Wal-Mart?

22      A.    Yes.

23              MS. COYNE:  Note my continuing

24   objection.

25              MR. REILLY:  Understood.

SANDERS, GALE & RUSSELL                    (203) 624-4157

KEY v. WAL-MART                                    February 10, 2004

Page 257

1        Q.    I'd ask you to refer to page 1350,

2   going on to 1351.   On page 1350, there's a

3   reference to Kathy Shaw; do you see that?

4        A.    Yes.

5        Q.    All right.   Was Miss Shaw a customer at

6   Wal-Mart?

7        A.    Yes.

8        Q.    I ask you to refer to page 1628.   On

9   that page there's a reference to Dylan Lesnewski;

10  do you see that?

11       A.    Yes.

12       Q.    Was Dylan Lesnewski a Wal-Mart

13  customer?

14       A.    Yes.

15       Q.    I ask you to refer to page 1666,

16  there's a reference there to a Mr. -- and correct

17  me if I'm wrong, looks like Mr. Saline.   Is that

18  how you say it?

19       A.    Yes.

20       Q.    Okay.   Was Mr. Saline a customer at

21  Wal-Mart?

22       A.    Yes.

23       Q.    Okay.   Ask you to refer to page 1696.

24  On that page there appears to be a reference to

25  Mrs. Gostin or Gostin?

KEY v. WAL-MART                                   February 10, 2004

Page 258

```
1        A.    Gostin.

2        Q.    Gostin; is that correct?

3        A.    Gostin.

4        Q.    And her husband.  Are either

5   Miss Gostin and her husband Wal-Mart customers?

6        A.    Her husband.

7        Q.    I see.  And I'd ask you to refer to

8   page 1009.  Will you look at the bottom?  You

9   know, the bottom of that page there's a reference

10  to a Richard Gagnon; is that correct?

11       A.    Gagnon.

12       Q.    Gagnon.  Was Mr. Gagnon a customer at

13  Wal-Mart?

14       A.    Yes.

15       Q.    With respect to all these individuals

16  that we've just went through and were customers

17  at Wal-Mart, were these individuals that had --

18  that there were customer issues with Marvin

19  about?

20       A.    Yes.

21             MR. REILLY:  That's all I have.

22  REDIRECT EXAMINATION

23  BY MS. COYNE:

24       Q.    Okay.  Just looking at this last one,

25  Richard Gagnon, it said that you wanted to chat
```

SANDERS, GALE & RUSSELL                        (203) 624-4157